FEB 14 2023 PM4:26
FILED-USDC-CT-NEW-HAVEN

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Grand Jury N-21-2

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 3:23**26** CR **KAD**(**TOF**) |
| v. | VIOLATIONS: |
| GLENN OZTEMEL and<br>EDUARDO INNECCO | 18 U.S.C. § 371<br>(Conspiracy to Violate the Foreign Corrupt<br>Practices Act)<br>15 U.S.C. § 78dd-2(a)<br>(Foreign Corrupt Practices Act)<br>18 U.S.C. § 1956(h)<br>(Conspiracy to Commit Money Laundering)<br>18 U.S.C. § 1956(a)(2)(A)<br>(Money Laundering)<br>18 U.S.C. § 2<br>(Aiding and Abetting) |

INDICTMENT

The Grand Jury charges:

COUNT ONE
(Conspiracy to Violate the Foreign Corrupt Practices Act)

At all times relevant to this Indictment, unless otherwise specified:

1.     The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States

Code, Sections 78dd-1, *et seq.* (the "FCPA"), was enacted by Congress for the purpose of, among

other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization

or payment of money or anything of value, directly or indirectly, to a foreign official for the

purpose of obtaining or retaining business for, or directing business to, any person.

Overview of the Scheme

2.     Between in or about 2010 and continuing until in or about 2018, defendants

GLENN OZTEMEL and EDUARDO INNECCO, together and with others, agreed to pay, and did

1

pay, bribes to foreign officials at Brazil's state-owned and state-controlled oil and gas company, Petróleo Brasileiro S.A. – Petrobras ("Petrobras"), on behalf of Trading Company #1 and Trading Company #2. In exchange for the bribes, foreign officials at Petrobras, including Rodrigo Berkowitz ("Berkowitz"), who has been charged separately, provided OZTEMEL, INNECCO and others with confidential information related to Petrobras's business. The inside information and other improper assistance Berkowitz provided to OZTEMEL, INNECCO and others gave Trading Company #1 and Trading Company #2 improper business advantages in trades with Petrobras.

3.      To conceal the scheme, INNECCO used coded language in his communications with OZTEMEL to refer to bribes and bribe amounts. In addition, OZTEMEL, INNECCO and their co-conspirators used personal email accounts, fictitious names, and encrypted messaging applications to communicate in furtherance of the scheme, particularly regarding the confidential Petrobras information they received from Berkowitz.

4.      In furtherance of and to promote the corrupt bribery scheme, OZTEMEL and INNECCO, together and with others, agreed to and did cause employees of Trading Company #1 and Trading Company #2, located in the District of Connecticut, to transmit the corrupt payments from bank accounts in the United States to and through bank accounts in Switzerland and Uruguay. The payments were made pursuant to invoices sent from INNECCO to OZTEMEL and others, which sought payment for purported consulting fees and commissions.

5.      INNECCO paid a portion of the money he received from Trading Company #1 and Trading Company #2 to Berkowitz and others as bribes. The bribes were paid into a bank account in Uruguay and in cash.

The Defendants

6.      Defendant GLENN OZTEMEL was a United States citizen and resided in Westport, Connecticut. OZTEMEL was a senior oil and gas trader at Trading Company #1 and later at Trading Company #2. OZTEMEL was a "domestic concern" and an "employee" and "agent" of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a), 78dd-2(h)(1).

7.      Defendant EDUARDO INNECCO was a citizen of Brazil and Italy and resided in Brazil. INNECCO was an oil and gas broker and worked as an agent for various energy trading companies in Brazil, including Trading Company #1, Trading Company #2, and Trading Company #3. INNECCO owned and controlled several companies including Albatross Shipping Consultants Ltd. ("Albatross"), Brazilian Chemicals & Petroleum LTDA ("Brazilian Chemicals"), Morgenstern Energy Trading Ltd ("Morgenstern") and Wertech S.A. ("Wertech") (collectively, the "Innecco Companies"). INNECCO also served as a Vice President of Trading Company #3. INNECCO was an "agent" and "officer" of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a), 78dd-2(h)(1), and a "person" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-3(a), 78dd-3(f)(1).

The Trading Companies

8.      Trading Company #1, an entity, the identity of which is known to the Grand Jury, was a commodities trading company with its principal place of business in the District of Connecticut. Trading Company #1 was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

9.      Trading Company #2, an entity, the identity of which is known to the Grand Jury, was a commodities trading company with its principal place of business in the District of

3

Connecticut.  Trading Company #2 was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

10.    Trading Company #3, an entity, the identity of which is known to the Grand Jury, was a commodities trading company registered in Panama, with its principal place of business in the District of Connecticut.  Trading Company #3 was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

<u>State-Owned Entities and Foreign Officials</u>

11.    Petrobras was the Brazilian state-owned and state-controlled oil company of Brazil. Petrobras was wholly owned and controlled by the government of Brazil and performed a function that Brazil treated as its own.  Petrobras was an "instrumentality" of a foreign government, and Petrobras's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

12.    Petrobras America Inc. ("PAI") was a wholly owned subsidiary of Petrobras with its principal place of business in Houston, Texas.  PAI was controlled by the government of Brazil and performed a function that Brazil treated as its own.  PAI was an "instrumentality" of a foreign government and PAI's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

13.    Rodrigo Berkowitz was a citizen of Brazil and resided in Rio de Janeiro, Brazil and Houston, Texas.  Berkowitz worked as a trader at PAI from in or about February 2010 through in or about January 2014, and from in or about July 2017 through in or about November 2018. Berkowitz worked as a trader at Petrobras in Rio de Janeiro from in or about January 2014 through in or about July 2017.  Berkowitz was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

14.     Petrobras Official #1, whose identity is known to the Grand Jury, was a citizen of Brazil and resided in Rio de Janeiro, Brazil.   Petrobras Official #1 had responsibility for Petrobras's fuel oil desk during the relevant period and was based in Rio de Janeiro.   Petrobras Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

15.     Petrobras Official #2, whose identity is known to the Grand Jury, was a citizen of Brazil and resided in Rio de Janeiro, Brazil and Houston, Texas.   Petrobras Official #2 worked as a trader at PAI from in or about February 2014 through in or about August 2017.   Petrobras Official #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

<u>Other Relevant Entities and Individuals</u>

16.     Co-Conspirator #1, whose identity is known to the Grand Jury, was a United States citizen and resided in the District of Connecticut.   Co-Conspirator #1 was an oil and gas trader at Trading Company #1 and later, at Trading Company #2.

17.     Co-Conspirator #2, whose identity is known to the Grand Jury, was a citizen of the United States and resided in the District of Connecticut.    Co-Conspirator #2 was the owner of Trading Company #3.

18.     Co-Conspirator #3, whose identity is known to the Grand Jury, was a citizen of Brazil and resided in Rio de Janeiro, Brazil.   Co-Conspirator #3 owned and operated Uruguay Company.

19.     Uruguay Company, the identity of which is known to the Grand Jury, was a shell company formed in Uruguay by Co-Conspirator #3 for the benefit of Berkowitz.   Berkowitz used

Uruguay Company to receive and conceal bribe payments from and on behalf of Trading Company #2.

20.    Albatross Shipping Consultants LTD ("Albatross") was a company based in Liberia that was owned and controlled by INNECCO.  INNECCO used Albatross to receive, conceal and distribute bribe payments from and on behalf of Trading Company #2, for the benefit of Berkowitz, Petrobras Official #1 and others.

21.    Brazilian Chemicals & Petroleum LTDA ("Brazilian Chemicals") was a company based in Brazil that was owned and controlled by INNECCO.  INNECCO used Brazilian Chemicals to receive, conceal and distribute bribe payments from and on behalf of Trading Company #1, for the benefit of Berkowitz, Petrobras Official #1 and others.

22.    Morgenstern Energy Trading Ltd ("Morgenstern") was a company based in the British Virgin Islands that was owned and controlled by INNECCO.  INNECCO used Morgenstern to receive, conceal and distribute bribe payments from and on behalf of Trading Company #2, for the benefit of Berkowitz, Petrobras Official #1 and others.

23.    Wertech S.A. ("Wertech") was a company based in Uruguay that was owned and controlled by INNECCO.  INNECCO used Wertech to receive, conceal and distribute bribe payments from and on behalf of Trading Company #2, for the benefit of Berkowitz, Petrobras Official #1 and others.

<u>The Conspiracy</u>

24.    Beginning in or about 2010 and continuing until in or about 2018, in the District of Connecticut and elsewhere, defendants OZTEMEL and INNECCO did knowingly conspire, confederate and agree, together and with each other and with others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.      being a domestic concern and an employee and agent of a domestic concern (OZTEMEL), and an agent and officer of a domestic concern (INNECCO), to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all and a portion of such money and thing of value would be and had been offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of:

(i)      influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity;

(ii)     inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party;

(iii)    securing any improper advantage; and

(iv)     inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities,

in order to assist OZTEMEL, Trading Company #1, Trading Company #2, Trading Company #3, Co-Conspirator #1, Co-Conspirator #2 and others in obtaining and retaining business for and with, and directing business to, Trading Company #1, Trading Company #2, OZTEMEL and others, contrary to Title 15, United States Code, Sections 78dd-2(a); and

b.      while in the territory of the United States, to willfully make use of the mails and means and instrumentalities of interstate commerce and to do any act corruptly in furtherance

of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all and a portion of such money and thing of value would be offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of:

(i)      influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity;

(ii)     inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party;

(iii)    securing any improper advantage; and

(iv)     inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities,

in order to assist INNECCO and others in obtaining and retaining business for and with, and directing business to, Trading Company #1, Trading Company #2, OZTEMEL and others, contrary to Title 15, United States Code, Section 78dd-3(a).

Purpose of the Conspiracy

25.     The purpose of the conspiracy was for OZTEMEL, INNECCO and their co-conspirators to offer, promise and pay bribes to foreign officials, including Berkowitz, in order to obtain and retain business with Petrobras, for and with, and direct business to, Trading Company #1 and Trading Company #2.

Manner and Means of the Conspiracy

26.      The manner and means by which OZTEMEL, INNECCO and their co-conspirators sought to accomplish, and did accomplish, the purpose of the conspiracy included, among other ways, the following:

a.      It was part of the conspiracy that OZTEMEL and INNECCO, together with others, would and did offer to pay, promise to pay, and authorize the payment of bribes, directly and indirectly, to and for the benefit of foreign officials, including Berkowitz, in order to obtain confidential information related to Petrobras's business from Berkowitz and others, and to obtain other improper commercial advantages for and on behalf of Trading Company #1 and Trading Company #2.

b.      It was further part of the conspiracy that OZTEMEL and INNECCO, together with others, would and did use the confidential information they obtained from Berkowitz and others to gain improper commercial advantages for and on behalf of Trading Company #1 and Trading Company #2 in trades with Petrobras.

c.      It was further part of the conspiracy that OZTEMEL and INNECCO, together with others, would and did take steps to conceal their receipt and use of the confidential information they obtained from Berkowitz and others by, among other ways: (i) sharing the confidential information via personal, alias email accounts and encrypted messaging applications; (ii) using coded language to refer to other individuals involved in the scheme and using coded language to refer to bribes and bribe amounts, including terms such as "breakfast" and "breakfast servings"; and (iii) engaging in sham negotiations to give the appearance of legitimacy to trades between Petrobras and Trading Company #1, and between Petrobras and Trading Company #2.

d.      It was further part of the conspiracy that OZTEMEL and INNECCO, together with others, would and did cause Trading Company #1 and Trading Company #2 to make payments to the Innecco Companies for the purpose of paying bribes to foreign officials, including Berkowitz.

e.      It was further part of the conspiracy that OZTEMEL and INNECCO, together with others, would and did conceal the bribe payments by, among other ways, paying purported commissions to INNECCO through the Innecco Companies, and by using the Innecco Companies to pay bribes to foreign officials, including Berkowitz, in cash and into an account held in the name of Uruguay Company.

<u>Overt Acts</u>

27.      In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed and caused to be committed, in the District of Connecticut and elsewhere, at least one of the following overt acts, among others:

a.      On or about September 14, 2010, INNECCO sent an email to OZTEMEL, stating:

> GLENN, THIS IS THE E-MAIL I WAS GOING TO SEND TO [CO-CONSPIRATOR #2] WITH COPY TO YOU, JUST BEFORE YOU CALLED:
>
> Quote
>
> [Co-Conspirator #2],
>
> Met key people last evening.  Glad to inform they ready to start discussing future business with [Trading Company #1] through you, under conditions they already told us, i.e., 60cts/bbl [(cents/barrel)] for the whole group.
> . . .
> <u>SUBJECT TO GLENN'S FINAL APPROVAL</u>, pls call Rodrigo Berkowitz <u>AFTER 3:00 PM HOUSTON TIME TODAY</u>.  Tell him you are speaking on behalf of [Trading

> Company #1]. By that time he will already be expecting
> your call. . . .

b.      On or about September 14, 2010, INNECCO sent an email to OZTEMEL,

stating that, "[Trading Company #1] wud [*sic*] pay commission either to Morgenstern or Albatross.

. . . Morgenstern or Albatross would make the distribution, including to [Co-Conspirator #2]."

c.      On or about September 17, 2010, INNECCO sent an email to OZTEMEL

stating, "As mentioned, the USD 60/bbl commission would cover the whole group, including [Co-

Conspirator #2]. . . . For obvious reasons my suggestion is that this commission comes out of

[Trading Company #1] Geneva, no matter if the deal is booked by the USA company or not. That

will make things easier for you."

d.      On or about October 6, 2011, INNECCO sent an email to Co-Conspirator

#2, copying OZTEMEL, using one of his personal email accounts associated with an alias, with

the subject "Miami + Current situation," stating in part:

> The guys you met in Rdam were recently instructed from
> high above to book as much bizz as possible with us. . . . Fyg
> Mr. X organized this scheme with the support of a very
> influential man, the current "capo di tutti capi" [(boss of
> bosses)] around the block.
> . . .
> There is only one little problem: in principle max [number]
> of people [coded name for Trading Company #1] can invite
> for breakfast is 25, and that would leave some key people
> (although not top people) with no breakfast. If they [*sic*] not
> happy these people can find many ways for not letting things
> happen, even legitimate ways. . . .

e.      In or about October 2011, OZTEMEL and INNECCO attended a

conference in Miami, Florida, which was also attended by Berkowitz and Petrobras Official #1.

At the conference, INNECCO told Berkowitz that Trading Company #1 would be willing to pay

bribes of up to 25 cents per barrel on transactions directly with Trading Company #1, and that he

could arrange for bribes of up to $1 per barrel for any transactions that used Trading Company #3 to intermediate the transaction between Petrobras and Trading Company #1.

      f.      On or about November 15, 2011, INNECCO sent an email to OZTEMEL, with the subject line "Maintaining the goodwill," using the fictitious name "Spencer Kazisnaf," and an associated email addresses. In the email, INNECCO stated, "May I remind you of requested increase for 5 additional breakfast servings after first table set up, which already occurred."

      g.      On or about December 31, 2011, Trading Company #1 wired approximately $70,012.75 from the company's bank account in the United States to a bank account in Switzerland in the name of Brazilian Chemicals.

      h.      On or about July 1, 2012, INNECCO executed a "Service Provision Agreement," on behalf of his company Albatross, with Trading Company #2.

      i.      On or about November 21, 2012, OZTEMEL caused employees of Trading Company #2, located in District of Connecticut, to wire approximately $98,166.13 from the company's bank account in the United States to a bank account in Switzerland in the name of Albatross.

      j.      On or about November 29, 2012, INNECCO caused Albatross to wire approximately $25,000 from the company's bank account in Switzerland to a bank account in Uruguay in the name of Uruguay Company.

      k.      On or about August 25, 2014, INNECCO sent an email using the alias "Spencer Kazisnaf" to OZTEMEL's personal email address, stating, "Dear Glenn, [Please] note from now on my substitute, Mr. Nikita Maksimov, will be sending you the cargo reports. He signs SMaksimov. [Best Regards], Spencer Kazisnaf."

l.      On or about August 19, 2015, OZTEMEL sent an email to INNECCO stating: "Please let me know if we can conclude at between -1 and -.7. . . . This is very important to know if they will do this number . . ."

m.      On or about August 19, 2015, INNECCO responded to the email referenced in paragraph 27-l above, stating:

> Answer from RB [(Berkowitz)]:
>
> We can work basis 0.5 or 3%, but we believe we can be more competitive on 3%. . . .
>
> Again, unfortunately our bottom line will be 3% + 4.7. . . .

n.      On or about August 25, 2015, INNECCO sent OZTEMEL an email to OZTEMEL'S personal email address, stating:

> At meeting tomorrow it's very important that you [please] do not show too much knowledge [about] what [Petrobras] is doing.  [Please] avoid mentioning things such as price they sold last cargo to [a Trading Company #2 competitor]. That may let them wrongly think you did not obtain this info from the [market].  If [Petrobras] start thinking in that direction it [could] upset things in a way that, at the end of the day, will not [have] a positive result.

o.      On or about August 31, 2015, INNECCO sent OZTEMEL an email with the subject "Forget [about] it," providing OZTEMEL with the details of three offers that Petrobras had received from competitors of Trading Company #2.

p.      On August 31, 2015, INNECCO sent OZTEMEL an email stating, in part, "please do not show [Petrobras Official #2] that you [have] any knowledge that you [could] never been [*sic*] obtained from the [market]," and stating, "RB [(Berkowitz)] will be happy to help us on price guidance."

q.       On or about August 15, 2016, INNECCO caused Morgenstern to wire approximately $19,390.85 from the company's bank account in Switzerland to a bank account in Uruguay in the name of Uruguay Company.

r.       On or about August 1, 2017, INNECCO sent OZTEMEL an email to his personal email address with the subject, "Amazon Gladiator – 69kt 0.6%S cargo – Additional info," stating, "Hi Glenn, It's very important to bid in all cargoes, even if at lower price which has no chance to win."

s.       On or about May 9, 2018, OZTEMEL caused employees of Trading Company #2, located in the District of Connecticut, to wire approximately $77,996.95 from the company's bank account in the United States to a bank account in Uruguay in the name of Wertech.

t.       On or about June 12, 2018, OZTEMEL caused employees of Trading Company #2, located in the District of Connecticut, to wire approximately $107,541.17 from the company's bank account in the United States to a bank account in Uruguay in the name of Wertech.

u.       On or about July 17, 2018, INNECCO sent Berkowitz several Portuguese language messages via WhatsApp.  In one those messages, as translated to English, INNECCO told Berkowitz that he sent "5 messages to G overnight . . . ."  INNECCO then quoted his messages to "G," which included confidential pricing for several future Petrobras cargos.

v.       On or about August 10, 2018, OZTEMEL caused employees of Trading Company #2, located in the District of Connecticut, to wire approximately $39,293.01 from the company's bank account in the United States to a bank account in Uruguay in the name of Wertech.

w.       On or about September 12, 2018, INNECCO sent an email to an employee of Trading Company #2, located in the District of Connecticut, copying OZTEMEL and Co-

Conspirator #1, attaching two invoices seeking payment of a consultancy fee in the amount of $8,000 and commission in the amount of $103,570.08.

        x.      On or about November 13, 2018, OZTEMEL caused employees of Trading Company #2, located in the District of Connecticut, to wire approximately $113,515.49 from the company's bank account in the United States to a bank account in Uruguay in the name of Wertech.

All in violation of Title 18, United States Code, Section 371.

COUNTS TWO, THREE AND FOUR
(Foreign Corrupt Practices Act)

28.      Paragraphs 1 through 23 and 25 through 27 are incorporated by reference.

29.      On or about the dates set forth below, in the District of Connecticut and elsewhere, defendants OZTEMEL and INNECCO, being a domestic concern and an employee and agent of a domestic concern (OZTEMEL), and an agent and officer of a domestic concern (INNECCO), together with others known and unknown to the Grand Jury, did willfully make use of, and aid, abet and willfully cause others to make use of, the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all and a portion of such money and thing of value would be and had been offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with

a foreign government and agencies and instrumentalities thereof to affect and influence acts and

decisions of such government and agencies and instrumentalities, in order to assist OZTEMEL,

Trading Company #1, Trading Company #2, Co-Conspirator #1, Co-Conspirator #2 and others in

obtaining and retaining business for and with, and directing business to, Trading Company #1,

Trading Company #2, OZTEMEL and others, as set forth below:

| COUNT | APPROXIMATE DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|---|---|---|
| TWO | May 9, 2018 | A wire transfer of approximately $77,996.95, initiated by Trading Company #2 in the District of Connecticut, from Trading Company #2's bank account in the United States to Wertech's bank account in Uruguay. |
| THREE | June 12, 2018 | A wire transfer of approximately $107,541.17, initiated by Trading Company #2 in the District of Connecticut, from Trading Company #2's bank account in the United States to Wertech's bank account in Uruguay. |
| FOUR | September 12, 2018 | An email sent by INNECCO to an employee of Trading Company #2, located in the District of Connecticut, copying OZTEMEL and Co-Conspirator #1, attaching two invoices seeking payment of a consultancy fee in the amount of $8,000 and commission in the amount of $103,570.08. |

All in violation of Title 15, United States Code, Sections 78dd-2; and Title 18, United

States Code, Section 2.

COUNT FIVE
(Money Laundering Conspiracy)

30.      Paragraphs 1 through 23 and 25 through 27 are incorporated by reference.

31.      In or about and between 2010 and 2018, in the District of Connecticut and

elsewhere, defendants OZTEMEL and INNECCO did knowingly conspire, confederate and agree,

together with each other and with others known and unknown to the Grand Jury, to commit

offenses under Title 18, United States Code, Section 1956, namely, to transport, transmit and

transfer monetary instruments and funds from a place in the United States to a place outside the

United States, with the intent to promote the carrying on of one or more specified unlawful

activities, that is: (i) a felony violation of the FCPA, in violation of Title 15, United States Code, Sections 78dd-2(a) and 78dd-3(a); and (ii) one or more offenses against a foreign nation involving bribery of a public official, and the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of the Brazilian Penal Code, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), contrary to Title 18, United States Code, Section 1956(a)(2)(A).

Manner and Means of the Conspiracy

32.     The manner and means by which OZTEMEL, INNECCO and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other ways, the following:

a.      It was part of the conspiracy that INNECCO sent invoices to employees of Trading Company #1 and Trading Company #2, including OZTEMEL, Co-Conspirator #1 and others, located in the District of Connecticut and elsewhere, seeking payment of consultancy fees and commissions, for the purpose of promoting the offer, promise and payment of bribes to Petrobras officials, including Berkowitz.

b.      It was further part of the conspiracy that OZTEMEL caused employees of Trading Company #1 and Trading Company #2, located in the District of Connecticut and elsewhere, to initiate wire transfers from Trading Company #1's and Trading Company #2's bank accounts in the United States to bank accounts in Switzerland and Uruguay in the name of the Innecco Companies, for the purpose of promoting the offer, promise and payment of bribes to Petrobras officials, including Berkowitz.

All in violation of Title 18, United States Code, Section 1956(h).

COUNTS SIX AND SEVEN
(Money Laundering)

33.     Paragraphs 1 through 23,  25 through 27 and paragraph 32 are incorporated by reference.

34.     On or about the dates set forth below, in the District of Connecticut and elsewhere, defendants OZTEMEL and INNECCO, together with others known and unknown to the Grand Jury, did knowingly transport, transmit and transfer, and aid, abet, and cause others to transport, transmit and transfer the following monetary instruments and funds from a place in the United States to a place outside the United States, namely Switzerland and Uruguay, intending that each of the transactions, in whole and in part, promote the carrying on of a specified unlawful activity, that is: (i) a felony violation of the FCPA, in violation of Title 15, United States Code, Section 78dd-2(a) and 78dd-3(a); and (ii) one or more offenses against a foreign nation involving bribery of a public official, and the misappropriation, theft and embezzlement of public funds by and for the benefit of a public official, in violation of the Brazilian Penal Code, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), as follows:

| COUNT | APPROXIMATE DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|-------|------------------|----------------------------------------------------------------------|
| SIX | August 10, 2018 | A wire transfer in the amount of $39,323.01, initiated by Trading Company #2 in the District of Connecticut, from Trading Company #2's bank account in the United States to Wertech's account in Uruguay. |
| SEVEN | November 13, 2018 | A wire transfer in the amount of $113,515.49, initiated by Trading Company #2 in the District of Connecticut, from Trading Company #2's bank account in the United States to Wertech's bank account in Uruguay. |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

## NOTICE OF FORFEITURE ALLEGATIONS
(Forfeiture Relating to Counts One through Four)

35.     Upon conviction of the Foreign Corrupt Practices Act offenses alleged in Counts One through Four of this indictment, OZTEMEL and INNECCO shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all right, title, and interest in any and all money and any other property, real or personal, involved in such offense in violation of Title 15, United States Code, Section 78dd-2, and all property traceable to such property, including but not limited to the following:

### Money Judgment

36.     A sum of money equal to the total amount of any property, real or personal, which constitutes or is derived from proceeds involved in the offense as charged in Counts Two through Four.

37.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants, cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

All in accordance with Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Rule 32.2(a), Federal Rules of Criminal Procedure.

## NOTICE OF FORFEITURE ALLEGATIONS
(Forfeiture Relating to Counts Five through Seven)

38.     Upon conviction of the money laundering offenses alleged in Counts Five through Seven of this Indictment, OZTEMEL and INNECCO shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), all right, title, and interest in any and all money and any other property, real or personal, involved in such offense in violation of Title 18, United States Code, Section 1956(h), and all property traceable to such property, including but not limited to the following:

### Money Judgment

39.     A sum of money equal to the total amount of any property, real or personal, which constitutes or is derived from proceeds involved in the offense as charged in Counts Five through Seven.

40.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants, cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

All in accordance with Title 18, United States Code, Section 982(a)(1), and Rule 32.2(a), Federal Rules of Criminal Procedure.

A TRUE BILL

_____
FOREPERSON

UNITED STATES OF AMERICA

_____
VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

_____
MICHAEL S. McGARRY
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

_____
GLENN S. LEON
CHIEF, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
CLAYTON P. SOLOMON
TRIAL ATTORNEY, FRAUD SECTION

DEREK J. ETTINGER
JONATHAN P. ROBELL
ASSISTANT DEPUTY CHIEFS,
FRAUD SECTION