UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Grand Jury N-23-1

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 3:23CR26 (KAD) |
| v. | VIOLATIONS: |
| GLENN OZTEMEL,<br>GARY OZTEMEL, and<br>EDUARDO INNECCO | 18 U.S.C. § 371<br>(Conspiracy to Violate the Foreign Corrupt Practices Act)<br>15 U.S.C. § 78dd-2(a)<br>(Foreign Corrupt Practices Act)<br>18 U.S.C. § 1956(h)<br>(Conspiracy to Commit Money Laundering)<br>18 U.S.C. § 1956(a)(2)(A)<br>(Money Laundering – Promotion)<br>18 U.S.C. § 1956(a)(2)(B)(i)<br>(Money Laundering – Concealment)<br>18 U.S.C. § 1957<br>(Monetary Transactions Involving Criminally Derived Property)<br>18 U.S.C. § 2<br>(Aiding and Abetting) |

SUPERSEDING INDICTMENT

The Grand Jury charges:

COUNT ONE
(Conspiracy to Violate the Foreign Corrupt Practices Act)
(All Defendants)

At all times relevant, unless otherwise specified:

1.      The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States

Code, Sections 78dd-1, *et seq.* (the "FCPA"), was enacted by Congress for the purpose of, among

other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization

or payment of money or anything of value, directly or indirectly, to a foreign official for the

purpose of obtaining or retaining business for, or directing business to, any person.

1

Overview of the Scheme

2.     Between in or about 2010 and continuing until in or about 2018, defendants GLENN OZTEMEL, GARY OZTEMEL, and EDUARDO INNECCO, together and with others, agreed to pay, and did pay, bribes to foreign officials at Brazil's state-owned and state-controlled oil and gas company, Petróleo Brasileiro S.A. – Petrobras ("Petrobras"), on behalf of Trading Company #1, Trading Company #2, and Oil Trade & Transport S.A. ("OTT"), a company owned and controlled by GARY OZTEMEL.  In exchange for the bribes, foreign officials at Petrobras, including Rodrigo Berkowitz ("Berkowitz"), who has been charged separately, provided GLENN OZTEMEL, GARY OZTEMEL, INNECCO and others with confidential information related to Petrobras's business.  The inside information and other improper assistance Berkowitz provided to GLENN OZTEMEL, GARY OZTEMEL, INNECCO and others gave Trading Company #1, Trading Company #2, and OTT improper business advantages in trades with Petrobras.

3.     To conceal the scheme, INNECCO used coded language in his communications with GLENN OZTEMEL and GARY OZTEMEL to refer to bribes and bribe amounts.  In addition, GLENN OZTEMEL, GARY OZTEMEL, INNECCO and their co-conspirators used personal email accounts, fictitious names, and encrypted messaging applications to communicate in furtherance of the scheme, particularly regarding the confidential Petrobras information they received from Berkowitz.

4.     In furtherance of and to promote the corrupt bribery scheme, GLENN OZTEMEL and INNECCO, together and with others, agreed to and did cause employees of Trading Company #1 and Trading Company #2, located in the District of Connecticut, to transmit the corrupt payments from bank accounts in the United States to and through bank accounts in Switzerland

and Uruguay.  The payments were made pursuant to invoices sent from INNECCO to GLENN OZTEMEL and others, which sought payment for purported consulting fees and commissions.

5.      In addition, and in furtherance of and to promote the corrupt bribery scheme, GLENN OZTEMEL, GARY OZTEMEL, and INNECCO agreed to and did cause OTT to facilitate multiple "back-to-back" trades between OTT and Petrobras on the one hand, and OTT and Trading Company #1 or Trading Company #2 on the other.  In those back-to-back trades, OTT purchased fuel oil from Petrobras and immediately sold the fuel oil to Trading Company #1 or Trading Company #2 at a higher price.  GARY OZTEMEL thereafter caused OTT to transmit corrupt payments, funded at least in part from OTT's profits on the "back-to-back" trades between OTT and Petrobras, from bank accounts in the United States to INNECCO to and through bank accounts in Switzerland.

6.      INNECCO paid a portion of the money he received from Trading Company #1, Trading Company #2, and OTT to Berkowitz and others as bribes.  The bribes were paid into a bank account in Uruguay and in cash.

<u>The Defendants</u>

7.      Defendant GLENN OZTEMEL was a United States citizen and resided in Westport, Connecticut.  GLENN OZTEMEL was a senior oil and gas trader at Trading Company #1 and later at Trading Company #2.  GLENN OZTEMEL was a "domestic concern" and an "employee" and "agent" of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a), 78dd-2(h)(1).

8.      Defendant GARY OZTEMEL was a United States citizen and resided in Riverside, Connecticut.  GARY OZTEMEL was the owner and president of OTT.  GARY OZTEMEL was

a "domestic concern" and an "agent" and "officer" of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a), 78dd-2(h)(1).

9.      Defendant EDUARDO INNECCO was a citizen of Brazil and Italy and resided in Brazil.  INNECCO was an oil and gas broker and worked as an agent for various energy trading companies in Brazil, including Trading Company #1, Trading Company #2, and OTT.  INNECCO owned and controlled several companies including Albatross Shipping Consultants Ltd. ("Albatross"), Brazilian Chemicals & Petroleum LTDA ("Brazilian Chemicals"), Morgenstern Energy Trading Ltd ("Morgenstern") and Wertech S.A. ("Wertech") (collectively, the "Innecco Companies").  INNECCO also served as a Vice President of OTT.  INNECCO was an "agent" and "officer" of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Sections 78dd-2(a), 78dd-2(h)(1), and a "person" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-3(a), 78dd-3(f)(1).

<u>The Trading Companies</u>

10.     Trading Company #1, an entity, the identity of which is known to the Grand Jury, was a commodities trading company with its principal place of business in the District of Connecticut.  Trading Company #1 was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

11.     Trading Company #2, an entity, the identity of which is known to the Grand Jury, was a commodities trading company with its principal place of business in the District of Connecticut.  Trading Company #2 was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

12.     OTT was a commodities trading company registered in Panama, with its principal place of business in the District of Connecticut.  OTT was a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

<u>State-Owned Entities and Foreign Officials</u>

13.     Petrobras was the Brazilian state-owned and state-controlled oil company of Brazil. Petrobras was wholly owned and controlled by the government of Brazil and performed a function that Brazil treated as its own.  Petrobras was an "instrumentality" of a foreign government, and Petrobras's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

14.     Petrobras America Inc. ("PAI") was a wholly owned subsidiary of Petrobras with its principal place of business in Houston, Texas.  PAI was controlled by the government of Brazil and performed a function that Brazil treated as its own.  PAI was an "instrumentality" of a foreign government and PAI's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

15.     Rodrigo Berkowitz was a citizen of Brazil and resided in Rio de Janeiro, Brazil and Houston, Texas.  Berkowitz worked as a trader at PAI from in or about February 2010 through in or about January 2014, and from in or about July 2017 through in or about November 2018. Berkowitz worked as a trader at Petrobras in Rio de Janeiro from in or about January 2014 through in or about July 2017.  Berkowitz was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

16.     Petrobras Official #1, whose identity is known to the Grand Jury, was a citizen of Brazil and resided in Rio de Janeiro, Brazil.  Petrobras Official #1 had responsibility for Petrobras's fuel oil desk during the relevant period and was based in Rio de Janeiro.  Petrobras

Official #1 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

17.     Petrobras Official #2, whose identity is known to the Grand Jury, was a citizen of Brazil and resided in Rio de Janeiro, Brazil and Houston, Texas.  Petrobras Official #2 worked as a trader at PAI from in or about February 2014 through in or about August 2017.  Petrobras Official #2 was a "foreign official," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

<u>Other Relevant Entities and Individuals</u>

18.     Co-Conspirator #1, whose identity is known to the Grand Jury, was a United States citizen and resided in the District of Connecticut.  Co-Conspirator #1 was an oil and gas trader at Trading Company #1 and later, at Trading Company #2.

19.     Co-Conspirator #2, whose identity is known to the Grand Jury, was a citizen of Brazil and resided in Rio de Janeiro, Brazil.  Co-Conspirator #2 owned and operated Uruguay Company.

20.     Uruguay Company, the identity of which is known to the Grand Jury, was a shell company formed in Uruguay by Co-Conspirator #2 for the benefit of Berkowitz.  Berkowitz used Uruguay Company to receive and conceal bribe payments from and on behalf of Trading Company #1 and Trading Company #2.

21.     Albatross Shipping Consultants LTD ("Albatross") was a company based in Liberia that was owned and controlled by INNECCO.  INNECCO used Albatross to receive, conceal, and distribute bribe payments from and on behalf of Trading Company #2, for the benefit of Berkowitz, Petrobras Official #1 and others.

22.     Brazilian Chemicals & Petroleum LTDA ("Brazilian Chemicals") was a company based in Brazil that was owned and controlled by INNECCO.  INNECCO used Brazilian Chemicals to receive, conceal, and distribute bribe payments from and on behalf of Trading Company #1, for the benefit of Berkowitz, Petrobras Official #1 and others.

23.     Morgenstern Energy Trading Ltd ("Morgenstern") was a company based in the British Virgin Islands that was owned and controlled by INNECCO.  INNECCO used Morgenstern to receive, conceal, and distribute bribe payments from and on behalf of Trading Company #2 and OTT, for the benefit of Berkowitz, Petrobras Official #1, and others.

24.     Wertech S.A. ("Wertech") was a company based in Uruguay that was owned and controlled by INNECCO.  INNECCO used Wertech to receive, conceal, and distribute bribe payments from and on behalf of Trading Company #2, for the benefit of Berkowitz, Petrobras Official #1, and others.

25.     Petro Trade Services, Inc. ("Petro Trade") was a company based in Connecticut that was owned and controlled by GARY OZTEMEL.  GARY OZTEMEL used Petro Trade to, among other things, receive and conceal the nature of proceeds derived from the scheme.

<u>The Conspiracy</u>

26.     Beginning in or about 2010 and continuing until in or about 2018, in the District of Connecticut and elsewhere, defendants GLENN OZTEMEL, GARY OZTEMEL, and INNECCO did knowingly conspire, confederate and agree, together and with each other and with others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.      being a domestic concern (GLENN OZTEMEL and GARY OZTEMEL), an employee and agent of a domestic concern (GLENN OZTEMEL), and an agent and officer of a domestic concern (GARY OZTEMEL and INNECCO), to willfully make use of the mails and

means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all and a portion of such money and thing of value would be and had been offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of:

(i)     influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity;

(ii)    inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party;

(iii)   securing any improper advantage; and

(iv)    inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities,

in order to assist GLENN OZTEMEL, GARY OZTEMEL, Trading Company #1, Trading Company #2, OTT, Co-Conspirator #1, and others in obtaining and retaining business for and with, and directing business to, Trading Company #1, Trading Company #2, OTT, GLENN OZTEMEL, GARY OZTEMEL, and others, contrary to Title 15, United States Code, Sections 78dd-2(a); and

b.      while in the territory of the United States, to willfully make use of the mails and means and instrumentalities of interstate commerce and to do any act corruptly in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a

8

foreign political party and official thereof, and to a person while knowing that all and a portion of such money and thing of value would be offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of:

(i)     influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity;

(ii)    inducing such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party;

(iii)   securing any improper advantage; and

(iv)    inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities,

in order to assist INNECCO and others in obtaining and retaining business for and with, and directing business to, Trading Company #1, Trading Company #2, OTT, GLENN OZTEMEL, GARY OZTEMEL, and others, contrary to Title 15, United States Code, Section 78dd-3(a).

<u>Purpose of the Conspiracy</u>

27.     The purpose of the conspiracy was for GLENN OZTEMEL, GARY OZTEMEL, INNECCO, and their co-conspirators to offer, promise, and pay bribes to foreign officials, including Berkowitz, in order to obtain and retain business with Petrobras, for and with, and direct business to, Trading Company #1, Trading Company #2, and OTT.

<u>Manner and Means of the Conspiracy</u>

28.     The manner and means by which GLENN OZTEMEL, GARY OZTEMEL, INNECCO, and their co-conspirators sought to accomplish, and did accomplish, the purpose of the conspiracy included, among other ways, the following:

        a.      It was part of the conspiracy that GLENN OZTEMEL, GARY OZTEMEL, and INNECCO, together with others, would and did offer to pay, promise to pay, and authorize the payment of bribes, directly and indirectly, to and for the benefit of foreign officials, including Berkowitz, in order to obtain confidential information related to Petrobras's business from Berkowitz and others, and to obtain other improper commercial advantages for and on behalf of Trading Company #1, Trading Company #2, and OTT.

        b.      It was further part of the conspiracy that GLENN OZTEMEL, GARY OZTEMEL, and INNECCO, together with others, would and did use the confidential information they obtained from Berkowitz and others to gain improper commercial advantages for and on behalf of Trading Company #1, Trading Company #2, and OTT in trades with Petrobras.

        c.      It was further part of the conspiracy that GLENN OZTEMEL, GARY OZTEMEL, and INNECCO, together with others, would and did take steps to conceal their receipt and use of the confidential information they obtained from Berkowitz and others by, among other ways: (i) sharing the confidential information via personal, alias email accounts and encrypted messaging applications; (ii) using coded language to refer to other individuals involved in the scheme and using coded language to refer to bribes and bribe amounts, including terms such as "breakfast," "breakfast servings," and "freight deviation;" and (iii) engaging in sham negotiations to give the appearance of legitimacy to trades between Petrobras and Trading Company #1, between Petrobras and Trading Company #2, and between Petrobras and OTT.

d.      It was further part of the conspiracy that GLENN OZTEMEL, GARY OZTEMEL, and INNECCO, together with others, would and did cause Trading Company #1, Trading Company #2, and OTT to make payments to the Innecco Companies for the purpose of paying bribes to foreign officials, including Berkowitz.

e.      It was further part of the conspiracy that GLENN OZTEMEL, GARY OZTEMEL, and INNECCO, together with others, would and did conceal the bribe payments by, among other ways, causing Trading Company #1, Trading Company #2, and OTT to pay purported commissions and purported profit sharing to INNECCO through the Innecco Companies, and by using the Innecco Companies to pay bribes to foreign officials, including Berkowitz, in cash and into an account held in the name of Uruguay Company.

Overt Acts

29.      In furtherance of the conspiracy and to achieve the objects thereof, at least one of the co-conspirators committed and caused to be committed, in the District of Connecticut and elsewhere, at least one of the following overt acts, among others:

a.      On or about August 19, 2010, INNECCO sent an email to GARY OZTEMEL, stating:

> Just for the sake of good order, I would like to reconfirm to you, in [writing], what I think are the basic points of our recent discussions few days ago, in Connecticut, on this subject, and what my final understanding is:
>
> 1.   Available funds, basis OTT last transfer to Morgenstern, were just [about] the same value of outstanding brkfst;
>
> 2.   Outstanding brkfst had to be settled, in order to guarantee the continuity of bizz . . . .

       b.       On or about September 14, 2010, INNECCO sent an email to GLENN

OZTEMEL, stating:

> GLENN, THIS IS THE E-MAIL I WAS GOING TO SEND
> TO GARY, WITH COPY TO YOU, JUST BEFORE YOU
> CALLED:
>
> Quote
>
> Gary,
>
> Met key people last evening.  Glad to inform they ready to
> start discussing future business with [Trading Company #1]
> through you, under conditions they already told us, i.e.,
> 60cts/bbl [(cents/barrel)] for the whole group.
> . . .
> SUBJECT TO GLENN'S FINAL [APPROVAL], pls call
> Rodrigo Berkowitz AFTER 3:00 PM HOUSTON TIME
> TODAY.  Tell him you are speaking on behalf of [Trading
> Company #1].  By that time he will be already expecting
> your call. . . .

       c.       On or about September 14, 2010, INNECCO sent an email to GLENN

OZTEMEL, stating that, "[Trading Company #1] wud [sic] pay commission to either Morgenstern

or Albatross. . . .  Morgenstern or Albatross would make the distribution, including to Gary."

       d.       On or about September 17, 2010, INNECCO sent an email to GLENN

OZTEMEL stating, "As mentioned, the USD 60/bbl commission would cover the whole group,

including Gary.  For obvious reasons my suggestion is that this commission comes out of [Trading

Company #1] Geneva, no matter if the deal is booked by the USA company or not.  That will make

things easier for you."

       e.       On or about October 6, 2011, INNECCO sent an email to GARY

OZTEMEL, copying GLENN OZTEMEL, using one of INNECCO's personal email accounts

associated with an alias, with the subject "Miami + Current situation," stating in part:

The guys you met in Rdam were recently instructed from high above to book as much bizz as possible with us. . . . Fyg Mr. X organized this scheme with the support of a very influential man, the current "capo di tutti capi" [(boss of bosses)] around the block.

. . .

There is only one little problem: in principle max [number] of people Archie can invite for breakfast is 25, and that [would] leave some key people (although not top people) with no breakfast. If they [sic] not happy these people can find many ways for not letting things happen, even legitimate ways. . . .

f.     In or about October 2011, GLENN OZTEMEL and INNECCO attended a conference in Miami, Florida, which was also attended by Berkowitz and Petrobras Official #1. At the conference, INNECCO told Berkowitz that Trading Company #1 would be willing to pay bribes of up to 25 cents per barrel on transactions directly with Trading Company #1, and that he could arrange for bribes of up to $1 per barrel for any transactions that used OTT to intermediate the transaction between Petrobras and Trading Company #1.

g.     On or about November 15, 2011, INNECCO sent an email to GLENN OZTEMEL, with the subject line "Maintaining the goodwill," using the fictitious name "Spencer Kazisnaf," and an associated email address. In the email, INNECCO stated, "May I remind you of requested increase for 5 additional breakfast servings after first table set up, which already occurred."

h.     On or about December 31, 2011, Trading Company #1 wired approximately $70,012.75 from the company's bank account in the United States to a bank account in Switzerland in the name of Brazilian Chemicals.

i.     On or about March 26, 2012, INNECCO sent an email to GARY OZTEMEL, stating that INNECCO'S "accumulated loss up to M Lisa cargo was $115,932.18" and that GLENN OZTEMEL "told me he [would] rather not [receive] any more messages on

13

breakfast related subjects on his private e-mail."   In the email, INNECCO also stated, "$188,502.28 – [total] due to me (aside from breakfast)."

        j.      On or about April 16, 2012, INNECCO sent an email to GARY OZTEMEL with the subject line "40k mt 3% S cargo on Amazon Beauty."   In the email, INNECCO stated, "As previously discussed, if we book this deal we [should] deduct costs (including brkfst) and split profit 50/50 OTT/Morgenstern."

        k.      On or about April 26, 2012, INNECCO sent an email to GLENN OZTEMEL, copying GARY OZTEMEL, with the subject line "Meeting in Miami."   In the email, INNECCO stated, "I think we [should] meet asap, to discuss things that you do not want to discuss over the phone or by e-mail."

        l.      On or about June 20, 2012, INNECCO sent an email to GARY OZTEMEL with the subject line "Freight Deviations."   In the email, INNECCO stated:

> A B - 323,144.00 nautical miles X 1.00 = 323, 144.00
> A P - 179,680.31 nautical miles X 0.90 = 161,712.27
>                        484,856.27 ([total] both vsls)
>
> 484,856.27
> 100,000.00 -
> 100,000.00 -
> 150,000.00 -
> --------------------
> 134,856.27 (freight deviation due)

        m.      On or about July 1, 2012, INNECCO executed a "Service Provision Agreement," on behalf of his company Albatross, with Trading Company #2.

        n.      On or about September 13, 2012, INNECCO, using the alias "Spencer Kazisnaf," sent an email to GARY OZTMEL stating:

> Attached [please] find a quite complete worksheet.  It will allow us, in a quick [glance], a quite thorough panorama of what we've been doing so far. This good and bad. It is good

14

> because it will save a lot of time if we need to check this type
> of info. It is bad because anyone who sees it will also get to
> know what we've been doing in a quick glance. Needless to
> say, we must keep this worksheet out of curious eyes. That
> is why I've asked Mr. Spencer Kazinaf to send it to you ….

The email attached a spreadsheet listing details about OTT's trades with Petrobras in 2012.

o.     On or about November 13, 2012, INNECCO sent an email to GLENN OZTEMEL attaching a file named "OTT 2012 deals with [Petrobras] (Frank's last update)."

p.     On or about November 13, 2012, GLENN OZTEMEL responded to the email from INNECCO, referenced in paragraph 29-o, stating, "Spencer, u. R. A bad boy!"

q.     On or about November 21, 2012, GLENN OZTEMEL caused employees of Trading Company #2, located in District of Connecticut, to wire approximately $98,166.13 from the company's bank account in the United States to a bank account in Switzerland in the name of Albatross.

r.     On or about November 29, 2012, INNECCO caused Albatross to wire approximately $25,000 from the company's bank account in Switzerland to a bank account in Uruguay in the name of Uruguay Company.

s.     On or about August 25, 2014, INNECCO sent an email using the alias "Spencer Kazisnaf" to GLENN OZTEMEL's personal email address, stating, "Dear Glenn, [Please] note from now on my substitute, Mr. Nikita Maksimov, will be sending you the cargo reports. He signs SMaksimov. [Best Regards], Spencer Kazisnaf."

t.     On or about July 22, 2014, INNECCO and GARY OZTEMEL executed "an amendment to the agreement of the 4th day of January 2008" between OTT and Morgenstern. The agreement stated that OTT "[w]ill transfer a share of profit or loss to Morgenstern from sales to Petrobras oil."

u.      On or about July 22, 2014, INNECCO emailed GARY OZTEMEL five invoices from Morgenstern to OTT for "profit sharing" dated January 8, 2013, February 8, 2013, May 8, 2013, June 24, 2013, and July 17, 2013.

v.      On or about August 19, 2015, GLENN OZTEMEL sent an email to INNECCO stating: "Please let me know if we can conclude at between -1 and -.7. . . . This is very important to know if they will do this number . . ."

w.      On or about August 19, 2015, INNECCO responded to the email from GLENN OZTEMEL referenced in paragraph 29-v above, stating:

> Answer from RB [(Berkowitz)]:
>
> We can work basis 0.5 or 3%, but we believe we can be more competitive on 3%. . . .
>
> Again, unfortunately our bottom line will be 3% + 4.7. . . .

x.      On or about August 25, 2015, INNECCO sent an email to GLENN OZTEMEL'S personal email address, stating:

> At meeting tomorrow it's very important that you [please] do not show too much knowledge [about] what [Petrobras] is doing. [Please] avoid mentioning things such as price they sold last cargo to [a Trading Company #2 competitor]. That may let them wrongly think you did not obtain this info from the [market]. If [Petrobras] start thinking in that direction it [could] upset things in a way that, at the end of the day, will not [have] a positive result.

y.      On or about August 31, 2015, INNECCO sent GLENN OZTEMEL an email with the subject "Forget [about] it," providing GLENN OZTEMEL with the details of three offers that Petrobras had received from competitors of Trading Company #2.

z.      On August 31, 2015, INNECCO sent GLENN OZTEMEL an email stating, in part, "[please] do not show [Petrobras Official #2] that you [have] any knowledge that you

16

[could] never been [sic] obtained from the [market]," and stating, "RB [(Berkowitz)] will be happy to help us on price guidance."

      aa.    On or about August 15, 2016, INNECCO caused Morgenstern to wire approximately $19,390.85 from the company's bank account in Switzerland to a bank account in Uruguay in the name of Uruguay Company.

      bb.    On or about August 1, 2017, INNECCO sent GLENN OZTEMEL an email to his personal email address with the subject, "Amazon Gladiator – 69kt 0.6%S cargo – Additional info," stating, "Hi Glenn, <u>It's very important to bid in all cargoes, even if at lower price which has no chance to win</u>."

      cc.    On or about April 22, 2018, INNECCO sent GARY OZTEMEL an email to GARY OZTEMEL's personal email address with the subject, "Petro Trade Invoices to Wertech – Feb 1st 2017 thru Jan 31st 201[8]," stating, "To save you time and work I've prepared 18 Petro Trade invoices, based on an old invoice I've received from you more than a year ago.  All invoices correspond to the transfers Wertech made to Petro Trade from Feb 1st 2017 thru Jan 31st 2018. The only thing I ask you is to insert them [sic] invoices numbers in chronological order; stamp them; sign them; scan them; and send them to me by e-mail, as soon as you can."

      dd.    On or about May 2, 2018, GARY OZTEMEL responded to the April 22, 2018 email referenced in paragraph 29-cc above, stating "Attached are the signed and numbered invoices.  Did not see Glenn yet.  We keep rescheduling."

      ee.    On or about May 9, 2018, GLENN OZTEMEL caused employees of Trading Company #2, located in the District of Connecticut, to wire approximately $77,996.95 from the company's bank account in the United States to a bank account in Uruguay in the name of Wertech.

ff.     On or about June 12, 2018, GLENN OZTEMEL caused employees of Trading Company #2, located in the District of Connecticut, to wire approximately $107,541.17 from the company's bank account in the United States to a bank account in Uruguay in the name of Wertech.

gg.     On or about July 17, 2018, INNECCO sent Berkowitz several Portuguese language messages via WhatsApp.  In one of those messages, as translated to English, INNECCO told Berkowitz that he sent "5 messages to G overnight . . . ."  INNECCO then quoted his messages to "G," which included bids from Trading Company #2's competitors for several Petrobras cargos.

hh.     On or about August 10, 2018, GLENN OZTEMEL caused employees of Trading Company #2, located in the District of Connecticut, to wire approximately $39,293.01 from the company's bank account in the United States to a bank account in Uruguay in the name of Wertech.

ii.     On or about September 12, 2018, INNECCO sent an email to an employee of Trading Company #2, located in the District of Connecticut, copying GLENN OZTEMEL and Co-Conspirator #1, attaching two invoices seeking payment of a consultancy fee in the amount of $8,000 and commission in the amount of $103,570.08.

jj.     On or about November 13, 2018, GLENN OZTEMEL caused employees of Trading Company #2, located in the District of Connecticut, to wire approximately $113,515.49 from the company's bank account in the United States to a bank account in Uruguay in the name of Wertech.

kk.     On or about November 16, 2018, INNECCO caused Wertech to wire $10,000 from a bank account in Uruguay to a bank account in the name of Petro Trade in the United States.

ll.     On or about November 17, 2018, GARY OZTEMEL responded to an email from INNECCO on or about November 16, 2018, with the subject line "Petro Trade - Consulting Services (parcial) [*sic*] USD 10K."  In the email, GARY OZTEMEL wrote, "Funds received, send more."

mm.     On or about November 19, 2018, INNECCO caused Wertech to wire $7,681.40 from a bank account in Uruguay to a bank account for Petro Trade in the United States.

nn.     On or about November 27, 2018, INNECCO caused Wertech to wire $10,000 from a bank account in Uruguay to a bank account for Petro Trade in the United States.

All in violation of Title 18, United States Code, Section 371.

### COUNTS TWO, THREE, AND FOUR
(Foreign Corrupt Practices Act)
(GLENN OZTEMEL and EDUARDO INNECCO)

30.     Paragraphs 1 through 25 and 27 through 29 are incorporated by reference.

31.     On or about the dates set forth below, in the District of Connecticut and elsewhere, defendants GLENN OZTEMEL and INNECCO, being a domestic concern and an employee and agent of a domestic concern (GLENN OZTEMEL), and an agent and officer of a domestic concern (INNECCO), together with others known and unknown to the Grand Jury, did willfully make use of, and aid, abet and willfully cause others to make use of, the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay and authorization of the payment of any money, offer, gift, promise to give and authorization of the giving of anything of value to a foreign official, to a foreign political party and official thereof, and to a person while knowing that all and a portion of such money and thing of value would be and had been offered, given and promised to a foreign official and to a foreign political party and official thereof, for purposes of: (i) influencing acts and decisions of such foreign official, foreign political party and official thereof in his, her or its official capacity; (ii) inducing

such foreign official, foreign political party and official thereof to do and omit to do acts in violation of the lawful duty of such official and party; (iii) securing any improper advantage; and (iv) inducing such foreign official, foreign political party and official thereof to use his, her or its influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist GLENN OZTEMEL, Trading Company #1, Trading Company #2, Co-Conspirator #1, Co-Conspirator #2, and others in obtaining and retaining business for and with, and directing business to, Trading Company #1, Trading Company #2, GLENN OZTEMEL, and others, as set forth below:

| COUNT | APPROXIMATE DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|-------|------------------|----------------------------------------------------------------------|
| TWO | May 9, 2018 | A wire transfer of approximately $77,996.95, initiated by Trading Company #2 in the District of Connecticut, from Trading Company #2's bank account in the United States to Wertech's bank account in Uruguay. |
| THREE | June 12, 2018 | A wire transfer of approximately $107,541.17, initiated by Trading Company #2 in the District of Connecticut, from Trading Company #2's bank account in the United States to Wertech's bank account in Uruguay. |
| FOUR | September 12, 2018 | An email sent by INNECCO to an employee of Trading Company #2, located in the District of Connecticut, copying GLENN OZTEMEL and Co-Conspirator #1, attaching two invoices seeking payment of a consultancy fee in the amount of $8,000 and commission in the amount of $103,570.08. |

All in violation of Title 15, United States Code, Sections 78dd-2; and Title 18, United States Code, Section 2.

COUNT FIVE
(Money Laundering Conspiracy)
(All Defendants)

32.     Paragraphs 1 through 25 and 27 through 29 are incorporated by reference.

33.     In or about and between 2010 and 2018, in the District of Connecticut and elsewhere, defendants GLENN OZTEMEL, GARY OZTEMEL, and INNECCO did knowingly conspire, confederate and agree, together and with each other and with others known and unknown to the Grand Jury, to commit offenses under Title 18, United States Code, Section 1956, namely, to transport, transmit, and transfer monetary instruments and funds from a place in the United States to a place outside the United States, with the intent to promote the carrying on of one or more specified unlawful activities, that is: (i) a felony violation of the FCPA, in violation of Title 15, United States Code, Sections 78dd-2(a) and 78dd-3(a); and (ii) one or more offenses against a foreign nation involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of the Brazilian Penal Code, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), contrary to Title 18, United States Code, Section 1956(a)(2)(A).

Manner and Means of the Conspiracy

34.     The manner and means by which GLENN OZTEMEL, GARY OZTEMEL, INNECCO and their co-conspirators sought to accomplish the purpose of the conspiracy included, among other ways, the following:

        a.      It was part of the conspiracy that INNECCO sent invoices to employees of Trading Company #1 and Trading Company #2, including GLENN OZTEMEL, Co-Conspirator #1, and others, located in the District of Connecticut and elsewhere, seeking payment of

21

consultancy fees and commissions, for the purpose of promoting the offer, promise, and payment of bribes to Petrobras officials, including Berkowitz.

   b. It was further part of the conspiracy that GLENN OZTEMEL caused employees of Trading Company #1 and Trading Company #2, located in the District of Connecticut and elsewhere, to initiate wire transfers from Trading Company #1's and Trading Company #2's bank accounts in the United States to bank accounts in Switzerland and Uruguay in the name of the Innecco Companies, for the purpose of promoting the offer, promise, and payment of bribes to Petrobras officials, including Berkowitz.

   c. It was further part of the conspiracy that INNECCO sent emails and spreadsheets to GARY OZTEMEL listing payments to a purported "investment fund" for the purpose of promoting the offer, promise, and payment of bribes to Petrobras officials, including Berkowitz.

   d. It was further part of the conspiracy that INNECCO sent emails to GARY OZTEMEL attaching invoices from Morgenstern to OTT seeking purported "profit sharing" payments for the purpose of promoting the offer, promise, and payment of bribes to Petrobras officials, including Berkowitz.

   All in violation of Title 18, United States Code, Section 1956(h).

COUNTS SIX AND SEVEN
(Money Laundering – Promotion of Specified Unlawful Activity)
(GLENN OZTEMEL and EDUARDO INNECCO)

35.     Paragraphs 1 through 25,  27 through 29, and paragraph 34 are incorporated by reference.

36.     On or about the dates set forth below, in the District of Connecticut and elsewhere, defendants GLENN OZTEMEL and INNECCO, together with others known and unknown to the Grand Jury, did knowingly transport, transmit, and transfer, and aid, abet, and cause others to transport, transmit, and transfer the following monetary instruments and funds from a place in the United States to a place outside the United States, namely Switzerland and Uruguay, intending that each of the transactions, in whole and in part, promote the carrying on of a specified unlawful activity, that is: (i) a felony violation of the FCPA, in violation of Title 15, United States Code, Section 78dd-2(a) and 78dd-3(a); and (ii) one or more offenses against a foreign nation involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of the Brazilian Penal Code, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), as follows:

| COUNT | APPROXIMATE DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|---|---|---|
| SIX | August 10, 2018 | A wire transfer in the amount of $39,323.01, initiated by Trading Company #2 in the District of Connecticut, from Trading Company #2's bank account in the United States to Wertech's account in Uruguay. |
| SEVEN | November 13, 2018 | A wire transfer in the amount of $113,515.49, initiated by Trading Company #2 in the District of Connecticut, from Trading Company #2's bank account in the United States to Wertech's bank account in Uruguay. |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

<u>COUNT EIGHT</u>
(Money Laundering – Concealment)
(GARY OZTEMEL)

37.     Paragraphs 1 through 25,  27 through 29, and paragraph 34 are incorporated by reference.

38.     On or about the date set forth below, in the District of Connecticut and elsewhere, defendant GARY OZTEMEL, together with others known and unknown to the Grand Jury, did knowingly transport, transmit and transfer, and attempt to transport, transmit and transfer, monetary instruments and funds from one or more places outside the United States and to one or more places in the United States, knowing that such monetary instruments and funds involved in the transportation, transmissions and transfers represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmissions and transfers were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of one or more specified unlawful activities, to wit: (i) felony violations of the FCPA, in violation of Title 15, United States Code, Sections 78dd-2 and 78dd-3; (ii) one or more offenses against a foreign nation involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of the Brazilian Penal Code, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), as follows:

| COUNT | APPROXIMATE DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|---|---|---|
| EIGHT | November 27, 2018 | A wire transfer from Wertech's bank account in Uruguay, in the amount of $10,000.00, to Petro Trade's bank account in the District of Connecticut. |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(B)(i).

COUNT NINE
(Monetary Transactions Involving Criminally Derived Property)
(GARY OZTEMEL)

39.    Paragraphs 1 through 25, 27 through 29, and paragraph 34 are incorporated by reference.

40.    On or about the date set forth below, in the District of Connecticut and elsewhere, defendant GARY OZTEMEL, together with others known and unknown to the Grand Jury, did knowingly engage in a monetary transaction in criminally derived property of a value greater than $10,000, and which in fact was derived from a specified unlawful activity, that is: (i) a felony violation of the FCPA, in violation of Title 15, United States Code, Sections 78dd-2(a) and 78dd-3(a); and (ii) one or more offenses against a foreign nation involving bribery of a public official, and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of the Brazilian Penal Code, as defined in Title 18, United States Code, Section 1956(c)(7)(B)(iv), as follows:

| COUNT | APPROXIMATE DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE COMMERCE |
|---|---|---|
| NINE | December 11, 2018 | A wire transfer from Petro Trade's bank account, in the amount of $11,000.00, to GARY OZTEMEL's bank account, in and affecting interstate commerce. |

All in violation of Title 18, United States Code, Sections 1957.

25

## NOTICE OF FORFEITURE ALLEGATIONS
(Forfeiture Relating to Counts One through Four)

41.     Upon conviction of the Foreign Corrupt Practices Act offenses alleged in Count One (all Defendants) and Counts Two through Four (GLENN OZTEMEL and INNECCO) of this indictment, GLENN OZTEMEL, GARY OZTEMEL, and INNECCO shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all right, title, and interest in any and all money and any other property, real or personal, involved in such offense in violation of Title 15, United States Code, Section 78dd-2, and all property traceable to such property, including but not limited to the following:

### Money Judgment

42.     A sum of money equal to the total amount of any property, real or personal, which constitutes or is derived from proceeds involved in the offense as charged in Counts Two through Four.

43.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants, cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

All in accordance with Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Rule 32.2(a), Federal Rules of Criminal Procedure.

<u>NOTICE OF FORFEITURE ALLEGATIONS</u>
(Forfeiture Relating to Counts Five through Nine)

44.     Upon conviction of the money laundering offenses alleged in Count Five (all Defendants) and Counts Six through Nine (GLENN OZTEMEL and INNECCO) of this Indictment, GLENN OZTEMEL, GARY OZTEMEL, and INNECCO shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), all right, title, and interest in any and all money and any other property, real or personal, involved in such offense in violation of Title 18, United States Code, Section 1956(h), and all property traceable to such property, including but not limited to the following:

<u>Money Judgment</u>

45.     A sum of money equal to the total amount of any property, real or personal, which constitutes or is derived from proceeds involved in the offense as charged in Couns Five through Seven.

46.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants, cannot be located upon the exercise of due diligence, has been transferred, sold to, or deposited with a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

All in accordance with Title 18, United States Code, Section 982(a)(1), and Rule 32.2(a), Federal Rules of Criminal Procedure.

A TRUE BILL

_____

FOREPERSON

UNITED STATES OF AMERICA

_____
VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

_____
GLENN S. LEON
CHIEF, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
MICHAEL S. McGARRY
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

_____
ALLISON L. McGUIRE
CLAYTON P. SOLOMON
TRIAL ATTORNEYS, FRAUD SECTION

DEREK J. ETTINGER
JONATHAN P. ROBELL
ASSISTANT DEPUTY CHIEFS,
FRAUD SECTION

28