## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:23-CR-00026 (KAD) |
| | ) | |
| v. | ) | |
| | ) | |
| GLENN OZTEMEL | ) | |
| | ) | |
| | ) | JUNE 21, 2024 |

<u>**MEMORANDUM OF DECISION**</u>
**RE: DEFENDANT'S MOTION TO SUPPRESS AND FOR A *FRANKS* HEARING (ECF NO. 112)**

Kari A. Dooley, United States District Judge

Defendant Glenn Oztemel ("Defendant") was charged in Counts One through Seven of a nine-count Superseding Indictment (the "S1") returned on August 29, 2023. Specifically, Defendant is charged with conspiracy to violate the Foreign Corrupt Practices Act (FCPA) (Count One), violations of the FCPA (Counts Two, Three and Four), conspiracy to engage in international promotional money laundering (Count Five), and money laundering (Counts Six and Seven). *See* S1, ECF No 76 at 1–2, 19, 21, 23. During the investigation of this matter, federal agents sought and were granted two search warrants: one for Defendant's Yahoo account and one for his Apple iCloud account. *See* Def.'s Mem., Exhibit C (the "Yahoo Warrant"), ECF No. 114-4; Exhibit D (the "iCloud Warrant"), ECF No. 114-5. Pending before the Court is Defendant's motion to suppress all information obtained as a result of the execution of these warrants. [1] Defendant further seeks a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154 (1978), on the grounds that the Affiant for both warrants, FBI Special Agent Nathan Lundby, made material omissions that were

---

[1] Defendant's Notice of Motion at ECF No. 112 and its associated Memorandum in Support at ECF No. 114 contain multiple requests for relief, to include dismissal of the charges in the Superseding Indictment, the production of a bill of particulars, and suppression of evidence seized from certain email accounts after a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). This memorandum of decision applies only to the requests for suppression and for a *Franks* hearing.

necessary to the determination of probable cause, and that those omissions were made deliberately or in reckless disregard for the truth. As an alternate argument for suppression, Defendant contends that the Government's execution of the search was unreasonable as to both the extended time used to undertake the search of the materials seized and because the seizure exceeded the scope of the warrants. The Government argues that any omissions identified by Defendant were neither material nor made with the requisite intent to require suppression, that no hearing is therefore required, and that the execution of the warrants was reasonable in all respects under the Fourth Amendment. Alternatively, the Government relies upon the good faith exception to the exclusionary rule under *United States v. Leon*, 468 U.S. 897, 923 (1984). For the following reasons, Defendant's motion to suppress is DENIED.[2]

## LEGAL STANDARD

The Fourth Amendment of the United States Constitution prohibits "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The chief evil that prompted the framing and adoption of the Fourth Amendment was the 'indiscriminate searches and seizures' conducted by the British 'under the authority of general warrants.'" *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir.

---

[2] On June 10, 2024, codefendant Gary Oztemel filed a motion and supporting memorandum requesting, *inter alia*, suppression of evidenced seized by the Government pursuant to the search warrant issued for his Gmail Account ("the Gmail Warrant"). ECF Nos. 175, 176. Therein, Gary Oztemel argued that the affidavit in support of the Gmail Warrant relied on the same information and suffered from the same infirmities as the Yahoo and iCloud Warrants at issue here. ECF No. 176 at 4. He therefore contended that, "if the Court were to agree that the materials seized pursuant to the Yahoo[] search warrant must be suppressed and that materials obtained pursuant to the [iCloud] warrant must accordingly be suppressed under the exclusionary rule, the same conclusion would require suppression of the materials obtained through the Gmail [Warrant]." *Id.* at 4–5. Herein, the Court rejects the arguments advanced by Glenn Oztemel regarding the validity of both the Yahoo and iCloud warrants, so similarly rejects the argument advanced by Gary Oztemel. That portion of Gary Oztemel's motion seeking suppression of the Gmail Warrant on this basis is denied. The Court has extended briefing on Gary Oztemel's motion as to the other relief sought and will take up those issues as may be necessary in due course.

2013) (quoting *Payton v. New York*, 445 U.S. 573, 583 (1980)). "To prevent such general, exploratory rummaging in a person's belongings and the attendant privacy violations, the Fourth Amendment provides that a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Id.* (internal citations and quotations omitted).

"To be lawful under the Constitution, a search warrant must, *inter alia*, set forth evidence establishing probable cause to believe a crime has been committed and that evidence of that crime can be found in what is to be searched." *United States v. Weigand*, 482 F. Supp. 3d 224, 240 (S.D.N.Y. 2020). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Although the probable cause standard "does not demand 'hard certainties' . . . it does require more than a 'hunch.'" *United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023) (quoting *Gates*, 462 U.S. at 238, and *Terry v. Ohio*, 392 U.S. 1, 22, 27 (1968)). Therefore, "[i]n determining whether probable cause exists to support the issuance of a warrant, a judge must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Boles*, 914 F.3d 95, 102 (2d Cir. 2019) (cleaned up). This decision "must be grounded in sufficient facts to establish the sort of 'fair probability' on which 'reasonable and prudent men, not legal technicians, act.'" *Lauria*, 70 F.4th at 128 (quoting *Gates*, 462 U.S. at 231, 238, 241).

### *Franks* Standard

As set forth in *Franks v. Delaware*, a defendant may "challenge the veracity of a sworn statement used by police to procure a search warrant." 438 U.S. at 155. If, after a hearing, "the

allegation of perjury or reckless disregard [for the truth] is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded ..." *Id.* at 156. However, when a *Franks* motion is filed, the Court convenes a hearing on the motion only if "the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, *and* if the allegedly false statement is necessary to the finding of probable cause ..." *Id.* at 155–6 (emphasis added); *United States v. Thomas*, 788 F.3d 345, 349 n.6 (2d Cir. 2015).

Thus, if the disputed information is not material or necessary to the ultimate finding of probable cause, a *Franks* hearing is unnecessary. *United States v. Osborne*, 739 F. App'x 11, 16–17 (2d Cir. 2018) (summary order) (affirming denial of *Franks* hearing concerning wiretap and search warrant applications where erroneous information "was neither material nor necessary to an ultimate finding of probable cause"); *United States v. Aguiar*, 737 F.3d 251, 263 (2d Cir. 2013) (same; pen register and trap and trace warrant). To determine whether the disputed information is "material" a court must extract the alleged falsehoods from the application and determine whether the remaining portions of the application support a finding of probable cause. *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013). When the *Franks* challenge involves alleged omissions rather than affirmative false statements, the inquiry is "governed by the same rules." *United States v. Ferguson*, 758 F.2d 843, 848 (2d Cir. 1985). As such, a court must "determine whether, if the omitted material had been included in the affidavit, the affidavit would still establish probable cause." *Rajaratnam*, 719 F.3d at 146.

**FACTUAL BACKGROUND**

4

**The Yahoo Warrant**

The Yahoo Warrant application and its accompanying affidavit were submitted on April 28, 2020, and the warrant was obtained the same day. Def.'s Mem., Exhibit A (the "Yahoo Affidavit"), ECF No. 114-2 at 18; Yahoo Warrant at 1. The Yahoo Affidavit outlines allegations that Defendant, together with Innecco and others, "engaged in a scheme to offer and pay bribes to officials at Brazil's state-owned and state-controlled oil company, [Petrobras]," in exchange for confidential information that assisted two trading companies ("TC1" and "TC2") to win contracts with Petrobras and "buy and sell oil at favorable prices." *Id*. at ¶ 11.  In the affidavit, the Affiant summarized the Government's investigation, described the alleged conspiracy to bribe Petrobras officials, identified the conspiracy's participants, and detailed the basis for his belief that there was probable cause to believe that Defendant's Yahoo account contained evidence of wire fraud, money laundering, violations of the FCPA and the Travel Act, and conspiracies to commit same. *See* Yahoo Affidavit at ¶ 4.  To establish probable cause, the Affiant cited statements from Rodrigo Berkowitz ("Berkowitz"), a cooperating witness and former Petrobras official,[3] as well as bank records, other documents, and electronic communications obtained during the investigation. *Id*. at ¶¶ 17–20. The Affiant included the content of certain electronic communications and emails, including from Defendant's as well as Innecco's Yahoo accounts, that had been provided by TC 1 and TC2. *Id*. at ¶ 19, 21.

As to statements by Berkowitz, the Affiant included that Berkowitz had "pleaded guilty in [the Eastern District of New York] pursuant to a cooperation agreement… to conspiracy to commit money laundering," that he was "cooperating in the hopes of leniency," and that "the statements

---

[3] Berkowitz was not identified in the Yahoo Affidavit and was only referred to as "Petrobras Official." He was subsequently identified in the iCloud Warrant application, and there is no dispute that "Petrobras Official" was in fact Berkowitz.  For ease of reference, the Court uses his name.

made by [Berkowtiz] are corroborated by other evidence gathered in the investigation." *Id*. at ¶ 17, n. 3. The affidavit summarized Berkowitz's statements as follows: (1) between at least 2010 and 2018, Defendant and Innecco, on behalf of TC1 and TC2, paid bribes to Berkowitz in exchange for confidential information that allowed TC1 and TC2 to win Petrobras contracts; (2) Defendant's former company and his co-defendant Gary Oztemel also paid bribes to Berkowitz; (3) the co-conspirators used shell companies and foreign bank accounts to conceal the proceeds of the scheme and to promote the scheme; (4) Berkowitz provided Innecco with confidential information, which Innecco then shared with Defendant; (5) Berkowitz communicated with Defendant on the Yahoo Messenger platform; (6) communications with Defendant were designed to create the false appearance of legitimate contract negotiations; and (7) the bribes were paid pursuant to invoices from Innecco's companies, which were paid to Innecco and who then used the funds to pay Berkowitz and others. *Id*. at ¶ 17.

The affidavit also included the content of bank records and documents "showing payments from accounts controlled by [TC2] to bank accounts controlled by the Innecco Companies… and subsequent payments from accounts controlled by Innecco to accounts controlled by or held for the benefit of [Berkowitz]." *Id*. at ¶ 18. The Affiant also included several email communications involving the Defendant and Innecco which had been provided by TC1 and TC2.  *Id.* at ¶¶ 21–32. Some of these emails were sent or received from the Yahoo accounts for which the warrant was sought. In one such email, Innecco, using a fictious email account, provided Defendant with confidential information. *Id*. at ¶ 22. In others, Innecco provided confidential information and identified Berkowitz as the source of that information. *Id*. at ¶¶ 26–27, 29–30. In addition, investigators had also obtained non-content Yahoo records, which revealed communications

between Innecco and Defendant using their Yahoo accounts between August 30, 2010, and November 8, 2018. *Id*. at ¶¶ 10, 20.

As approved, the Yahoo Warrant authorized the Government to seize all emails or Yahoo Messenger communications associated with the Defendant's account that constituted fruits, contraband, evidence, and instrumentalities of offenses specified in the affidavit occurring between August 1, 2010, and December 31, 2018. Yahoo Warrant at ¶ II. The warrant identified specific categories of information to be seized in paragraphs II(a)–(k).

**The iCloud Warrant**

The Affiant applied for and obtained the iCloud Warrant on February 23, 2021. Def.'s Mem., Exhibit B (the "iCloud Affidavit"), ECF No. 114-3 at 34; iCloud Warrant at 1. The Affiant again described the alleged bribery scheme, the history of the investigation, Berkowitz's guilty plea and cooperation, and the Apple IDs for the accounts that investigators believed would contain evidence of the crimes under investigation, including one belonging to the Defendant. iCloud Affidavit at ¶¶ 6–12. As in the Yahoo Affidavit, the Affiant included a summary of Berkowitz' statements to law enforcement. *Id*. at ¶¶ 21–22. In addition, the iCloud Affidavit included information obtained as a result of the execution of the Yahoo Warrant, which "corroborate[d] Berkowtiz's statements regarding how the bribery scheme operated…" to include "(i) the flow of funds from the Trading Companies, through Innecco, to Petrobras officials; (ii) the Case Subjects'[4] knowledge of Berkowtiz's role in the scheme, and; (iii) how the Case Subjects communicated regarding the scheme." *Id.* at ¶ 35. The Affidavit details the content of multiple emails between Innecco, the Defendant, and others which appear to confirm the ongoing existence of the bribery scheme. *Id.* 35(a)–35(j). One such email was sent by Innecco to Defendant on October 14, 2011.

---

[4] The Case Subjects were identified as Defendant, his brother Gary Oztemel, Innecco, Robert Peck and others. iCloud Affidavit at ¶ 4.

As interpreted by the Affiant, the email was a confirmation of a bribe, the amount of the bribe on a per barrel basis, and Innecco's fee for the transaction. *Id.* at ¶¶ 35(a). Finally, the Affiant cited bank records showing the flow of funds, Apple iMessages by and between various co-conspirators, and certain screenshots provided by Berkowitz which evidence the bribery scheme. *Id.* at ¶¶ 37–45.

As approved, the iCloud Warrant allowed the Government to seize information from Defendant's iCloud account that constituted fruits, contraband, evidence, and instrumentalities of the offenses under investigation for the period October 12, 2011, through November 30, 2018. iCloud Warrant at ¶ II. The warrant detailed specific categories of information to be seized in paragraphs II(a)–(g).

**DISCUSSION**

Defendant first argues that evidence seized pursuant to the Yahoo Warrant should be suppressed because the Affiant made material omissions of information necessary to the magistrate's determination of probable cause and did so deliberately or in reckless disregard of the truth. Def.'s Mem., ECF No. 114 at 27[5]. He makes the same claim with respect to the iCloud Warrant and adds that insofar as the iCloud Affidavit relied on information obtained from the execution of the Yahoo Warrant, it is tainted by that warrant's illegality. *Id.* at 36. Further to his *Franks* claim, Defendant contends, with respect to the iCloud Warrant, that the Affiant "engaged in misleading editing" by purposely omitting an exculpatory portion of an email. *Id.* at 35–36. Finally, Defendant argues that the Government's execution of the warrants, even if lawfully obtained, was unreasonable so as to justify suppression of all evidence seized pursuant to them.

---

[5] Doc. No. 114 is the publicly available, though partially redacted, memorandum.  The sealed unredacted memorandum is at Doc. No. 115. The Court cites to Doc. No. 115 only to the extent the citation includes material redacted in Doc. No. 114.

*Id.* at 37–40. In opposition the Government argues that neither warrant omitted material information, that even if all the information identified by Defendant had been disclosed it would not have affected the probable cause determinations, and that it acted reasonably and in good faith in executing the warrants. Gov. Opp'n at 35–36.

**Probable Cause**

To necessitate a hearing under *Franks*, Defendant must first make a substantial preliminary showing that the omissions he has identified were "intentional and material." *Rajaratnam*, 719 F.3d at 146 (quoting *United States v. Awadallah,* 349 F.3d 42, 64 (2d Cir.2003)). Defendant must show that the omissions were "designed to mislead" or were made "in reckless disregard of whether they would mislead," *Id.* at 154, and that the affidavit would not have established probable cause if the omissions had been included. *Id*. at 146. Defendant fails to meet this standard for either warrant. Because the omissions were not material to the finding of probable cause, the Court need not reach the issue of whether the omissions were intended to mislead or were made in reckless disregard of the truth.[6]

*Yahoo Affidavit*

With respect to the Yahoo Affidavit, Defendant identifies six intentional or reckless omissions that he claims would have been material to the Magistrate Judge's finding of probable cause. Def.'s Mem., ECF No. 115 at 28–30. Three of those omissions relate to information which would have undermined the credibility or reliability of Berkowitz's statements to law enforcement. These include that he had previously lied to Brazilian law enforcement, he had deleted documents

---

[6] That said, in this case, the inference of recklessness and the materiality of the omissions are two sides of the same coin. Defendant asks this court to infer recklessness because "the omitted information was 'clearly critical' to the probable cause determination." Def.'s Mem., ECF No. 114 at 35 (quoting *United States v. Disla Ramos*, No. 22 Crim. 431, 2022 WL 17830637, at *8 (S.D.N.Y. Dec. 21, 2022)). The Court disagrees, as discussed below on the issue of materiality. As the Court concludes that the omitted information was not "clearly critical" to the Magistrate Judge's probable cause analysis, there is no basis upon which to infer recklessness on the part of the affiant. *See, Rajaratnam*, 719 F.3d at 155.

when he learned that he was the subject of a bribery investigation, and he and his family received certain benefits from the Government as a result of his cooperation. *Id.* at 28–29.  In addition, Defendant relies on the omission of Berkowitz's 2019 purported statement that he "had only discussed [bribe] payments with Innecco," the fact that Innecco's companies received funds from sources other than those controlled by Defendant, and that Defendant's brother, Gary Oztemel, stated to the FBI that Defendant was "squeaky clean." *Id*. at 29–30.

On the issue of materiality, the inclusion of omitted impeachment material does not necessarily undermine a finding of probable cause. The Second Circuit counsels that "the reliability or veracity of the informant and the basis for the informant's knowledge are but two of several relevant considerations when determining the existence of probable cause." *United States v. Gagnon*, 373 F.3d 230, 235–236 (2d Cir. 2004) (internal quotations omitted, cleaned up). Deficiencies in either veracity, reliability, or basis of knowledge "may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id*. at 236.

Berkowitz's statements described in broad strokes the structure of the bribery scheme. He described a scheme whereby Defendant, on behalf of TC1 and TC2, paid bribes to Berkowitz via Innecco's companies, in exchange for confidential Petrobras information, enabling the TCs to "win contracts from Petrobras on advantageous terms." Yahoo Affidavit at ¶ 17(b). Berkowitz indicated that he would share the confidential information with Innecco, who would then relay it to Defendant. *Id*. at ¶ 17(d).

The application included that Berkowitz was a cooperating witness who had pled guilty to a money laundering conspiracy and who hoped for leniency. The Magistrate Judge was undoubtedly aware of the enhanced scrutiny and great caution with which cooperator testimony is

considered. The failure to disclose additional benefits he and his family received and his early efforts to avoid detection or thwart the investigation does not support the conclusion that his statements would have been disregarded in the probable cause analysis had they been disclosed. And it is hardly remarkable that Defendant's brother would have offered an exculpatory opinion about Defendant during the investigation. *See e.g., Cartier v. Lussier*, 955 F.2d 841, 846 (2d Cir. 1992) (affidavits from interested parties, such as family members, may properly be judged as less credible than other sources.). In addition, Berkowitz's statement, that he spoke with Innecco about bribes is the subject of competing inferences as to whether it is exculpatory at all;[7] and the information that Innecco may have had sources of income other than TC1 and TC2 adds little, if anything to the "totality of the circumstances" assessment of probable cause. *Gates,* 788 F.3d at 350.

More significant perhaps is the extent and degree to which Berkowitz's statements about the existence of the bribery scheme and Defendant's role in it were independently corroborated throughout the remainder of the affidavit.

Corroborating material consisted of bank records showing "payments from accounts controlled by [TC2] to bank accounts controlled by the Innecco Companies… and subsequent payments from accounts controlled by Innecco to accounts controlled or held for the benefit of [Berkowitz]" as well as email communications involving Innecco, Defendant, and others provided by TC1 and TC2. Yahoo Affidavit at ¶¶ 18, 21. The

---

[7] Berkowitz's 2019 statement that the "discussions about commission I had with Innecco," does not necessarily, as the Defendant argues, give rise to the inference that he *only* discussed payments with Innecco. Def.'s Mem., ECF No. 115 at 29. And even if Berkowitz only discussed bribes directly with Innecco, the Yahoo Affidavit still provides enough information to establish probable cause that Defendant facilitated payments via Innecco in exchange for confidential information from Berkowitz. The Affidavit was based in part on statements from Berkowitz indicating that the bribe payments flowed "through Innecco" and that he shared the confidential information with Innecco, "who in turn shared the information with Oztemel." Yahoo Affidavit at ¶¶ 17(c)–(d). That precise flow of payments and information is corroborated in the Affidavit by bank records, *Id.* at ¶ 18, and emails in which Innecco and Defendant discuss receiving confidential information from Berkowtiz. *Id.* at ¶¶ 25–27, 29–31.

Affidavit reveals that those emails contained multiple disclosures of confidential information regarding Petrobras bids, contract negotiations, export volumes, and pricing and delivery information, which the Affiant knew, based on his training and experience, is generally "not available to the public." *Id.* at ¶¶ 22–32.[8] The emails, some of which were between Defendant and Innecco, also identified Berkowitz as the source of this confidential information. *Id.* at ¶¶ 25–27, 29–31.[9] This additional information serves to corroborate Berkowtiz's account and provides the "indicia of reliability" the issuing magistrate may use when assessing an informant's credibility as part of a probable cause analysis. More than that however, it outweighs any impact that the omitted material might have had not just on Berkowitz's credibility, but on the existence of probable cause.

Defendant has thus failed to show that any alleged omissions in the Yahoo Warrant were material to the finding of probable cause. There is therefore no need for the Court to convene a *Franks* hearing, and the motion to suppress evidence seized pursuant to the Yahoo Warrant for lack of probable cause is denied.

*iCloud Affidavit*

---

[8] Defendant also argues that any probable cause that could be established by these emails was "stale" at the time the warrant was sought. Def.'s Mem., ECF No. 114 at 33–34. The Court disagrees. There is "no bright-line rule for staleness," and it must be evaluated "on the basis of the facts of each case." *United States v. Raymonda*, 780 F.3d 105, 114 (2d Cir. 2015) (internal citations omitted). "Facts of past criminal activity that by themselves are too stale can be sufficient if the affidavit also establishes a pattern of continuing criminal activity so there is reason to believe that the cited activity was probably not a one-time occurrence." *United States v. Wagner*, 989 F.2d 69, 75 (2d Cir. 1993). Here, the facts allege a criminal conspiracy that continued over the course of eight years, thus negating somewhat the two-year delay between the end of the conspiracy and the warrant. Staleness is also less likely when the information sought is electronic data which is "not temporary in nature or likely to dissipate over the intervening time." *United States v. Watson*, No. 23-CR-82(EK), 2023 WL 7300618, at *7 (E.D.N.Y. Nov. 6, 2023) (internal citation omitted). Indeed, staleness is "rarely relevant" when the object sought is a computer file. *United States v. Seiver*, 692 F.3d 774, 777 (7th Cir. 2012).

[9] In a footnote, the Affiant detailed that in the referenced communications, "Innecco and Glenn Oztemel described a Petrobras employee by his first name or initials only. Based on my training and experience, as well as documents I have reviewed in connection with this investigation, I believe that the individual referred to is Petrobras Official." Yahoo Affidavit at ¶ 25, n. 7. In the communications, Defendant and Innecco explicitly reference receiving confidential information from the cooperating "Petrobras Official," who has been subsequently identified as Berkowitz. *See id.* at ¶ 26 ("Vitol offered 3% +$1.00bbll DES Statia which [Petrobras Official] thinks currently unbeatable."); ¶ 27 ("Answer from [Petrobras Official]: We can work basis 0.5 or 3%, but we believe we can be more competitive on 3%..."); ¶ 31 ("You may not know, but depending on what you say [Petrobras Official] cud be completely exposed, even by a small detail in your wording.").

Defendant argues that the evidence received from the iCloud account should be suppressed because it "made the same material omissions and conclusory statements as the Yahoo Affidavit;" relied in part on the Affiant's "misleading editing" of an email exchange between Innecco and Defendant, and "relied heavily on emails returned by the Yahoo Search Warrant," which were themselves tainted by the illegality of the Yahoo warrant. Def.'s Mem., ECF No. 114 at 35–37. Because the Court has already rejected claims regarding the validity of the Yahoo Warrant, it need only address the alleged misleading edit.

In the iCloud Affidavit, the Affiant included descriptions of several emails obtained via the Yahoo Warrant as corroboration of Berkowitz's statements detailing how the bribery scheme operated. iCloud Affidavit at ¶ 35. One of those was an email sent by Innecco to Defendant on October 14, 2011. The subject line was "The bottom line to the Question (my last e-mail yesterday)," and the body of the email stated, "I hve to pay min 25 free of any taxes (I cannot deduct any tax if the payment I hv to make)…. So, the best solution is to pay 30 to Morgen. I can pay 25 and keep 5 for myself, which OK with me." The Affiant averred, based on his training and experience, that "the number '30'… represents the per-barrel commission Innecco was seeking from [TC2] (to be paid to one of the Innecco Companies, Morgenstern Energy Trading Ltd.), the number '25' represents per-barrel bribe payments to Petrobras officials, and the number '5' represents the amount per barrel to be taken by Innecco as a fee." *Id.* at ¶ 35(a).

The Defendant challenges the Government's decision to omit his response to that email, which was sent five months later on March 26, 2012. Therein, Defendant wrote "going thru old emails. I have no clue what you were talking about Eduardo here but maybe you want to give me a call to discuss. very odd," to which Innecco replied, "sorry this email was sent to you by mistake… pls disregard." Def.'s Mem., ECF No. 115 at 36. Defendant argues that this exchange

is evidence that Defendant was ignorant of the bribery scheme, and that Innecco in fact concealed the scheme from Defendant. Thus, he posits, failing to include the exculpatory portion of the email was "undoubtedly reckless—especially given the Affiant's awareness that Rodrigo Berkowitz had already tampered with email evidence." *Id*. The Government responds that Berkowitz's prior deletion of electronic information is irrelevant because investigators did not obtain the email in question from Berkowitz and as such, he is not alleged to have had any involvement in its creation or maintenance. The Government further opines that the "more persuasive" reading of the email is as an attempt by Defendant to distance himself from any written communications regarding the bribery scheme, evincing his consciousness of guilt. Gov. Opp'n at 43.

First, the court agrees with the Government that Berkowitz's prior deletion of electronic evidence has no bearing on the validity of the warrant or the purported recklessness of the Government's decision to omit Defendant's response to the October 14, 2011, email. The email was obtained directly from Yahoo pursuant to the Yahoo Warrant so there would be no reason to question the accuracy of its content. And the Court further agrees that the Government's reading of the response as an attempt to avoid written documentation of the bribery scheme is at least as persuasive as Defendant's argument that it is exculpatory, particularly when read in conjunction with the other information presented in the iCloud Affidavit. *See Boles*, 914 F.3d at 102 ("a judge must make a practical, common-sense decision whether, *given all the circumstances set forth in the affidavit before him*,… there is a fair probability that contraband or evidence of a crime will be found in a particular place." (emphasis added, cleaned up)). For example, the iCloud Affidavit includes another email communication between Defendant and Innecco in which Defendant writes, on January 14, 2015, "we can talk in the morning. U write too much…". This was in response to an email from Innecco discussing business lessons he had learned about being an

"intermediary" and how to ensure you're being fair with your "collaborators," and in which he referenced "breakfast" in the subject line, a coded term known to the Affiant as referring to bribe payments. *Id*. at ¶ 35(b).

Whether it might have been a better practice to include the entire e-mail exchange and therefore the various inferences that might be drawn from it, the Court need not decide. Neither the inclusion of the edited email nor the omission of Defendant's response would require a *Franks* hearing. Even with the entire email exchange included, there was ample probable cause to search the iCloud account. Defendant's motion to suppress the evidence obtained pursuant to the iCloud Warrant for lack of probable cause is denied.

**Warrant Execution**

Finally, Defendant argues that all evidence seized pursuant to the Yahoo and iCloud warrants should be suppressed because the Government's search exceeded the scope of the warrants and was otherwise unreasonable. Def.'s Mem., ECF No. 114 at 37. He contends that the Government failed to run sufficiently targeted searches on the seized material, as required, and that this failure constituted "flagrant disregard" of the warrants' scope restrictions, resulting in the retention of non-responsive documents to such an extent that the execution constituted a general search of Defendant's accounts. *Id.* at 38–39. The Government counters that each warrant authorized a two-step process by which Yahoo and Apple were ordered to turn over the entirety of Defendant's accounts and that subsequent to this production investigators *did* use targeted searches on the Yahoo account, while the non-searchable nature of the iCloud account required a document-by-document review. Gov. Opp'n at 54. After these searches and reviews, documents and records deemed non-responsive were segregated from the case team. *Id*. The Government argues that these

procedures, even though a lengthy undertaking, were reasonable under the Fourth Amendment. The Court agrees with the Government.

In *United States v. Grubbs*, the Supreme Court held that "[n]othing in the language of the Constitution or in this Court's decisions interpreting that language suggests that, in addition to the [requirements set forth in the text], search warrants also must include a specification of the precise manner in which they are to be executed." 547 U.S. 90, 98 (2006). As such, "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search warrant." *United States v. Csanadi*, No. 3:11CR239 JBA, 2012 WL 3779166, at *3 (D. Conn. Aug. 31, 2012) (internal citations omitted). Even though a warrant need not set out specific execution procedures, "the touchstone of the Fourth Amendment is reasonableness," and "the reasonableness of government conduct in executing a valid warrant, can present Fourth Amendment issues." *United States v. Ganias*, 824 F.3d 199, 209–10 (2d Cir. 2016). Therefore, "[t]he manner in which a warrant is executed is subject to later judicial review as to its reasonableness." *Id*. at 209, n. 22 (quoting *Dalia v. United States*, 441 U.S. 238, 258 (1979)).

 "[W]hen items outside the scope of a valid warrant are seized, the normal remedy is suppression and return of those items, not invalidation of the entire search." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) (internal citation omitted). However, "the drastic remedy of the suppression of *all* evidence seized" is justified when "those executing the warrant acted in flagrant disregard of the warrant's terms." *Id.* (internal citations omitted). Investigators flagrantly disregard the terms of a warrant only when "(1) they effect a widespread seizure of items that were not within the scope of the warrant, and (2) do not act in good faith." *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000) (internal citations omitted).

In the context of electronically stored information, courts have followed the Supreme Court's directive in *Andresen v. Maryland* regarding the scope of searches for paper records. There, the Court held, "[i]n searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Andresen v. Maryland,* 427 U.S. 463 (1976); *United States v. Graziano*, 558 F. Supp. 2d 304, 317 (E.D.N.Y. 2008); *see also United States v. Scarfo*, 180 F. Supp. 2d 572, 578 (D.N.J. 2001) ("Where proof of wrongdoing depends upon documents or computer passphrases whose precise nature cannot be known in advance, law enforcement officers must be afforded the leeway to wade through a potential morass of information in the target location to find the particular evidence which is properly specified in the warrant.").

The practical difficulties that law enforcement face when examining electronic materials has led courts to "routinely [uphold] the seizure or copying of hard drives and other storage devices in order to effectuate a proper search for the categories of documents or files listed in a warrant." *In the Matter of a Warrant for All Content & Other Info. Associated with the Email Acct. xxxxxxx gmail.com Maintained at Premises Controlled By Google, Inc.* ("*In re Google Account*"), 33 F. Supp. 3d 386, 392 (S.D.N.Y. 2014), *as amended* (Aug. 7, 2014) (citing *United States v. Schesso,* 730 F.3d 1040, 1046 (9th Cir.2013), *United States v. Evers,* 669 F.3d 645, 652 (6th Cir.2012)). Similarly, when investigators seek digital information stored in an email account, "[c]ourts in this Circuit, [] have uniformly held that law enforcement need not rely upon an email host company or any other private party to sift through emails to determine what is relevant and that it may obtain a warrant to request all emails from an account." *United States v. Ray*, 541 F. Supp. 3d 355, 399 (S.D.N.Y. 2021) (collecting cases). "[T]here is no "constitutionally significant difference between the searches of hard drives [which of necessity must be conducted offsite] ...

17

and searches of email accounts." *Id.* It is understood that such a seizure and the necessity of an off-site search, may result in the government receiving vast amounts of information "much of which may be entirely irrelevant to the criminal investigation that led to the seizure." *Ganias*, 824 F.3d at 217.

Once the government is in possession of such a trove of electronic information, "the Fourth Amendment requires the government to complete its review, *i.e.,* execute the warrant, within a "reasonable" period of time." *United States v. Metter*, 860 F. Supp. 2d 205, 215 (E.D.N.Y. 2012). Law enforcement may not "seize and image electronic data and then retain that data with no plans whatsoever to *begin* review of that data to determine whether any irrelevant, personal information was improperly seized," but there is "no established upper limit as to when the government must review seized electronic data to determine whether the evidence seized falls within the scope of a warrant." *Id.* When assessing what is a reasonable period of time, courts have recognized that "the Government has a need to retain materials as an investigation unfolds for the purpose of retrieving material that is authorized by the warrant," as law enforcement may need to adjust their search based on information uncovered as the investigation proceeds. *In re Google Account*, 33 F. Supp. 3d at 398 (citing United *States v. Lustyik,* 2014 WL 1494019, at *5 (D.Utah April 16, 2014)).

The Government did obtain the entire contents of Defendant's Yahoo and iCloud accounts. However, this broad production was specifically authorized by each warrant. Yahoo Warrant at ¶ I; iCloud Warrant at ¶ I. And courts in this circuit have determined that such productions are reasonable within the scope of the Fourth Amendment. *See Ray*, 541 F. Supp. 3d at 399 (collecting cases). The mere fact that the Government came into possession of thousands of irrelevant records when Yahoo and Apple produced the contents of Defendant's accounts does not establish unreasonableness, let alone that the Government flagrantly disregarded the terms of the warrants.

Once in receipt of Defendant's data, the Government bore the responsibility of conducting a "responsiveness review," "to determine whether the evidence that the government seized ... fell within the scope of the categories of information sought in the search warrants." *United States v. Nejad*, 436 F. Supp. 3d 707, 734 (S.D.N.Y. 2020) (quoting *Metter*, 860 F. Supp. 2d at 214–15).[10] The Government procedure for review of the Yahoo material included using a "filter team", a "group of attorneys and paralegals separate from the case team" to segregate privileged communications, and then conducting a series of progressively more refined searches designed to identify responsive documents. Gov. Opp'n at 8–9. Yahoo produced material in response to the Yahoo Warrant on June 11, 2020, and the Government's review ran until March 2, 2023, or approximately two years and eight months. *Id*. Of the approximately 112,000 records produced in response to the Yahoo Warrant, the Government found 64,458 of them responsive to its list of 257 targeted search terms. *Id.* at 9. For the iCloud material, the Government similarly employed a filter team, and after determining that it contained only non-searchable files, conducted a manual review to identify pertinent records. *Id.* at 11–12. All other records were segregated from the case team. The review process for the iCloud account ran from April 26, 2021, to February 23, 2023, or approximately one year and nine months. *Id*. Out of 7,168 records produced by Apple, the Government determined 32 to be pertinent to the iCloud Warrant. *Id*. at 12.

Defendant argues that the Government's search protocol produced a large number of irrelevant, and indeed strictly personal, documents, and thus the seizure went beyond the scope of

---

[10] *Nejad* also cites Fed. R. Crim. P. 41(e)(2)(B), which specifically contemplates a two-step procedure where a warrant "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information," and states that "[u]nless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant." Notably, this rule specifies that the time limits imposed on warrants under Rules 41(e)(2)(A) and (f)(1)(A) "refer[] to the seizure or on-site copying of the media information, and not to any later off-site copying or review."

the warrants. Def.'s Mem., ECF No. 114 at 39.[11] At oral argument on May 20, 2024, the Government represented that it made a conscious choice to employ targeted search terms to the Yahoo account rather than conduct a document-by-document review and articulated that in the Government's opinion this is a less invasive approach to identify responsive documents. *See Csanadi*, 2012 WL 3779166, at *3. Reviews using less organized search protocols than those reported by the Government in this case have been deemed appropriate under the Fourth Amendment. *See Nejad*, 436 F. Supp. 3d 707, 734 ("Though it may have been more desirable for the reviewers to have agreed upon a comprehensive set of search terms and consistently removed documents tagged as responsive from the review population over the course of the review, the review methodology was nonetheless reasonable under the circumstances."); *United States v. Lumiere*, 2016 WL 7188149, at *4 (S.D.N.Y. Nov. 29, 2016 (holding that responsiveness review was reasonable where agents did not follow a formal document review protocol, did not mark documents responsive or unresponsive, and in which non-responsive data was readily accessible to other members of the investigative team). As the Government's review procedures were reasonable, the appropriate remedy here is not blanket suppression. The Court will however preclude the use of records which, although seized pursuant to these protocols, still fall outside the scope of the warrant. Defendant may raise this issue by motion *in limine* once the Government discloses its exhibit list. Relatedly, any irrelevant materials may be returned to Defendant under Rule 41(g). *See Ganias*, 824 F.3d at 218-19.

---

[11] According to Defendant's analysis of documents produced by the Government, "at least 51,000 of the 64,458 emails … seized from Glenn Oztemel's Yahoo account are non-responsive—as are all 32 documents seized from Glenn Oztemel's Apple account." Def.'s Mem., ECF No. 114 at 39. In support of this contention, they noted an email from Defendant's nephew regarding a vacation and a sale offer from Bloomingdales. *Id.* Clearly then, the use of search terms did not identify *only* responsive documents.  However, the parties' competing assessments as to the responsiveness of the seized records, highlights the inherent difficulty in challenging the scope of the execution of a warrant for electronic records. This Court cannot, and need not under Fourth Amendment jurisprudence, adjudicate which party has the better assessment as to "responsiveness" on a document-by-document basis.

Lastly, the Court holds that the time the Government spent conducting its responsiveness review was reasonable. Two years and nine months, the amount of time that the Government required to sift through the information from the Yahoo Warrant, is within or similar to timeframes approved by courts in this Circuit. *See Nejad* 436 F. Supp. 3d at 735("roughly three year[]" period was reasonable "under the circumstances"); *United States v. Aguilar*, No. 20-CR-00390 (E.D.N.Y. July 7, 2023) ECF No. 160 at 6–8 (finding review of two and a half years to be reasonable in a review involving 170,000 documents and which involved "code words" discovered during the course of the investigation); *United States v. Zottola*, No. 18-CR-609 (HG), 2022 WL 3682222, at \*4 (E.D.N.Y. Aug. 25, 2022) (A review lasting "approximately three years" did not warrant suppression); *United States v. Sosa*, 379 F. Supp. 3d 217, 222 (S.D.N.Y. 2019) (delay of fifteen months to review the contents of an LG Phone was "within the bounds of reason.").

For the above reasons, the Court finds that the Government execution of both the Yahoo and iCloud warrants complied with established standards of reasonableness under the Fourth Amendment. The investigators' actions did not demonstrate flagrant disregard for the warrants' terms, and the Court has no basis to conclude that the searches were conducted in bad faith. Therefore, Defendant's motion to suppress evidence seized pursuant to the two warrants, on the grounds that the Government's execution of the warrants was unreasonable, is denied.

**Conclusion**

For the foregoing reasons, to the extent that Defendant Oztemel's motion at ECF No. 112 moved to Suppress evidence seized from certain email accounts, that request is DENIED.

**SO ORDERED** at Bridgeport, Connecticut, this 21st day of June 2024.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE.