UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:23-cr-26 (KAD) |
| | : | |
| v. | : | |
| | : | |
| GLENN OZTEMEL | : | |
| | : | |
| | : | |

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT GLENN OZTEMEL'S MOTION FOR A JUDGMENT OF ACQUITTAL
<u>OR, IN THE ALTERNATIVE, A NEW TRIAL</u>**

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ......................................................................................... I

**PRELIMINARY STATEMENT** .................................................................................. I

**BACKGROUND** ........................................................................................................ 2

**I.    Relevant Pretrial Matters** ................................................................................ 2

**II.   Trial** .................................................................................................................. 4

    A.    The Government's Case-In-Chief ................................................................... 4

    B.    Glenn Oztemel's Motion for a Mistrial and Cross-Examination of Berkowitz ................. 6

    C.    The Government's Case in Chief—Continued ................................................. 8

    D.    The Defense Case ........................................................................................ 10

    E.    Charge Conference, Closing Arguments, and Verdict .................................... 10

**ARGUMENT** ............................................................................................................ 11

**I.    Glenn Oztemel's Rule 29 Motion Should be Denied** ...................................... 11

    A.    Legal Standard ............................................................................................ 11

    B.    There Was Sufficient Evidence of Glenn Oztemel's Knowledge of and Participation in the Bribery Conspiracy .................................................................. 13

    C.    The Evidence Sufficiently Established the Substantive FCPA Counts ........... 19

    D.    There Was Sufficient Evidence of Glenn Oztemel's Knowledge of and Participation in the Money Laundering Conspiracy .............................................. 21

    E.    The Evidence Sufficiently Established the Substantive Money Laundering Counts ....... 23

**II.   Oztemel's Rule 33 Motion Should be Denied** ................................................ 24

    A.    Legal Standard ............................................................................................ 24

    B.    The Court Correctly Instructed the Jury ........................................................ 26

1.    An "Agent" of a Domestic Concern under 15 U.S.C. § 78dd-2(a)(1) Can Also Be "Any Person" under 15 U.S.C. § 78dd-2(a)(3)..................................................................... 26

2.    The Jury Instructions Tracked the Language of the Statute and Conformed to the Superseding Indictment and the Evidence Presented ............................................ 30

3.    Glenn Oztemel's Additional and Untimely Arguments Regarding the Jury Instructions Do Not Warrant a New Trial.................................................................... 33

    (a)    The Instructions' Citation to Section 78dd-2(a)(1) Does Not Warrant a New Trial  33

    (b)    The Court Properly Instructed the Jury on Both Section 78dd-2(a)(1) and Section 78dd-2(a)(3) .................................................................................................... 34

    (c)    The Court Properly Instructed the Jury on Unanimity............................................. 36

4.    The Court's Conscious Avoidance Instruction Does Not Merit a New Trial.............. 38

5.    The Court Properly Instructed the Jury on the Statute of Limitations......................... 42

C.    Glenn Oztemel Was Not Prejudiced by the Court's "Guardrails" for Opening Statements 46

D.    The Court Should Deny Glenn Oztemel's Request that the Court Reconsider its Previous *Giglio* Ruling ......................................................................................................... 51

**CONCLUSION** ..................................................................................................... 55

## <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, (2008) .................................................... 29

*Cupp v. Naughten*, 414 U.S. 141 (1973)............................................................................ 45

*Descamps v. United States*, 570 U.S. 254, (2013) ......................................................... 38

*Luparella v. United States*, 335 F. App'x 212(3d Cir. 2009) ....................................... 45

*Mathis v. United States*, 579 U.S. 500 (2016) ...................................................... 28, 38

*Richardson v. United States*, 526 U.S. 813 (1999)… ……… …………..……………………39

*Smith v. United States*, 568 U.S. 106 (2013) ............................................................... 46

*United States v. Aguilar*, 737 F.3d 251 (2d Cir. 2013) ........................................... 2,31

*United States v. Autuori*, 212 F.3d 105 (2d Cir. 2000) ........................................... 12,14

*United States v. Benussi*, 216 F. Supp. 2d 299 (S.D.N.Y. 2002))................................... 3

*United States v. Bin Laden*, 397 F. Supp. 2d 465 (S.D.N.Y. 2005)) ........................... 26

*United States v. Brettholz*, 485 F.2d 483 (2d Cir. 1973)............................................... 47

*United States v. Carter*, No. 20-CR-00058 (KAD), 2025 WL 81068 (D. Conn. Jan. 13, 2025).. 25

*United States v. Chambers*, No. 18-CR-00079 (KAD), 2020 WL 734217(D. Conn. Feb. 13, 2020) .................................................................................................... 13

*United States v. Chang*, No. 18-CR-00681 (NGG) (CLP), 2024 WL 4766371(E.D.N.Y. Nov. 13, 2024) .................................................................................................... 22

*United States v. Chu*, No. 02CR673–RMB, 2004 WL 1176647 (S.D.N.Y. May 26, 2004) ........ 49

*United States v. Cook*, No. 3:17-CR-65 (SRU), 2019 WL 4247938, (D. Conn. Sept. 6, 2019)... 55

*United States v. Coppa*, 267 F.3d. 132 .......................................................... 55

*United States v. Cote*, 544 F.3d 88 (2d Cir. 2008)....................................................... 19

*United States v. Damra*, No. 1:06 CR 367, 2008 WL 11404220 (N.D. Ohio Sept. 12, 2008)..... 44

*United States v. Delva*, No. 12-CR-802 (KBF), 2015 WL 629375 (S.D.N.Y. Feb. 13, 2015)..... 25

*United States v. Donald*, No. 3:21-CR-8 (VAB), 2023 WL 6958797 (D. Conn. Oct. 20, 2023) . 48

*United States v. Estevez*, 961 F.3d 519 (2d Cir. 2020) ................................................. 39

*United States v. Evans*, 629 F. Supp. 1544D. Conn. 1986) ................................................. 48,50

*United States v. Facen*, 812 F.3d 280 (2d Cir. 2016)) ................................................. 12

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001) ................................................. 25

*United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011) ................................................. 36

*United States v. Ferrarini*, 219 F.3d 145 (2d Cir. 2000)…...……………….…………….42

*United States v. Flom*, 256 F. Supp. 3d 253 (E.D.N.Y. 2017)................................................. 25

*United States v. Florez*, 447 F.3d 145 (2d Cir. 2006)................................................. 12

*United States v. Full Play Group, S.A.*, No. 15CR252S3PKC, 2023 WL 1994196 (E.D.N.Y. Feb. 13, 2023) ................................................. 54

*United States v. Gambino*, 59 F.3d 353 (2d Cir. 1995) ................................................. 25

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) ................................................. 26

*United States v. Gengo*, 808 F.2d 1 (2d Cir. 1986)................................................. 45

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) ................................................. 22

*United States v. Grimm*, 738 F.3d 498 (2d Cir. 2013) ................................................. 16

*United States v. Grote*, 961 F.3d 104 (2d Cir. 2020)................................................. 37,38

*United States v. Guadagna*, 183 F.3d 122 (2d Cir. 1999) ................................................. 12,13

*United States v. Hilton*, 521 F.2d 164 (2d Cir. 1975) ................................................. 54

*United States v. Ho*, 984 F.3d 191 (2d Cir. 2020) ................................................. 1,31

*United States v. Huezo*, 546 F.3d 174 (2d Cir. 2008)................................................. 12,17

*United States v. Hunter*, 32 F.4th 22 (2d Cir. 2022) ............................................................... 54,55

*United States v. Jackson*, 335 F.3d 170 (2d Cir. 2003) ........................................................... 12

*United States v. James*, 712 F.3d 79 (2d Cir. 2013) ............................................................... 25

*United States v. Kay*, 413 F.3d 432 (5th Cir. 2007)) ................................................................ 3

*United States v. Khalupsky*, 5 F.4th 279 (2d Cir. 2021). ......................................................... 41,42

*United States v. Kim*, 303 F. Supp. 2d 150 (D. Conn. 2004) .................................................... 36,37

*United States v. Kozeny*, 493 F. Supp. 2d 693 (S.D.N.Y. 2007)) ............................................ 3

*United States v. Lauria*, 70 F.4th 106 (2d Cir. 2023) .................................................... 26, 30, 34,42

*United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008) ........................................................... 13

*United States v. Madori*, 419 F.3d 1592d Cir. 2005) ............................................................... 55

*United States v. Malpeso*, 115 F.3d 155 (2d Cir. 1997) ........................................................... 45,47

*United States v. McDonough*, 56 F.3d 381, 390 (2d Cir. 1995)………………………………31

*United States v. Mennuti*, 679 F.2d 1032 (2d Cir. 1982)) .......................................................... 22

*United States v. Morales*, No. 21-885-cr (L), 22-334 (Con), 2024 WL 220402 (2d Cir. Jan. 22,

    2024) ....................................................................................................................... 46,47

*United States v. Morgenstern*, 933 F.2d 1108 (2d Cir. 1991) ...................................................... 43

*United States v. Obrien*, 560 U.S. 218 (2010)) ........................................................................... 39

*United States v. Ortiz*, 666 F. Supp. 2d 399 (S.D.N.Y. 2009) ..................................................... 19

*United States v. Parks*, No. 19-CR-00299 (KAD), 2023 WL 5276361 (D. Conn. Aug. 16, 2023)

    ................................................................................................................................... 12

*United States v. Pimentel*, 346 F.3d 285 (2003) .......................................................................... 27

*United States v. Pinkerton*, 328 U.S. 640 (1946) ......................................................................... 32

*United States v. Pippins*, 733 F. Supp. 3d 136 (E.D.N.Y. 2024) ................................................. 26

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006) ............................................................ 26

*United States v. Ravenell*, 66 F.4th 472 (4th Cir. 2023) ............................................................ 46

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) .................................................................... 11

*United States v. Requena*, 980 F.3d 30 (2d Cir. 2020) ........................................................... 28,38

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007) ............................................................ 54

*United States v. Rosenthal*, 9 F.3d 1016 (2d Cir. 1993) ............................................................... 12

United States v. Rossomando, 144 F.3d 197 (2d Cir. 1998)…… …………………….……34

*United States v. Salmonese*, 352 F.3d 608 (2d Cir. 2003) ....................................................... 44,46

*United States v. Salovitz*, 701 F.2d 17 (2d Cir. 1983)........................................................... 48,50

*United States v. Sasso*, 59 F.3d 341 (2d Cir. 1995). ................................................................... 25

*United States v. Teague*, 93 F.3d 81 (2d Cir. 1996)...................................................................... 43

*United States v. Truman*, 688 F.3d 129 (2d Cir. 2012)................................................................. 14

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ................................................................. 37,43

*United States v. Walsh*, 774 Fed. App'x 706 (2d Cir. 2019) ........................................................ 54

*United States v. Weintraub*, 273 F.3d 139 (2d Cir. 2001) ........................................................... 34

*United States v. Wharton*, No. CRIM. ELH-13-0043, 2014 WL 1430387 (D. Md. Apr. 10, 2014),

 *aff'd*, 840 F.3d 163 (4th Cir. 2016)........................................................................................ 44

*United States v. Yakobowicz*, 427 F.3d 144 (2d Cir. 2005) ........................................................ 51

*Victor v. Nebraska*, 511 U.S. 1, 5 (1994)…. ……………………………………….……………26

*Whitfield v. United States*, 543 U.S. 209 (2005)........................................................................ 46

## **STATUTES**

15 U.S.C. § 78dd-2………………………………………………………………...…20,26-28,32,35,37

## PRELIMINARY STATEMENT

On September 26, 2024, following a three-week trial, a jury convicted defendant Glenn Oztemel of conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), three counts of violating the FCPA, money laundering conspiracy, and two counts of money laundering. The jury heard from nine government witnesses, including the foreign government official Glenn Oztemel bribed, and five defense witnesses. In addition, the Court admitted over 400 exhibits, including email communications seized from Glenn Oztemel's personal email account, encrypted messages between Glenn Oztemel and his co-conspirators, and nearly eight years of sham "consulting" invoices approved by Glenn Oztemel. After deliberating for approximately a day and a half, the jury returned a verdict of guilty on all counts.

Glenn Oztemel moves for a judgment of acquittal or, in the alternative, for a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33. *See* ECF No. 379, 379-1 (the "Motion"). In asking the Court to set aside the jury's verdict, Glenn Oztemel argues that the government failed to carry its burden of proof. But Glenn Oztemel himself fails to carry the "heavy" burden required by the Second Circuit for Rule 29 acquittal, a standard that "is exceedingly deferential" to the jury verdict and requires the Court to sustain a conviction "if viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ho*, 984 F.3d 191, 199 (2d Cir. 2020) (cleaned up) (emphasis in original). Here, substantial evidence supports the jury's verdict, including documents and testimony that tie the 2018 substantive offenses to Glenn Oztemel's participation in a nearly decade-long scheme to offer, promise, and pay bribes to government officials in Brazil. Glenn Oztemel's Motion asks the Court simply to disregard this evidence and the deferential legal standard, and to resolve various competing

inferences—inferences that have already been rejected by the jury—in his favor. In addition, the Motion is premised upon an incorrect application of the FCPA, one that has already been rejected by the Court and would contravene the statute. The Court should therefore deny the Rule 29 motion.

The Court should likewise deny Glenn Oztemel's motion for a new trial under Rule 33, which is based on claimed errors in the jury instructions and in the Court's rulings on opening statements and purported *Giglio* violations. The Court ruled on these issues during trial and gave Glenn Oztemel the opportunity to mitigate any perceived prejudice from its rulings, an opportunity he declined. For these reasons and more, Glenn Oztemel cannot show a "manifest injustice" suggesting a "real concern that an innocent person may have been convicted," as is required under Rule 33. *United States v. Aguilar*, 737 F.3d 251, 264 (2d Cir. 2013). The jury found Glenn Oztemel guilty on all counts; the Court should uphold the verdict and deny the Motion.

## **BACKGROUND**

### I.     **Relevant Pretrial Matters**

On August 29, 2023, a grand jury in New Haven returned a nine-count superseding indictment charging Glenn Oztemel, Gary Oztemel, and Eduardo Innecco with conspiracy, violating the FCPA, money laundering conspiracy, and money laundering. ECF No 76.

On October 16, 2013, Glenn Oztemel filed a motion seeking, among other things, to dismiss the Superseding Indictment under Rule 12(b). ECF Nos. 112, 114 ("Motion to Dismiss"). The Motion to Dismiss argued that the substantive counts (Counts Two, Three, Four, Six, and Seven) were "unconnected" to bribe payments to former Petrobras official Rodrigo Berkowitz. ECF No. 114 at 10–15. It also sought dismissal of the conspiracy counts (Counts One and Five), arguing that "[m]ost of" the conduct alleged in the Superseding Indictment occurred outside of the

limitations period and that there were no actual bribe payments to Berkowitz during the limitations period.  *Id.* at 18.

The Court denied Glenn Oztemel's Motion to Dismiss on July 2, 2024, holding, in pertinent part, that "Defendant's argument is premised on an incorrect and narrow reading of the FCPA …." ECF No. 194 at 9.  The Court observed that "[i]n furtherance of" under the FCPA is generally afforded a "broad and encompassing reading," *id*. at 10 (citing *United States v. Kay*, 413 F.3d 432, 453–454 (5th Cir. 2007)), and held that the question of whether "the wire transfers and email were 'in furtherance of' the offer, promise, or payment [of a bribe] is for the jury to decide," *id.* at 11 (citing *United States v. Kozeny*, 493 F. Supp. 2d 693, 714–15 (S.D.N.Y. 2007)).  The Court also concluded that it was "ultimately for the jury" to determine whether certain acts that the government alleged were in furtherance of the FCPA and money laundering conspiracies continued into the statutory period.  *Id.* at 14 (citing *United States v. Benussi*, 216 F. Supp. 2d 299, 311 (S.D.N.Y. 2002)).

On August 27, 2024, the Court held a trial management conference to resolve several pre-trial matters, including the parties' joint request for opening statements.  The Court indicated it would grant the parties' motion, but there would need to be "guardrails," and the parties should not "presag[e] the evidence."  ECF No. 245 at 33–34.  Both parties had the opportunity to ask clarifying questions regarding the Court's practices and to indicate whether, given those guidelines, they no longer wished to have opening statements.  *Id.* at 35–56, 70–71.  Ultimately, both sides agreed to the Court's guardrails and gave opening statements.

## II.    Trial

### A.    The Government's Case-In-Chief

Trial commenced on September 4, 2024.  The government's first witness was Paul Adams, the former CEO of Arcadia Fuels, Inc. ("Arcadia").  Adams provided testimony regarding Glenn Oztemel's role at Arcadia and explained Arcadia's business relationship with Innecco.  Sept. 4 Tr. (AM) at 63–66.  Emails introduced through Adams, dated as early as November 2, 2010, showed Glenn Oztemel receiving confidential Petrobras information from alias email accounts used by Innecco, *e.g.*, otc_rio@innecco.com, saanenrio@yahoo.com.br, skazisnaf@yahoo.ca, and showed Innecco setting up meetings between Glenn Oztemel and Petrobras officials Jorge Rodrigez, Marcos Alcoforado, and Berkowitz in early 2011.  *See, e.g.*, GX 5137; GX 5184; GX 5205.

The government's second witness was FBI Special Agent Corena Marasco, who testified twice during the government's case-in-chief.  During the first portion of her testimony, which covered the period 2010 through mid-2012, Agent Marasco read into the record dozens of emails, among other communications.  Most of those emails were between Glenn Oztemel and Innecco and fell into one of the following general categories:

- Emails regarding meetings in the summer and fall of 2011 among Glenn Oztemel, Innecco, Berkowitz, and other Petrobras officials in Rotterdam, the Netherlands and Miami, Florida. *See, e.g.*, GX 5218; GX 5417.

- Emails regarding future Petrobras cargoes, trades, and bids submitted by Glenn Oztemel's competitors to Petrobras.  *See, e.g.*, GX 5340; GX 5091.

- Emails showing that Glenn Oztemel knew that "saanenrio" and "Spencer Kazisnaf" were aliases used by Innecco.  *See, e.g.*, GX 5007; GX 5091.

- Emails indicating that Innecco was sharing his commissions with others.  *See, e.g.*, 5009; GX 5393.

- Emails referring to "breakfast," "freight deviation," and other terms that Berkowitz later testified were code words for bribes.  *See, e.g.*, GX 5276; GX 5440.

4

The government's third witness was Kristen Scott, a Senior Digital Investigative Analyst at DOJ's Computer Crime and Intellectual Property Section. Sept. 6 Tr. (AM) at 63. During her testimony, the Court received in evidence over 500 pages of WhatsApp communications from January 2017 through January 2019 between and among Glenn Oztemel, Gary Oztemel, Innecco, and Berkowitz. *See* GX 4000-T, GX 4001, GX 4002-T, GX 4003-T, GX 4004-T.

The government next called Berkowitz, who testified for three days, stating, in sum and substance, that the bribery scheme began around October 2011, during a meeting at the Ritz-Carlton in Miami, where he, Glenn Oztemel, Innecco, and others entered into a corrupt agreement whereby Berkowitz would provide Glenn Oztemel, Gary Oztemel, and Innecco with inside Petrobras information in exchange for bribes. *See* Sept. 9 Tr. (AM) at 32–38, 43; *see also* Sept. 6 Tr. (PM) at 72–73. Berkowitz also testified regarding two additional meetings with Glenn Oztemel and Innecco at which bribes were discussed—a February 2015 meeting in London, and a 2016[1] meeting at the Copacabana Palace Hotel in Rio de Janeiro. Sept. 6 Tr. (PM) at 73; Sept. 9 Tr. (AM) at 58–60, 91–92.

Berkowitz testified that the bribes were paid through Innecco, who served as the "financial operator" for the scheme. Sept. 9 Tr. (AM) at 103. In addition, according to Berkowitz, Innecco was responsible for passing inside Petrobras information to Glenn Oztemel, so that Glenn Oztemel could win Petrobras cargoes and generate money to pay bribes. *See, e.g.*, *id.* at 71–76, 96.[2]

---

[1] Berkowitz could not recall the date of the meeting. However, other documents introduced into evidence established that the meeting took place in or around September 2016. *See* GX 6326.

[2] During Berkowitz's testimony regarding GX 4004, defense counsel maintained an "asked and answered" objection to questions about whether Berkowitz was promised bribes in connection with various specific transactions in 2017 and 2018. *See* Sept. 9 Tr (AM) at 99–100. During a sidebar, the Court told defense counsel, "I don't think I'm going to hear an argument that they haven't proven this transaction, that they haven't proven this transaction was in furtherance . . . . if that was your plan then I would certainly overrule the objection." *Id.* Defense counsel responded, "No, no. We may point out some situations that worked out differently than the ones the Government shows. But he's said it a lot of times, that's why he was giving the information, so Freepoint could win. I think that's pretty clear at this point." *Id.* at 100.

Berkowitz testified that he received over $1 million in bribes from Glenn Oztemel's companies. Sept. 6 Tr. (PM) at 29. However, this amount did not include all the bribes he was promised in connection with the scheme, since the $1 million estimate only accounted for bribes that Berkowitz actually received through August 2016. Sept. 6 Tr. (PM) at 29–30; Sept. 9 (AM) Tr. at 87–88. Specifically, Berkowitz testified that, until approximately August 2016, Innecco paid Berkowitz his share of the bribes into a bank account that Berkowitz controlled in Uruguay. Sept. 9 (AM) Tr. at 87–88. After that, however, Berkowitz closed the Uruguay account due to the "car wash" investigations in Brazil. *Id.* Berkowitz was still promised and still expected to receive bribes from Innecco's commissions on future trades between Freepoint and Petrobras, since he "had an agreement between Eduardo Innecco and Glenn to receive those bribes." Sept. 9 Tr. (AM) at 88. Berkowitz testified that the scheme continued until December 2018, when he was approached by the FBI and agreed to plead guilty and to cooperate with the government's investigation. Sept. 6 Tr. (PM) at 25–26, 28–29.

### B.    Glenn Oztemel's Motion for a Mistrial and Cross-Examination of Berkowitz

At the end of Berkowitz's direct examination, Glenn Oztemel moved for a mistrial based on an alleged Jencks Act violation. ECF Nos. 259, 260 (the "Motion for Mistrial"). Glenn Oztemel argued that he was prejudiced by Berkowitz's testimony regarding the meeting in Rio where, according to Berkowitz, bribes were discussed. Sept. 9 Tr. (PM) at 50. The government had previously disclosed the meeting itself in an FBI interview report prepared by Special Agent Nathan Lundby, but Agent Lundby's report did not reflect the fact that bribes or commissions were discussed at the meeting. *See* ECF No. 258 at 1.

On September 10, 2024, the Court addressed the Motion for Mistrial. Sept. 10 Tr. (AM) at 4. The Court explained that, based on its review of the cases submitted by the parties, there did

not appear to be a Jencks Act violation (assuming the statements at issue constituted Jencks at all) and, therefore, the Court believed it was appropriate to proceed with Berkowitz's cross examination. *Id*. at 4–6. The Court invited defense counsel to address whether "process demands a different path forward." *Id*. at 6. Counsel for Glenn Oztemel responded that he believed a mistrial was warranted, but as to "[e]verything else [the Court] said, I have no dispute with." *Id*. at 7. Counsel maintained that an independent inquiry into the government's representations was warranted, but, regardless, it would "not affect my Cross today." *Id*. at 9.

Berkowitz was subject to extensive cross-examination regarding the Rio meeting. Sept. 10 Tr. (AM) at 77–80. In addition, defense counsel showed Berkowitz a copy of Agent Lundby's interview report, which discussed the meeting. *Id*. at 79–80. When asked whether the report refreshed his recollection that, "the first time you mentioned the [meeting in Rio], you made no mentions of commissions being discussed," Berkowitz answered: "I mentioned commissions being discussed. But it's the first time seeing this document. I cannot say if I did it or not by the FBI notes." *Id*.

After Berkowitz's testimony, counsel for Glenn Oztemel reiterated his request that the Court further inquire as to when Berkowitz first told the government that commissions were discussed at the Rio meeting. Sept. 11 Tr. (AM) at 10–11. The Court asked whether defense counsel had "[a]ny reluctance . . . to explore that with Agent Lundby by calling him as a witness" and noted that Agent Lundby was "[c]ertainly available to you." *Id*. at 11. Counsel responded that he wanted to consider that option, adding "maybe that's the more appropriate way to proceed

for now." *Id.* at 11–12. The government represented that Agent Lundby was available to testify, if requested, without the need for a subpoena. Sept. 12 Tr. (AM) at 22–23.[3]

On September 13, 2024, the Court denied Glenn Oztemel's Motion for Mistrial for the reasons stated on the record. *See* Sept. 13 Tr. at 5–10; ECF No. 278.

### C.    The Government's Case in Chief—Continued

The government's fifth witness was Tim Cannon, Freepoint's Global Head of Operations. Cannon described Freepoint's business and introduced Freepoint emails and business records, including over 100 invoices from Innecco to Oztemel between August 4, 2013 and November 5, 2018. *See generally* Sept. 10 Tr. (PM) at 35–72; *see also* GX 9009; GX 9010; GX 9013.

Following Cannon, the government recalled Agent Marasco to read into the record emails from Glenn Oztemel's personal email account for the time period between mid-2012 and 2018. Those emails fell into one of the following general categories:

- Emails regarding the London and Rio meetings described by Berkowitz. *See, e.g.*, GX 6326; GX 7055.

- Emails advising Glenn Oztemel how to negotiate with Berkowitz's replacement in Petrobras's Houston office, Julia Canella. *See, e.g.*, GX 5976; GX 5983; GX 6018; GX 6091; GX 6246; GX 6347; GX 6361; GX 6699.

- Additional emails regarding future Petrobras cargoes and trades and regarding bids submitted by Glenn Oztemel's competitors to Petrobras. *See, e.g.*, GX 5716; GX 5730; GX 5751; GX 5938; GX 6091; GX 6347; GX 6433; GX 6567; GX 6699; GX 6718; GX 6725; GX 7034.

- Additional emails referring to "breakfast" and similar code words used to describe bribes. *See, e.g.*, GX 5793; GX 6020; GX 6049; GX 7055.

---

[3] The Court declined to conduct the additional inquiry requested by Glenn Oztemel, explaining that, "[e]ven if I were to conduct that inquiry or permit that inquiry, whatever is developed as a matter of fact, I don't think is going to result in a finding of a *Jencks*, *Brady*, or *Giglio* violation, because the information that you believe was withheld is *inculpatory*." Sept. 12 Tr. (AM) at 18 (emphasis added).

The government's next witness was Lucia Castellana, Glenn Oztemel's former assistant. Castellana described the process for approving Innecco's invoices and authenticated Glenn Oztemel's signature on several of those invoices, including over 40 invoices approved after August 14, 2017. *See, e.g.*, Sept. 12 Tr. (PM) at 13–15; GX 9013; *see also* GX 9009, GX 9010. Castellana's testimony was followed by FBI Forensic Accountant Dustin Wen, who prepared summary charts of relevant invoices, payments, and trades between 2010 and 2018, *see, e.g.*, GX 514–GX 517, and Freepoint's Controller, Thomas Muller, who, among other things, described the process for authorizing third-party payments, Sept. 13 Tr. at 58–63, 77–78. Muller testified about the specific 2018 international wires and related business records underlying Counts Two, Three, Six, and Seven. *Id.* at 63–77; GX 102, GX 103, GX 106, GX 107.

The government's final fact witness was Julia Canella, a former Petrobras trader who was Glenn Oztemel's trading counterparty at Petrobras from approximately January 2014 through August 2017, when Berkowitz worked in Petrobras's Rio office. Canella described the roles she and Berkowitz held at Petrobras during this period, including how Berkowitz was not supposed to be communicating with Petrobras's U.S. trading counterparties while he was working in Petrobras's office in Rio. *See, e.g.*, Sept. 16 Tr. at 33–36. Canella also testified that she did not know Innecco. *Id.* at 39–40, 71–72.

The government's last witness was Michael Petron, a forensic accountant who prepared summaries of payments between Glenn Oztemel's and Gary Oztemel's companies and Innecco (approximately 2011 to 2018), and between Innecco's companies and Berkowitz (approximately 2011 to 2016). Sept. 17 Tr. (AM) at 55–122; GX 501–507, GX 509–512. Petron identified over $1.7 million in payments from Innecco to Berkowitz's bank account in Uruguay, the last of which was dated August 15, 2016. GX 511; GX 512.

### D.    The Defense Case

The defense called five witnesses: Daniel Diette, a records custodian and reader; Martin Ramirez, Freepoint's former head of compliance; Carlos Cuervo, a purported trading expert; Robert Peck, a former Freepoint trader and Glenn Oztemel's close friend; and Jessica Hollobaugh, a forensic accountant.  The defense elected not to call Agent Lundby.  Sept. 19 Tr. (PM) at 5.

### E.    Charge Conference, Closing Arguments, and Verdict

On September 11 and September 17, 2024, the government provided the Court with revised proposed jury instructions.  *See* ECF No. 290.  The government also filed a memorandum addressing the Court's knowledge instruction and the basis for the government's proposed instruction under Section 78dd-2(a)(3).  ECF No. 292.

The charge conference was held on September 19 and September 23, 2024.  ECF No. 295. Of relevance to the Motion, the Court heard argument on the government's proposed charge on Section 78dd-2(a)(1) and 78dd-2(a)(3), and ultimately agreed with the government that a "domestic concern" under Section 78dd-2(a), or an agent or employee thereof, can also be the "person" to whom a payment is first made under Section 78dd-2(a)(3), subject to the statute's knowledge requirement.  Sept. 19 Charge Tr. at 10.  The Court also heard from the parties on the placement of the "conscious avoidance" instruction (the government had initially proposed that it be included in the Court's general instructions, prior to the any description of the charges).  *See* ECF No. 290 at 27.  Counsel for Glenn Oztemel stated that he had "no concern" about inserting the "conscious avoidance" instruction within the Second Element of the FCPA conspiracy charged in Count One.  Sept. 23 Charge Tr. at 5; *see also* Sept. 19 Charge Tr. at 19.

The final instructions were read to the jury on September 24, 2024.  Sept 24. Tr. (PM) at 5–80.  After the jury was instructed, counsel for Glenn Oztemel raised two additional objections,

both for the first time.  First, counsel objected that the jury was given a *Pinkerton* instruction on the money laundering counts.  *Id.* at 81–82.  Second, counsel objected to the inclusion of the conscious avoidance instruction in the Court's instructions regarding the FCPA conspiracy.  *Id.* at 86–87.  On the *Pinkerton* instruction, the Court invited defense counsel to submit any authority indicating that the Court should re-charge the jury.  *Id.* at 86.  On conscious avoidance, the Court reminded counsel that the instruction was included in Count one with counsel's consent.  *Id.* at 87.  Defense counsel did not later provide the Court with additional authority or request that the jury be re-charged.

The parties gave closing arguments on September 25, 2024, after which the jury began its deliberations.  Sept. 25 Tr. (AM) at 5, 113.  The following day, the jury returned a verdict of guilty on all seven counts.  ECF No. 303.[4]

## ARGUMENT

I.    **Glenn Oztemel's Rule 29 Motion Should be Denied**

A.    **Legal Standard**

Rule 29(a) of the Federal Rules of Criminal Procedure provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  *See* Fed. R. Crim. P. 29(a).  To set aside the jury's verdict, the defendant bears a "heavy burden."  *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006) (citations and quotation marks omitted).  Moreover, in considering such a motion, the Court must "credit every inference that could have been drawn in the government's favor."  *Id.*; *see also United*

---

[4] As counsel for Glenn Oztemel is aware, this case is subject to review by the Attorney General pursuant to the President's February 10, 2025 Executive Order (Exec. Order No. 14,209, 90 Fed. Reg. 9,587 (Feb. 14, 2025)).  The Government will advise the Court of any updates as soon as it is in position to do so.

*States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir. 1993); *United States v. Florez*, 447 F.3d 145, 154–55 (2d Cir. 2006).

In resolving a Rule 29 motion, the Court "must be careful to avoid usurping the role of the jury." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation and quotation marks omitted); *see also United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (Rule 29 "does not provide the trial court with an opportunity to 'substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'") (citation omitted); *United States v. Parks*, No. 19-CR-00299 (KAD), 2023 WL 5276361, at *5 (D. Conn. Aug. 16, 2023) ("Each of Parks' arguments are premised on an alternative view of the evidence, not a required view of the evidence."). The Second Circuit has cautioned courts not to usurp the jury's role because "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences." *United States v. Huezo*, 546 F.3d 174, 182 (2d Cir. 2008).[5]

Trial courts may grant a judgment of acquittal "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (cleaned up); *see also United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (district court may grant a Rule 29 motion for insufficiency only "if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt"). "[I]f the court 'concludes that either of

---

[5] The credibility of a testifying witness is particularly within the province of the jury, not that of a reviewing court. *See United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("the jury and not the court [must] determine whether a witness who may have been inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible in the essentials of his testimony") (cleaned up).

the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" *Guadagna*, 183 F.3d at 129 (citation omitted).[6]

Furthermore, "direct evidence is not required; in fact, the government is entitled to prove its case solely through circumstantial evidence, provided, of course, that the government still demonstrates each element of the charged offense beyond a reasonable doubt." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (cleaned up).  In a case based on circumstantial evidence, the government need not "exclude every reasonable hypothesis other than that of guilt." *United States v. Chambers*, No. 18-CR-00079, ECF No. 199 (KAD), 2020 WL 734217, at *10 (D. Conn. Feb. 13, 2020) (citation omitted).

## B.    There Was Sufficient Evidence of Glenn Oztemel's Knowledge of and Participation in the Bribery Conspiracy

Applying the highly deferential standard for Rule 29 motions, the Court should deny judgment of acquittal on Count One.  Mot. at 12, 16–19.  In short, Glenn Oztemel asks the Court to disregard extensive evidence, draw factual inferences in his favor, and accept his alternative explanations of the evidence presented to the jury.  This the Court cannot do.

The jury was presented with significant evidence—much of which Glenn Oztemel concedes was "not disputed"—about his knowledge of and participation in the bribery conspiracy. *See id.* at 4.  With respect to the evidence about which the parties took different views, as noted above, "[m]atters of the choice between competing inferences, the credibility of the witnesses, and

---

[6] Glenn Oztemel relies on the so-called equipoise rule, which he claims suggests that "if the trial gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, a reasonable jury must necessarily entertain a reasonable doubt, and the Court must grant an acquittal." *See* Mot. at 12 (citations and quotation marks omitted).  But the Second Circuit has repeatedly rejected that rule, holding that it "is of no matter to sufficiency analysis because it is the task of the jury, not the court, to choose among competing inferences." *United States v. Aquart*, 912 F.3d 1, 44 (2d Cir. 2018) (citation and quotation marks omitted).

the weight of the evidence are within the province of the jury, and [the Court is] not entitled to second-guess the jury's assessments." *United States v. Rea*, 958 F.2d 1206, 1221 (2d Cir. 1992).

Berkowitz testified that Glenn Oztemel promised and paid him bribes in exchange for helping Arcadia and Freepoint win Petrobras business. Sept. 9 Tr. (AM) at 55, 87–88; Sept. 9 Tr. (PM) at 48–49. Berkowitz outlined the origins of the bribery scheme, including the October 2011 meeting in Miami with Glenn Oztemel during which Glenn Oztemel said that "he was only interested in touching Petrobras oil." Sept. 9 Tr. (AM) at 35. Berkowitz understood this to mean that the Glenn Oztemel "was okay to be doing business with Petrobras if those commissions [*i.e.,* bribes] were involved." *Id.* at 38. Furthermore, Berkowitz testified that he expected to receive bribes on trades with Glenn Oztemel because they "had an agreement after the meeting in Miami." *Id.* at 42–43. Throughout his testimony, Berkowitz repeatedly affirmed that he was promised and paid bribes by Innecco and Glenn Oztemel. *See, e.g.*, *id.* at 55, 59–60.

Berkowitz's testimony alone is sufficient to sustain the conviction. *See United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) ("[E]ven the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not 'incredible on its face.'") (citation omitted). Oztemel contends, however, that Berkowitz's testimony should be disregarded because his account of the bribery discussions supposedly "grew more detailed and inculpatory regarding Oztemel each time Berkowitz met with government agents." Mot. at 18. But it is not the Court's role to "second-guess [the] jury's credibility determination[s] on a sufficiency challenge." *Florez*, 447 F.3d at 156. After all, Glenn Oztemel "had the opportunity to convince the jury that [Berkowitz] was not credible." *Autuori*, 212 F.3d at 118; *see also O'Connor*, 650 F.3d at 855.

In any event, Berkowitz's testimony was corroborated by extensive documentary evidence, including, but not limited to: Innecco's use of alias email accounts to communicate with Glenn

Oztemel at his "private" email account; emails in which Innecco reminded Glenn Oztemel that Petrobras's phone lines were recorded; and emails in which Innecco told Glenn Oztemel that he used a disposable phone to communicate with Berkowitz. *See, e.g.*, GX 5276; GX 5743; GX 5078; GX 6097; GX 6325; GX 5773; GX 7092.   The jury could infer from any one of these communications that Glenn Oztemel knew about and participated in the bribery scheme.

Moreover, the jury saw numerous emails received and sent by Glenn Oztemel *explicitly* discussing the bribery scheme, many of which used code words like "breakfast" to discuss bribes, and all of which corroborate Berkowitz's testimony and serve as further proof from which the jury could find Glenn Oztemel's knowledge of and participation in the bribery conspiracy:

- GX 5009 – Future business would require "60 cts/bbl for the whole group."

- GX 5393 – Innecco: "As mentioned, the USD 60/bbl commission would cover the whole group, including Gary."  Glenn Oztemel: "I will call u.  All is good."

- GX 5392 – "[T]he best solution is to pay 30 to Morgen.  I can pay 25 and keep 5 for myself, which OK with me."

- GX 5218 – "[M]ax nbr of people Archie can invite for breakfast is 25, and that wud leave some key people (although not top people) with no breakfast . . . .  Our mission is to find a way to cover the man and the key people, as we used to do.  OTT wud be the solution."

- GX 5276 – "May I remind you of requested increase for 5 additional breakfast servings after first able set up, which already occurred."

- GX 5793 – Innecco: "Your last message (breakfast);" "Need to talk to you abt it."  Glenn Oztemel: "This is crazy" and "We can talk in the morning. U write too much."

- GX 7055 – "There will be no breakfast discussions, repeat, no breakfast discussions.  You can bring Rob."

- GX 6020 – "Breakfast;" "Being discreetly told its abt time to improve it.  Think abt it."

- GX 6049 – "Breakfast;" "Pls let me know when you hv a reply for us."

- GX 5965 – "Thank god for rb who helps us with vital info and thank god for eduarrrrrrdo who feeds it to me."

15

- GX 6395 – Innecco: "Pls pay us 22.5 cnt/bbl or min 20 cts/bbl to avoid problems on my side . . . . I'm unable to justify 'internally' anything below 20 cnts/bbl."  Glenn Oztemel: "I don't like ure or br behavior.  It is greedy and unfortunate."

Despite this evidence, Glenn Oztemel contends that he is entitled to a judgment of acquittal because there is supposedly "insufficient evidence of an FCPA conspiracy continuing into August 2017 and beyond."  Mot. at 17.  In support of this argument, he points to the Court's observation in its order denying his Motion to Dismiss (before seeing any of the evidence in this case) that the allegations in the Superseding Indictment regarding events beyond 2016 were "fewer and less detailed" than the allegations prior to 2016.  Mot. at 3 (citing ECF No. 194 at 13, 17).

The parties agree that the government must "must establish that a conspirator knowingly committed at least one overt act in furtherance" of the bribery conspiracy after August 14, 2017.  *United States v. Grimm*, 738 F.3d 498, 501 (2d Cir. 2013).  However, Glenn Oztemel insists that there is "nothing facially unlawful about the transfers between Oztemel and Innecco in 2018" because the government purportedly failed to connect them to an actual bribe payment to Berkowitz. Mot. at 15.  This argument, which relies on his previously rejected and overly narrow interpretation of the FCPA, *see* ECF No. 194 at 9, ignores Berkowitz's clear testimony that, even after the last payment to his Uruguayan bank account in August 2016, he expected to be paid bribes from Innecco and Glenn Oztemel on transactions between Petrobras and Freepoint because he "had an agreement between Eduardo Innecco and Glenn to receive those bribes," and because he "was promised to receive those bribes."  Sept. 9 Tr. (AM) at 88.  The jury was entitled to apply their common sense and rely on this testimony to conclude that, once the scheme was in motion, there was simply no need for Glenn Oztemel to make an explicit, additional promise of bribes on every single trade; their corrupt agreement had already been made and was acted upon and renewed, over and over again, from the day they first reached it in October 2011.  *See Huezo*, 546

F.3d at 182 ("jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences").

Moreover, contrary to Glenn Oztemel's claim that Berkowitz "did not testify that Oztemel (directly or through Innecco) had paid a bribe or made any promises to pay a bribe during the limitations period," *see* Mot. at 8, the jury heard clear testimony on precisely that. For example, Berkowitz testified about a series of WhatsApp messages he had with Innecco on July 30, 2018. *See* GX 4004-T-C; Sept. 9 Tr. (AM) at 95–97. In those messages, Berkowitz shared confidential Petrobras information because he "would like Freepoint to be the most competitive buyer for this barge." Sept. 9 Tr. (AM) at 98. Berkowitz explained to the jury that, when he was the Petrobras trader in Houston in 2018, Innecco's role in trades with Glenn Oztemel was as the "intermediary, the financial operator for the bribes." Sept. 9 Tr. (AM) at 103. Furthermore, in GX 4004-T-C, the jury saw evidence of Berkowitz providing step-by-step instructions for Glenn Oztemel, through Innecco, to win Petrobras trades. Sept. 9 Tr. (AM) at 108–110. The government presented evidence that Freepoint won this trade, and Berkowitz testified that he was promised a bribe on it by Innecco and Glenn Oztemel. *See* GX 9007[7] at 22; Sept. 9 Tr. (PM) at 14–15. Berkowitz's expectation when he helped Glenn Oztemel win the trade was that he would eventually receive half of Innecco's commission. *See* Sept. 9 Tr. (AM) at 88; Sept. 9 Tr. (PM) at 14–15.

The jury also saw and heard evidence about an August 17, 2018 trade on which Berkowitz again provided confidential Petrobras information to Glenn Oztemel through Innecco, resulting in

---

[7] Berkowitz identified GX 9007 as a series a deal recaps between Petrobras and Glenn Oztemel. Sept. 9 Tr. (AM) at 67. All but three of the 15 deal recaps in GX 9007 are after the August 14, 2017 statute of limitations. And Berkowitz explicitly testified that with respect to an August 21, 2018 deal recap, he provided information about that trade to Innecco in exchange for bribes. Sept. 9 Tr. (AM) at 68 ("Q. Mr. Berkowitz, did you provide Eduardo Innecco information regarding the deal reflected in [GX] 9007? A. Yes. Q. Why did you do that? A. In exchange of bribes."); GX 9007 at 27. This alone is enough for the jury to conclude that the bribery conspiracy continued into the limitations period.

Freepoint winning the cargo.  *See* GX 9007 at 25; GX 4004-T at 143–152; Sept. 9 Tr. (PM) at 15–22.  Berkowitz testified that Innecco and Glenn Oztemel promised him a bribe for this August 17, 2018 trade as well.  Sept. 9 Tr. (PM) at 22.

The same is true for an October 31, 2018 trade.  The jury saw Berkowitz's communications with Glenn Oztemel on official, monitored communication channels, as well as Berkowitz's contemporaneous WhatsApp messages with Innecco in which Berkowitz was "giving competitors' bids information to Eduardo Innecco and to Freepoint."  Sept. 9 Tr. (PM) at 28; *see also id.* at 22–36; GX 7021; GX 4010-C; GX 9007 at 33.  Berkowitz testified yet again that he was promised a bribe from Innecco and Glenn Oztemel in connection with this trade.  Sept. 9 Tr. (PM) at 36.

In short, the government presented evidence to the jury about trades in June, July, August, and October 2018, and Berkowitz testified that he had been promised a bribe from Innecco and Glenn Oztemel for each one.[8]  Each piece of this evidence is proof of an in-statute act taken by a co-conspirator in furtherance of the bribery conspiracy, all of which the jury could reasonably rely on in concluding that Glenn Oztemel knowingly participated in the bribery conspiracy until December 2018.

The evidence notwithstanding, Glenn Oztemel asks the Court to draw myriad factual inferences in his favor—inferences the jury already rejected.  As just one example, he argues that Innecco was "a strange guy" and that "information of the type that Innecco passed on to Oztemel would have been normal for traders to receive from agents."  Mot. at 18.  But based on the evidence outlined above and presented at trial, including various "breakfast"-related emails that Glenn Oztemel does not address in his Motion, a reasonable jury could also conclude—as the jury in this

---

[8] *See* Sept. 9 Tr. (PM) at 48; GX 4001; GX 4004-T-B; GX 6874; GX 9007 at 20 (June 2018 trade); Sept. 9 Tr. (PM) at 14–15; GX 9007 at 22; GX 4004-T-C (July 2018 trade); Sept. 9 Tr. (PM) at 22; GX 7009; GX 4004-T at 143-51; GX 9007 at 25 (Aug. 2018 trade); Sept. 9 Tr. (PM) at 36; GX 7021; GX-4004-T-E; GX 4010-C (Oct. 2018 trade).

case did—that Glenn Oztemel knew that Innecco was sharing his commissions with Berkowitz and that, in return, he received confidential Petrobras information in exchange for those bribes. This evidence, when viewed "in the light most favorable to the government, and . . . [with] all reasonable inferences in [the government's] favor," *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008), was more than adequate for a rational trier of fact to find the essential elements of a bribery conspiracy. *See United States v. Ortiz*, 666 F. Supp. 2d 399, 403 (S.D.N.Y. 2009), *aff'd*, 394 F. App'x 722 (2d Cir. 2010) ("It is not th[e] Court's role to second-guess the inferences the jury drew, the weight it gave to the evidence, or its resolution of [supposed] conflicts in the evidence.").

### C. The Evidence Sufficiently Established the Substantive FCPA Counts

Glenn Oztemel's next challenge to the substantive FCPA charges—wherein he argues that the government did not prove that the May 9, 2018 and the June 12, 2018 wires from Freepoint to Wertech and the September 12, 2018 email from Innecco to several Freepoint employees, including Glenn Oztemel, were in furtherance of offers, promises, or payments of bribes to Berkowitz, *see* Mot. at 13—likewise fails. While he surmises there were "obvious lawful reasons" for Freepoint to pay Innecco, *id.* at 15, the evidence presented at trial demonstrated otherwise and was more than sufficient for a reasonable jury to conclude that the payments to Innecco and Innecco's email soliciting additional "commissions" were in furtherance of the bribery scheme. *See* GX 102, GX 102-A, GX 103, GX 103-A, GX 104.

As discussed above, the government presented significant evidence that payments made to Innecco and authorized by Glenn Oztemel after 2016 were in furtherance of bribes offered and promised to Berkowitz.[9]  *See supra* at Part I.B.  Berkowitz testified that he "started giving

---

[9]  Much of Glenn Oztemel's argument is premised on the fact that "Innecco's final payment to Berkowitz occurred roughly twenty-one months before the very first charged 2018 transfer." Mot. at 13–15.  But as Glenn Oztemel seemingly acknowledges, the charged conduct violates the FCPA if it is in furtherance of a corrupt offer,

Freepoint inside information from Petrobras, privileged information, in order to favor Freepoint on trading activities, in order to make them the most competitive buyers, in order to make Freepoint win long-term contracts" and that this continued "until 2018." Sept. 6 Tr. (PM) at 25.  Berkowitz described being in "daily contact with Eduardo Innecco trying to find business opportunities for Freepoint." *Id.* at 24–25.  For 2018 trades, Berkowitz expected, based on his agreement with Glenn Oztemel and Innecco, to get half of the commission Innecco received from Freepoint and that he would not get paid if Freepoint did not win the cargo.  *See* Sept. 9 Tr. (PM) at 14 ("The commission was an average was around 25 cents per barrel. I would get half of it."); *see also id.* at 48.

In addition, the jury saw evidence that each of the Wertech invoices to Freepoint, including those comprising the wires in Counts Two and Three, were authorized by Glenn Oztemel.  *See* Sept. 10 Tr. (PM) at 52–54; GX 9013.  For example, Lucia Castellana testified that these invoices were signed and approved by Glenn Oztemel, a required step for processing payment.  *See* Sept. 12 Tr. (PM) at 14, 17, 23–25; Sept. 12 Tr. (AM) at 125–26; *see also* Sept. 13 Tr. at 68 (Muller testifying that trader approval initiated the invoice payment process).  The jury also saw Glenn Oztemel's own words describing Innecco as "my agent," GX 5013, and heard from Freepoint's head of compliance, Martin Ramirez, that he expected Glenn Oztemel to be truthful and that he relied on what Glenn Oztemel told him about agents such as Innecco.  Sept. 18 Tr. (PM) at 11–13.  Simply put, the jury could infer, as the government argued, that *every* payment from Freepoint to Innecco—and authorized by Glenn Oztemel—was in furtherance of his agreement to pay bribes to Berkowitz.[10]

---

promise, or payment, not merely a payment actually received by a foreign official.  *Id.* at 13.  *See also* 15 U.S.C § 78dd-2(a)(1), (a)(3).  Glenn Oztemel's focus on the last wire to Berkowitz in 2016 is therefore a red herring.

[10]    The Motion seems to argue, once again, that the uses of interstate commerce alleged in the substantive counts must be in furtherance of a subsequent offer, promise or payment of bribes.  Mot. at 13 (arguing that, in light of the "forward-looking" aspect of the "in furtherance of" requirement, "the government must prove at trial that the

Thus, given the evidence before the jury about Berkowitz's expectation that he would receive bribes on trades with Glenn Oztemel from Innecco's commission payments, as well as the evidence about the ongoing bribery scheme among Glenn Oztemel, Innecco, and Berkowitz, the jury reasonably concluded that Innecco's submission of invoices directly to Glenn Oztemel, Glenn Oztemel's approval of those invoices, and Freepoint's wires to Innecco in payment of those invoices were in furtherance of promised bribes. Accordingly, Glenn Oztemel fails to meet his "heavy burden" to show that his conviction for substantive FCPA violations was based on insufficient evidence. *Gudagna*, 193 F.3d at 130.

### D.     There Was Sufficient Evidence of Glenn Oztemel's Knowledge of and Participation in the Money Laundering Conspiracy

Glenn Oztemel next contends that no reasonable jury could conclude that he knowingly and willfully joined the money laundering conspiracy charged in Count Five, or that the conspiracy continued past August 14, 2017. Mot. at 20–21. Here again, Glenn Oztemel's argument disregards, mischaracterizes, and minimizes the evidence.

As with the FCPA charges, the evidence presented at trial established that Glenn Oztemel knowingly engaged in a money laundering conspiracy, the object of which was to promote violations of the FCPA and Brazilian law. In addition, the government established through documents and testimony that Arcadia and Freepoint paid Innecco's companies (at their overseas bank accounts) over $4.5 million in corrupt commissions; that Glenn Oztemel himself authorized these payments; and that Berkowitz was promised and received portions of these payments in

---

specific charged conduct indeed occurred 'in furtherance of' the prohibited payment or promise"). As noted above, the Court has already rejected this argument, explaining that it was the function of the jury, not the Court, to determine whether the uses of interstate commerce alleged in the substantive counts in fact furthered an offer, promise or payment of bribes. The jury had ample basis on this record to make such a connection, including clear testimony from Berkowitz that, based on his agreement with Glenn Oztemel and Innecco, he expected to receive a portion of Innecco's commission as a bribe on those trades.

exchange for directing cargoes to Glenn Oztemel's companies and providing confidential information to help them win trades with Petrobras. *See* Sept. 13 Tr. (PM) at 31–32; GX 9005; GX 9006; GX 9009; GX 9010; GX 9013; GX 516; GX 520; GX 521; GX 522; *see also* Sept. 6 Tr. (PM) at 17; GX 511; GX 512. This evidence is more than sufficient for a reasonable jury to find that Glenn Oztemel conspired to commit promotional laundering. *See United States v. Gotti*, 459 F.3d 296, 337 (2d Cir. 2006) ("Under our Circuit's precedent, the government is required to link the moneys in question to specified unlawful activities, but this link can be made through circumstantial evidence."); *United States v. Chang*, No. 18-CR-00681 (NGG) (CLP), 2024 WL 4766371, at *12 (E.D.N.Y. Nov. 13, 2024) (denying motion for judgment of acquittal on promotional money laundering and holding "the Government need not have provided direct evidence" of diversion of funds into unauthorized account).

Furthermore, Glenn Oztemel's claim that "there was insufficient proof that the conspiracy continued into the relevant limitations period," *see* Mot. at 20, is contradicted by the evidence. Glenn Oztemel incorrectly asserts that the money laundering conspiracy ended in August 2016 when Berkowitz received his last bribe payment into his Uruguayan account. *Id.* at 21. As he acknowledges, however, "a conspiracy continues until the conspirators receive their anticipated economic benefits." *Id.* at 28 (citing *United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir. 1982)). Berkowitz expressly testified that he had been promised, but had yet to receive, bribes payments for trades in 2018. Moreover, the record is clear that Glenn Oztemel and Innecco continued to benefit from the scheme well into 2018, with Berkowitz continuing to steer cargoes to Freepoint, and Innecco being paid a commission on those cargoes. *See, e.g.*, Sept. 9 Tr. (PM) at 48 (Berkowitz testifying to bribe on June 15, 2018 cargo); GX 9007 at 20 (deal confirmation for June 15, 2018 cargo); GX 106-A at 4 (Glenn Oztemel approving Innecco's commission for June

15, 2018 cargo, paid as part of wire charged in Count Six).  Thus, none of the co-conspirators had received the entirety of their "anticipated economic benefits" as of August 2017, and the conspiracy continued.  Rather than continuing "indefinitely," *see* Mot. at 21, Berkowitz testified that his participation in the conspiracy ended in December 2018 when he "was fired from Petrobras" and the "FBI came to [his] door."  Sept. 6 Tr. (PM) at 25–26.  Accordingly, there was more than sufficient evidence to support the jury's finding that Glenn Oztemel knowingly joined a promotional money laundering conspiracy and that the conspiracy continued into the limitations period.

### E.    The Evidence Sufficiently Established the Substantive Money Laundering Counts

Finally, Glenn Oztemel asserts that there is insufficient proof of the substantive money laundering charges because "the government did not put forth any evidence at trial that these wires [underlying Counts Six and Seven] were connected to any promise or payment to Berkowitz." Mot. at 20.  Again, this argument is contradicted by the record, which supports the jury's verdict.

With respect to the August 10, 2018 wire charged in Count Six, the jury heard from Berkowitz that he expected to receive a bribe on one of the trades comprising this wire.  *See* Sept. 9 Tr. (PM) at 37–48; *see also* GX 4004-T-B; GX 6869; GX 4001 at 44–45; GX 6874; GX 9007 at 20.  Specifically, Berkowitz walked through the confidential Petrobras information he provided to Innecco on June 15, 2018, Sept. 9 Tr. (PM) at 39–42, 45–47, and the jury saw Innecco's messages to Glenn Oztemel minutes later.  *See* GX 4004-T-B at 5–6 and GX 4001 at 44–45.  Freepoint won this trade, and Berkowitz confirmed that he was promised a bribe on it and expected to receive half of Innecco's commission.  *See* GX 9007 at 20; Sept. 9 Tr. (PM) at 48.  The government also presented evidence that Innecco's invoice for commissions for the June 15, 2018 trade was among the invoices in the August 10, 2018 wire.  *See* GX 106; GX 106-A at 4; Sept. 13 Tr. (PM) at 71.

The same is true for the November 13, 2018 wire charged as Count Seven. This wire was supported by six invoices from Wertech to Freepoint. *See* GX 107; GX 107-A; Sept. 13 Tr. at 74. Berkowitz testified about providing confidential Petrobras information related to an August 17, 2018 trade between Freepoint and Petrobras, and the jury saw his messages with Innecco providing guidance "on how Freepoint would need to bid in order to conclude this deal." Sept. 9 Tr. (PM) at 16–22; GX 4004-T at 143–47. Freepoint also won this trade, GX 9007 at 25, and Berkowitz again confirmed that he was promised a bribe on it from "Eduardo Innecco and Glenn Oztemel." Sept. 9 Tr. (PM) at 22. The jury also had evidence that Innecco invoiced Freepoint for the trade and that the invoice was paid in the November 13, 2018 wire. *See* GX 107-A at 2.

Accordingly, with respect to the international wires underlying Counts Six and Seven, the government tied the specific charged wires to offers and promises of bribes. Glenn Oztemel's Rule 29 Motion should be denied.

## II.    Oztemel's Rule 33 Motion Should be Denied

### A.    Legal Standard

Federal Rule of Criminal Procedure 33 permits a court to vacate a judgment and "grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. In deciding whether to grant a Rule 33 motion, "[t]he test is whether it would be a manifest injustice to let the guilty verdict stand." *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013) (citations omitted). "For a trial judge to grant a Rule 33 motion, [the judge] must harbor a real concern that an innocent person may have been convicted." *Id.* (internal quotation marks omitted). A trial court therefore "must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances," and generally defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses. *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks

omitted).  The defendant bears the burden of showing that a new trial is warranted.  *See United States v. Sasso*, 59 F.3d 341, 350 (2d Cir. 1995).

Given the rigor of this standard, Rule 33 motions "are disfavored in this Circuit" and "the standard for granting such a motion is strict." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995); *see also United States v. Carter*, No. 20-CR-00058 (KAD), 2025 WL 81068, at *2 (D. Conn. Jan. 13, 2025) ("Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'").

"A Rule 33 motion is not an appropriate forum to revisit an evidentiary issue that the Court already decided," *United States v. Delva*, No. 12-CR-802 (KBF), 2015 WL 629375, at *4 (S.D.N.Y. Feb. 13, 2015), or to "relitigate pretrial rulings with which [the defendant] disagrees," *United States v. Flom*, 256 F. Supp. 3d 253, 271 (E.D.N.Y. 2017), *aff'd*, 763 F. App'x 27 (2d Cir. 2019).  In addition, where a defendant seeks a new trial based on the late disclosure of alleged *Giglio* material (even after trial), he must show both that there was an obligation to disclose such evidence in the first place and that the evidence in question was material insofar as "there is a reasonable probability that disclosure would have changed the outcome of the case or where the suppressed evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Pippins*, 733 F. Supp. 3d 136, 156 (E.D.N.Y. 2024) (internal quotations and citations omitted).  "Impeachment information is 'only rarely' material." *Id*. (citing *United States v. Bin Laden*, 397 F. Supp. 2d 465, 514 (S.D.N.Y. 2005)).  Glenn Oztemel cannot meet Rule 33's high standard for a new trial.

### B.    The Court Correctly Instructed the Jury

In arguing that the Court should set aside the verdict and grant a new trial, Glenn Oztemel takes issue with the Court's jury charge.  Jury instructions objected to at trial merit relief only "where the charge, viewed as a whole, either failed to inform the jury adequately of the law or misled the jury about the correct legal rule, thereby prejudicing the defense." *United States v. Lauria*, 70 F.4th 106, 132 (2d Cir. 2023) (internal citations and quotation marks omitted).  "No particular form of words is required, so long as 'taken as a whole' the instructions correctly convey the required legal principles." *United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007) (quoting *Victor v. Nebraska*, 511 U.S. 1, 5 (1994)).  Indeed, even erroneous jury instructions do not require relief "if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006) (quotation marks omitted).  In making that assessment, the Court considers "(a) whether there was sufficient evidence to permit a jury to find in favor of the defendant on the omitted element, and, if there was, (b) whether the jury would nonetheless have returned the same verdict of guilty." *United States v. Pimentel*, 346 F.3d 285, 302 (2d Cir. 2003) (cleaned up).  Applying this standard here, the Court's jury instructions must stand.

### 1.    An "Agent" of a Domestic Concern under 15 U.S.C. § 78dd-2(a)(1) Can Also Be "Any Person" under 15 U.S.C. § 78dd-2(a)(3)

Glenn Oztemel's challenge to the Court's instructions begins with a flawed premise: once again, he argues that the government had to make, and did make, a "fundamental choice" about whether to structure this case as an "(a)(1) or (a)(3) prosecution." Mot. at 23.  But as the Court previously determined, that is not what the law requires. *See* Sept. 19 Charge Tr. at 10.  The FCPA, by its plain language, provides for different means of violating the statute, and that is precisely how the government charged and prosecuted this case from the outset.

26

In Title 15, Section 78dd-2, Congress prohibited acts of bribery of foreign officials by "domestic concerns." A domestic concern is any individual who is a citizen, national, or resident of the United States, or any corporation, partnership, association, joint-stock company, business trust, unincorporated organization, or sole proprietorship, other than an issuer, that is organized under the laws of the United States or its states, territories, possessions, or commonwealths or that has its principal place of business in the United States. 15 U.S.C. § 78dd-2(a). Officers, directors, employees, agents, or stockholders acting on behalf of a domestic concern, including if they happen to be foreign nationals or companies, are also covered by Section 78dd-2. *Id.* The statute prohibits such covered persons from making "use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value" as part of the bribery. *Id.*[11]

Congress made clear that Section 78dd-2 may be violated in more than one way. Under Section 78dd-2(a), as relevant here, it is unlawful for "any domestic concern . . . or for any officer, director, employee, or agent of such domestic concern" to make the use of any means of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of anything of value to either: to a foreign official, or to "any person" while knowing that all or a portion of such thing of value will be provided to a foreign official, if made for a prohibited purpose. *Id.* at § 78dd-2(a)(1), (3). As discussed below in the context of juror unanimity, Congress's decision to allow for violations of the FCPA using multiple means is not uncommon,

---

[11] Glenn Oztemel's motion gets this crucial, plain-language point wrong, arguing that conviction under a Section 78dd-2(a)(1) theory required proof "that Oztemel made a payment or promise to Berkowitz directly in 2018[.]" Mot. at 25. The language of the statute, however, refers to a use of the means of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of payment. *See* 15 U.S.C. § 78dd-2(a). The distinction matters, as Glenn Oztemel has built his argument around an obvious misstatement of the law.

27

and the existence of multiple means does not create multiple crimes (or multiple elements) where Congress intended to create just one. *See United States v. Requena*, 980 F.3d 30, 48–49 (2d Cir. 2020) (discussing *Mathis v. United States*, 579 U.S. 500, 505–506 (2016) (hypothetical statute that requires use of a deadly weapon as element and provides that multiple weapons would qualify would not require jury finding on specific weapon)).[12]

Notably, the FCPA also defines "person" as the term applies to Section 78dd-2: "The term 'person' means a natural person, company, government, or political subdivision, agency, or instrumentality of a government." 15 U.S.C. § 78c(a)(9). This general definition includes no restriction on citizenship or status as an officer, employee, or agent of any type of entity. Thus, under Section 78dd-2(a)(3), the term "any person" includes any natural person or entity, without restriction. And as is relevant to this case, the term "any" makes clear that it does not exclude a domestic concern or agent thereof, or for that matter any other class of person or entity.[13]

During the charge conference, the Court correctly recognized that a domestic concern can also be the party or the person to whom the payment is made, so long as the payment is made with the requisite knowledge that it will be passed along to an official. Sept. 19 Charge Tr. at 10. Indeed, reading the statute otherwise, as Glenn Oztemel urges the Court to do, would lead to untenable results. For example, if an "agent" of a domestic concern could not also be "any person"

---

[12] Indeed, Congress provided for other means of violating the statute within Section 78dd-2 itself: Section 78dd-2(a)(2)(A) and (B) set forth four different prohibited purposes for the offer, payment, promise to pay, or authorization of payment described in Section 78dd-2(a). *See* 15 U.S.C. § 78dd-2(a)(2)(A), (B). Proof beyond a reasonable doubt of any one of the four purposes is sufficient to convict on an FCPA charge; the government need not choose only one theory to present to the jury, and the jury need not specify which of the prohibited purposes it found proven. *See* ECF No. 306 at 17–18 (instruction on sixth element of FCPA charges).

[13] *See generally Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) ("Read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind.") (cleaned up). In addition, the definition of "any person" in 15 U.S.C. § 78c(a)(9) stands in contrast to Congress's use of the term "person" in Section 78dd-3—a distinct part of the FCPA that is not at issue in Glenn Oztemel's motion. For purposes of Section 78dd-3 (not Section 78dd-2), Congress stated that the "term 'person,' when referring to an offender, means any natural *person other than* a national of the United States. . . ." 15 U.S.C. § 78dd-3(f)(1) (emphasis added). This separate definition does not apply to Section 78dd-2.

in evaluating another person's liability under Section 78dd-2, then either (a) a domestic concern could not be convicted for paying money to his agent knowing a portion would go to an official, which would read Section 78dd-2(a)(3) out of the statute, or (b) an "agent" of a domestic concern who served as an intermediary that received money and sent it to an official (or to another person knowing the money was going to an official) could not also himself be criminally liable under Section 78dd-2(a)(3), which would negate Congress's decision to include the word "agent" in the statute.   Both possibilities are inconsistent with the law's plain language, unsupported by any precedent, and would frustrate Congressional intent.[14]  *See, e.g.*, S. Rep. No. 95-1149, at 10 ("And payments *to agents*, while knowing or having reason to know, that all or a portion of the payment will be offered or given to a foreign government official, foreign political party or candidate for foreign political office for the proscribed purposes are also forbidden.") (emphasis added); *id.* at 11 ("The prohibitions against corrupt payments apply in this regard to payments *by agents* where the corporation paying them knew or had reason to know they would be passed on in whole or in part to a foreign government official for a proscribed purpose.") (emphasis added).[15]   Accordingly, because the statute itself provides that Innecco could be both an agent of a domestic concern  under 78dd-2(a)(1) and "any person" under 78dd-2(a)(3), the government was not required to choose

---

[14]   Glenn Oztemel is simply wrong when he claims that Innecco "is not liable under the FCPA and thus incapable of committing a principal violation."  Mot. at 26 (citing *United States v. Hoskins*, 902 F.3d 69, 85 (2d Cir. 2018) ("*Hoskins I*").  Innecco, as an agent of a domestic concern, falls squarely within the ambit of Section 78dd-2 and is therefore not exempted from FCPA principal liability.

[15]   Also during the charge conference, the Court expressed its view that "[Section 78dd-2](a)(3) adds nothing to the case, but I think under the law you're probably correct."  Sept. 19 Charge Tr. at 13–14.  Although the government respectfully disagrees that Section 78dd-2(a)(3) "adds nothing to the case," even if that were correct, it would not mean the Court's instructions to the jury merit a new trial.  The test is whether the instructions, viewed holistically, failed to inform or misled the jury about the correct legal rule, thereby prejudicing the defendant.  *United States v. Lauria*, 70 F.4th 106, 132 (2d Cir. 2023).  For the reasons discussed below, that is not the case here.

one or the other any more than it was required to choose between proving at trial that a bribe was offered, paid, promised, or authorized.[16]

### 2.    The Jury Instructions Tracked the Language of the Statute and Conformed to the Superseding Indictment and the Evidence Presented

The first and most obvious reason that the jury instructions were correct is because they tracked the FCPA and the Superseding Indictment itself.  Nonetheless, Glenn Oztemel argues that, because the government was permitted to try the case with multiple bases for liability, as the statute allows, the jury may not have understood the charges or the evidence supporting the different ways of violating the statute.  Mot. at 24.  Not so.  The evidence presented at trial also tracked the requirements of the statute, element by element, and overwhelmingly established that Glenn Oztemel in fact participated in a scheme to pay bribes to Petrobras officials in several prohibited ways.  Moreover, the evidence supporting his guilt under the different bases of liability outlined in the jury instructions was essentially the same.  Therefore, there was no genuine possibility that the jury's verdict was not supported by the evidence.

For starters, both the original Indictment and the Superseding Indictment made clear that Glenn Oztemel had been charged with violating the FCPA as a principal, as an aider and abettor, and as a co-conspirator.  *See* ECF No. 1 at ¶ 29; ECF No. 76 at ¶ 31.  The grand jury, moreover, charged Glenn Oztemel using the language of both 78dd-2(a)(1) and (a)(3).  *Id.*  Thus, Glenn Oztemel's claim that the government "made a choice . . . to treat this as an (a)(1) case," *see* Mot. at 23, and that it "belatedly introduced (a)(3) at the motion to dismiss hearing," *see* Mot. at 24, is

---

[16] Glenn Oztemel states that "[e]veryone agreed that Innecco could not simultaneously be an 'agent' of a domestic concern" and an "any person' intermediary."  Mot. at 23 (citing Sept. 19 Charge Tr. at 13).  However, the government merely agreed with the Court that Innecco could not make a promise or payment to himself and violate the FCPA (although he could violate the FCPA by, for example, wiring money from one shell company to another, knowing that some portion of that payment would be used to pay a bribe).  Otherwise, the government stated at the hearing that "the statute and Congressional intent makes clear than an agent of a domestic concern can also be any person under the FCPA."  Sept. 19 Charge Tr. at 12.  The government also memorialized its position in its mid-trial filing addressing the issue.  ECF No. 292 at 4.

plainly wrong.[17]  In addition, the evidence presented at trial ultimately established criminal liability

under both means of violating Section 78dd-2.

The Court's instructions on the elements of the FCPA likewise tracked the statutory

language.  The Court charged the jury that the elements of the FCPA counts required it to find, in

pertinent part, that Glenn Oztemel corruptly made use of any means or instrumentality of interstate

commerce in furtherance of an "offer, payment, promise to pay, or authorization of the payment

of money or a gift or anything of value . . . either: (a) to a foreign official; or (b) to any other person

or entity while [Glenn Oztemel] knew that all or a portion of the payment would be offered, given,

or promised, directly or indirectly, to a foreign official."  ECF No. 306 at 13–14.[18]  The Court also

instructed the jury on aiding and abetting and causing liability under 18 U.S.C. § 2 and on

conspiracy liability consistent with *United States v. Pinkerton*, 328 U.S. 640, 643 (1946), using

well-established language for both instructions.  *See* ECF No. 306 at 18–22.

Against this framework, the evidence admitted at trial overwhelmingly supported the jury's

conclusion that Glenn Oztemel (as a domestic concern and an employee and agent of a domestic

concern) corruptly used a means of interstate commerce (1) in furtherance of any offer, payment,

promise to pay, or authorization of the payment of anything of value to both a foreign official

(Berkowitz), as proscribed by Section 78dd-2(a)(1), and (2) to any person (Innecco as well as

---

[17] Charging in the conjunctive is a well-established practice, and the government is not required to prove all possibilities at trial.  *See United States v. McDonough*, 56 F.3d 381, 390 (2d Cir. 1995) ("Where there are several ways to violate a criminal statute, . . . *federal pleading requires . . . that an indictment charge in the conjunctive* to inform the accused fully of the charges. . . . A conviction under such an indictment will be sustained if the evidence indicates that the statute was violated in any of the ways charged.") (cleaned up) (emphasis added); *see also United States v. Ho*, 984 F.3d 191, 211 (2d Cir. 2020) (citing *McDonough*).

[18] As the government has argued in prior briefing, *see* ECF No. 292, similar instructions borrowing from the exact language of the FCPA have been used by other courts in this Circuit, *see United States v. Aguilar*, No. 1:20-cr-390 (ENV) (E.D.N.Y. Feb. 16, 2024) (ECF No. 321-3 in this case, at 136), and by Judge Arterton in the *Hoskins* case. *See United States v. Hoskins*, No. 3:12cr238 (JBA) (D. Conn. Nov. 6, 2019) (ECF No. 321-2 in this case, at 22).  *See also, e.g.*, *United States v. Lambert*, No. TDC-18-00012 (D. Md. Nov. 4, 2019) (ECF No. 321-5 in this case, at 54).

Innecco's companies) while knowing that a portion of the money would be provided to Berkowitz, as proscribed by Section 78dd-2(a)(3). That same evidence also established that Glenn Oztemel was liable under 18 U.S.C. § 2 and *Pinkerton* principles, for actions taken by Innecco and his companies, as agents of a domestic concern.[19]

For example, and as discussed in greater detail above, Berkowitz provided clear, credible testimony that Glenn Oztemel promised and paid him bribes in exchange for helping Arcadia and Freepoint win business with Petrobras. Sept. 9 Tr. (AM) at 55, 87–88; Sept. 9 Tr. (PM) at 48–49. In addition, in 2011, around the time of the Miami meeting, Glenn Oztemel began receiving "breakfast" emails and inside Petrobras information from Innecco and "Spencer Kazisnaf." *See, e.g.*, GX 5256; GX 5276. Glenn Oztemel also received confidential Petrobras information via email and WhatsApp, well into 2018. *See, e.g.*, GX 6868; GX 4004-T-B; GX 4001. Glenn Oztemel knew the information he was getting was confidential because Innecco told him so. *See, e.g.*, GX 5965; GX 5668. And Glenn Oztemel authorized payments to Innecco and his companies, knowing that at least a portion of those payments would be promised or paid to Berkowitz. *See, e.g.*, GX 102-A; GX 103-A; GX106-A; GX 107-A. Ultimately, regardless of the government's legal theory, the jury had to decide whether to credit Berkowitz's testimony or not; whether Glenn Oztemel knew "breakfast" meant bribes; whether Glenn Oztemel knew the information Innecco was providing was illegally obtained; and whether Glenn Oztemel authorized the payments to Innecco's companies with that knowledge, among other similar questions. In other words, the same evidence supports FCPA liability under both Sections 78dd-2(a)(1) and (a)(3), as well as the other bases of liability alleged in the Superseding Indictment, and ultimately it was up to the jury

---

[19] Even if the Court had found that Innecco, as an agent of a domestic concern, could not be "any person" under Section 78dd-2(a)(3), Glenn Oztemel would also be liable under Section 78dd-2(a)(3) for payments to any of Innecco's companies, each of which qualifies as a "person" under 15 U.S.C. § 78c(a)(9). *See, e.g.*, GX 106, GX 106-A, GX 107, GX 107-A.

to determine whether, after weighing that evidence, the government satisfied its burden as to at least one of the several means of violating the statute.

### 3.    Glenn Oztemel's Additional and Untimely Arguments Regarding the Jury Instructions Do Not Warrant a New Trial

Glenn Oztemel's Motion purports to identify four additional errors in the Court's instructions, all of which he could have, but did not, raise at the charge conference.  First, he argues that a lone reference to a U.S. Code provision warrants a new trial.  Mot. at 24.  Second, he claims the Court incorrectly instructed the jury on the substance of Sections 78dd-2(a)(1) and (a)(3).  *Id.* at 25–26.  Third, he argues that, based on the allegedly incorrect instructions regarding Sections 78dd-2(a)(1) and (a)(3), the Court improperly instructed the jury on Section 2 and conspiracy liability.  *Id.* at 26.  Finally, he argues that the instructions did not require unanimity on the elements of the FCPA.  *Id.* at 26.  Each argument lacks support in the law and should be rejected.

### (a)    The Instructions' Citation to Section 78dd-2(a)(1) Does Not Warrant a New Trial

Glenn Oztemel's first argument is that the Court's citation to only one section of subsection of Sections 78dd-2(a) at the beginning of its instruction on the substantive FCPA charges, and not both, so confused the jury that its unanimous verdict should be overturned.  *Id.* at 24.  The Court should reject this argument.  As the Second Circuit instructs, the Court does "not review portions of the instructions in isolation, but rather consider[s] them in their entirety to determine whether, on the whole, they provided the jury with an intelligible and accurate portrayal of the applicable law." *United States v. Weintraub*, 273 F.3d 139, 151 (2d Cir. 2001).  The recitation of a code citation—particularly to a jury of laypersons without access to the U.S. Code during deliberations—did nothing to detract from the Court's accurate recitation of the elements of the FCPA.  Glenn Oztemel's citation to *United States v. Rossomando* only highlights the weakness of his claim.  In *Rossomando*, the Second Circuit determined that there was a substantial risk that,

based on the existence of "contradictory" instructions, the jury believed it should convict the

defendant despite also being persuaded by a key defense. 144 F.3d 197, 203 (2d Cir. 1998) ("[T]he

court's initial charge could easily have mislead the jury into convicting [the defendant] without

finding that he intended to harm the Pension Fund . . . ."). Here, the alleged error is not even

substantive, much less contradictory, confusing,[20] or of the nature identified in *Rossomando*. The

Court's instructions adequately informed the jury of the law, *see Lauria*, 70 F.4th at 132, and

Glenn Oztemel's argument should be rejected.

> **(b)    The Court Properly Instructed the Jury on Both Section 78dd-2(a)(1) and Section 78dd-2(a)(3)**

Glenn Oztemel's second and third arguments fare no better, as they are premised on a

misreading of the FCPA and Second Circuit precedent. As an initial matter, the Court was correct

to instruct the jury that it could consider as "satisfied" the "domestic concern" element of the

substantive FCPA counts. *See* ECF No. 306 at 14. The parties stipulated to Glenn Oztemel's

status as a domestic concern and as an employee and agent of a domestic concern, *see* GX 10012,

and the Court accurately described the stipulation in providing its instructions on the elements of

the FCPA. Likewise, the Court's separate instruction on aiding and abetting liability, ECF No.

306 at 18–21, which concerned the jury's ability to find that Glenn Oztemel was liable for

Innecco's actions as the agent of a domestic concern, was also accurate. The instructions were

clear, and the Court should reject Glenn Oztemel's objection to the domestic concern instruction.

As discussed above, because Congress established multiple ways to violate Section 78dd-

2, the plain language of the FCPA provides that Innecco can be an agent of a domestic concern as

well as "any person." Glenn Oztemel is wrong when he argues that the jury could only convict

---

[20] During its deliberations, the jury in *Rossomando* asked the Court to clarify the legal definition of "intentional," which, according to the Second Circuit, suggested that the jury was "evidently confused on the question of intent." 144 F.3d at 199, 203. Here, there was no evidence of juror confusion.

under a Section 78dd-2(a)(1) theory based on proof "that Oztemel made a payment or promise to Berkowitz directly in 2018[.]"  Mot. at 25.  The FCPA refers to a use of the means of interstate commerce corruptly *in furtherance of* an offer, payment, promise to pay, or authorization of payment.  *See* 15 U.S.C. § 78dd-2(a).  The uses of interstate commerce specified in the substantive FCPA counts—wires and an email authorized and transmitted in furtherance of promises of bribes to Berkowitz by Glenn Oztemel—plainly meet that standard, and the jury was correct to convict based on the evidence admitted for each.

Moreover, in terms of any potential prejudice if the Court were to find error (which it should not), evidence abounded of Glenn Oztemel's uses of interstate commerce in furtherance of the scheme—both by Glenn Oztemel directly[21] and through his agent, Innecco, and was sufficient to establish beyond a reasonable doubt Glenn Oztemel's liability as both principal and an aider and abettor.[22]   In addition, the jury considered extensive evidence of Glenn Oztemel's authorization of and causing of payments to Innecco's companies, including the payments associated with Counts Two and Three, and Counts Six and Seven.  *See* GX 102-A, GX 103-A, GX 106-A, GX 107-A.

---

[21] Not only did Glenn Oztemel stipulate to his status as a domestic concern, but he also did not object to the jury instruction based on that stipulation.  *See* Mot. at 25.  The Court should reject this about-face.  At a minimum, the stipulation satisfied the domestic concern element as to Glenn Oztemel's principal liability.  *Compare* GX 10012 *with* ECF 306 No. at 14.

[22] The Court was not required to instruct the jury on the specifics of agency law.  Glenn Oztemel did not request an agency instruction at trial and did not object to its omission, and the Court should thus consider this claim under the plain error standard.  *See United States v. Kim*, 303 F. Supp. 2d 150, 157 (D. Conn. 2004); *see also United States v. Botti*, 711 F.3d 299, 307–308 (2d Cir. 2013) (applying plain error review in absence of trial objection).  Here, there was no error, plain or otherwise, as the jury saw and heard voluminous evidence—from both parties' witnesses— that Innecco was, in fact, Glenn Oztemel's agent.  *See, e.g.*, GX 5013 (Glenn Oztemel: "The man talking to me now [Innecco] is a person I have used as my agent in Petrobras for the past 6 years."); GX 5419 (Glenn Oztemel: "There may be clear opportunities to make money off petrobras and Eduardo is an excellent agent in this regard."); Sept. 9 (AM) Tr. at 55 (Berkowitz: "I received the bribes from Eduardo Innecco. . . . He was the Arcadia agent, and then he became the Freepoint agent."); Sept. 23 (AM) Tr. at 69–70 (Peck agreed that Innecco was "the Defendant's agent").  *See also* Sept. 18 (PM) Tr. at 66–68 (defense expert testimony describing experience with agents).  Indeed, even the Motion refers to Innecco as Glenn Oztemel's "agent."  *See* Mot. at 17.  While Glenn Oztemel was entitled to a jury charge that reflected his defense, *see United States v. Vasquez*, 82 F.3d 574, 577 (2d Cir. 1996), in this case Innecco's status as an agent was not in dispute.

Glenn Oztemel also argues, for the first time, that the Court should have "cabined" its aiding-and-abetting and *Pinkerton* instructions to only a particular theory of FCPA liability, *see* Mot. at 26, but he cites to no authority for that proposition, and the government is aware of none.[23] In fact, courts regularly instruct on multiple theories of liability. *See United States v. Ferguson*, 676 F.3d 260, 279 (2d Cir. 2011) ("jurors were presented with four theories of liability: principal, aiding and abetting, willfully causing, and *Pinkerton*"). Thus, Glenn Oztemel's *Pinkerton* argument is ultimately built on the same fundamental misreading of the FCPA that underpins his other arguments—namely, that Innecco could not be both an agent of a domestic concern under Section 78dd-2(a)(1) and "any person" under Section 78dd-2(a)(3). As such, for the same reasons as discussed above, the Court's instructions on secondary liability did not risk conviction on the basis of aiding and abetting or conspiring with a person exempt from FCPA liability.[24]

### (c)    The Court Properly Instructed the Jury on Unanimity

Glenn Oztemel's final argument regarding the Court's instructions for Sections 78dd-2(a)(1) and 78dd-2(a)(3) is that the Court should have included an additional unanimity admonition for each theory of liability. Mot. at 26. Otherwise, he maintains, "some jurors may have convicted under (a)(1) while others convicted under (a)(3)." *Id.*

Because Glenn Oztemel did not raise this issue at trial, the Court reviews this argument under the plain error standard. *See United States v. Vilar*, 729 F.3d at 88 (2d Cir. 2013) (citation omitted) ("[W]here a defendant fails to make a specific and timely objection to a district court's jury charge those instructions are subject to review only for plain error."); *see also Kim*, 303 F.

---

[23] Other courts presiding over FCPA cases have instructed on *Pinkerton* and aiding and abetting in a manner substantially identical to the Court's actions in this case. *See, e.g.*, *Hoskins*, No. 3:12cr238 (JBA) (D. Conn. Nov. 6, 2019) (ECF No. 321-2 in this case, at 27–29 (*Pinkerton*), 40–44 (aiding and abetting)).

[24] Glenn Oztemel's citation to *Hoskins I* is therefore inapposite. As discussed above and conceded both at trial and in Glenn Oztemel's Motion, Innecco was an agent of a domestic concern. As such, Innecco is liable as a principal under the FCPA. *Hoskins I*, 902 F.3d at 97–98 (allowing prosecution to proceed under Section 78dd-2).

Supp. 2d at 157 (conducting plain error review on Rule 33 motion).  Under plain error review, relief is appropriate only where an instruction contains "'(1) error, (2) that is plain, and (3) that affect[s] substantial rights.'  In addition, the error must 'seriously affect[] the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Grote*, 961 F.3d 104, 115–16 (2d Cir. 2020) (citations omitted).

Glenn Oztemel's argument on unanimity presumes that violations of Section 78dd-2(a)(1) and 78dd-2(a)(3) constitute separate crimes, but he cites no authority for that proposition.  Indeed, the cases go the other way.  Congress may establish a crime whose elements may be satisfied via "diverse means" and may even "leave[] the many potential means of fulfilling [the] elements entirely to the jury's imagination." *Requena*, 980 F.3d at 49 & n.15 (citing *Mathis v. United States*, 579 U.S. 500, 505–506 (2016) and *Descamps v. United States*, 570 U.S. 254, 273 (2013)).  As discussed by the Second Circuit in *Requena* and by the Supreme Court in *Mathis*, if a statute required "use of a deadly weapon" as an essential element of the crime, "a 'jury could convict even if some jurors concluded that the defendant used a knife while others concluded he used a gun, so long as all agreed that the defendant used a "deadly weapon.'" *See id.* (quoting *Mathis*, 579 U.S. at 506) (cleaned up).  By comparison, in Section 78dd-2, Congress proscribed uses of interstate commerce by covered persons in furtherance of offers, payments, promises, and authorizations of payments to three classes of recipients, as reflected in subsections (a)(1), (a)(2), and (a)(3). *See generally* 15 U.S.C. § 78dd-2.  In other words, Congress provided for diverse ways to violate the element of the FCPA requiring proof of a payment to a prohibited class of recipients, all within a single portion of the statute (entitled "Prohibition") setting forth the elements of the offense. *Id.* Thus, there was no error in the Court's instructions, plain or otherwise, on account of there being no stand-alone unanimity instruction for each of the Section 78dd-2(a) subparts.

In addition, even if there were an error, and such error was plain, it would have had no effect on the "fairness, integrity, or public reputation of judicial proceedings." *See Grote*, 961 F.3d at 115–16. The Court's instructions included five separate admonitions regarding the requirement of a unanimous verdict. *See* ECF No. 306 at 54–55. The verdict form also required the jury to make unanimous findings on each count—which it did, finding Glenn Oztemel guilty of all seven counts in the Superseding Indictment. *See* ECF No. 303. The law requires no more. *See United Requena*, 980 F.3d 48–49 (any disagreement among jurors regarding "'which of several possible means the defendant used to commit an element of the crime' . . . does not matter as long as all 12 jurors unanimously conclude" that necessary element of crime has been proven) (quoting *Richardson v. United States*, 526 U.S. 813, 817 (1999)); *see also United States v. Estevez*, 961 F.3d 519, 527 (2d Cir. 2020) ("As to how the jury should be instructed in this respect, we have, time and again, held that a general charge regarding unanimity is ordinarily sufficient to protect the defendant's right to a unanimous verdict.") (internal quotation marks omitted); *United States v. Obrien*, 560 U.S. 218, 225 (2010) ("[W]hether a given fact is an element of a crime . . . is a question for Congress."). The Court's instructions for Sections 78dd-2(a)(1) and 78dd-2(a)(3) were therefore correct, and overturning the jury's verdict is not warranted.

### 4.    The Court's Conscious Avoidance Instruction Does Not Merit a New Trial

Glenn Oztemel also challenges the inclusion of a conscious avoidance instruction in the part of the Court's instructions regarding the conspiracy charged in Count One. Mot. at 27–29. Absent from his argument, however, is a discussion of the charge conference where, during the first day, defense counsel told the Court, "it's our view that [the conscious avoidance instruction] is only pertinent for the two conspiracy counts," Sept. 19 Charge Tr. at 8, and said that it would be "fine" to include the instruction in Count One, adding only, "I guess I reserve the right to change my mind . . . ," *id.* at 19. The following week, during the second day of the charge conference,

counsel was again asked whether he had "any concern" with including the conscious avoidance instruction where it was. Sept. 23 Charge Tr. at 5. Counsel responded, "No concern about inserting it there. I think that's where it first really comes up." *Id*. For this reason alone, the Court should reject this challenge. *See United States v. Klein*, 216 F. App'x 84, 90 (2d Cir. 2007) (When a defendant asks for the instruction that he or she later challenges as erroneous, the 'invited error' doctrine bars the defendant from challenging that instruction on appeal.") (citing *United States v. Young*, 745 F.2d 733, 752 (2d Cir.1984)); *see also United States v. Bahadar*, No. 90 CR 343, 1990 WL 110913, at *5 & n.6 (E.D.N.Y. July 31, 1990) (noting defense counsel's failure to raise objection until after jury charge).[25]

Even if Glenn Oztemel had preserved this argument, however, he would still not be entitled to a new trial because the Court's instructions, considered in their entirety, adequately informed the jury of the requisite knowledge for Glenn Oztemel to be found guilty on the conspiracy counts. *See United States v. Raniere*, 55 F. 4th 354, 262 (2d Cir. 2022) (affirming trial Court's instructions on de novo review where instructions, on the whole, "neither failed to inform the jury adequately of the law no misled the jury about the correct legal rule.").

In charging the jury on the law of conspiracy, the Court emphasized the requirements of knowledge and willfulness from the outset and repeated them throughout the instructions. *See* ECF No. 306 at 23 ("[T]he government must prove beyond a reasonable doubt . . . that the defendant knowingly and willfully joined the conspiracy, that is, he agreed to be associated with the conspiracy . . . ."); *id.* at 25 ("Before a defendant can be found to have been a conspirator, you

---

[25] As noted above, counsel for Glenn Oztemel did raise an objection to the placement of this instruction *after* the jury was charged. *See* Sept. 24 Tr. at 86–87. The Court responded, "I don't know what to say except that the only request from the defense was that this charge be placed in the context of this conspiracy count instead of outside it, so that's what I did." Counsel replied, "Yes, Your Honor." *Id.* at 87. Counsel did not ask that the jury be re-charged, for a curative instruction, or for any other relief from the Court.

must first find that he knowingly joined in the unlawful agreement or plan. The key inquiry is whether a defendant joined the conspiracy charged with an awareness of at least some of the basic aims and purposes of the unlawful agreement and with the intent to help it succeed."); *id.* at 26 ("The second element the government must prove beyond a reasonable doubt is that the defendant knowingly, willfully, and voluntarily became a member in the charged conspiracy.").

The Court also instructed the jury on conscious avoidance: "[I]n determining whether Glenn Oztemel knowingly joined the conspiracy, you may find that he consciously avoided obtaining the required knowledge by (1) subjectively believing that there was a high probability that bribery was occurring; and by (2) taking deliberate actions to avoid learning those facts." *Id.* at 26. The Court later cautioned, however, that "knowledge of a conspiracy, without agreement to participate in it, is not sufficient." *Id.* at 27. The Court added:

> Moreover, the fact that the acts of a defendant, without knowledge, merely happen to further the purposes or objectives of the conspiracy, does not make the defendant a member. More is required under the law. What is required is that the defendant participated in the conspiracy with knowledge of at least some of its unlawful purposes or objectives, and with an intent to aid in the accomplishment of its unlawful objectives. . . . In sum, Glenn Oztemel, with an understanding of the unlawful purpose of the conspiracy, must have knowingly and willfully agreed with others to accomplish that purpose, proven beyond a reasonable doubt. *Id.*

The Court also separately instructed the jury on knowledge, intent, and willfulness. "To act 'knowingly' means to act voluntarily and deliberately, rather than mistakenly or inadvertently. Whether the defendant acted knowingly may be proven by his conduct and by all of the facts and circumstances surrounding the case." *Id.* at 9. "A person acts 'intentionally' if he acts deliberately and purposefully, that is the person's actions must have been his conscious objective rather than the product of mistake, accident, negligence or some other innocent reason." *Id.* at 9–10. "An act is 'willful' if it's done voluntarily and intentionally and with the specific intent to do something

which the law forbids or with the specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or disregard the law." *Id*. at 10.

Viewed as a whole, the Court's instructions on knowledge neither "failed to inform the jury adequately of the law or misled the jury about the correct legal rule, thereby prejudicing the defense." *Raniere*, 55 F. 4th at 262. As in *Khalupsky*, the Court's instructions, as a whole, "made clear that proof of membership in the conspiracy required a showing of actual knowledge." 5 F.4th 279, 297 (2d Cir. 2021). The jury was required to find that Glenn Oztemel had joined the conspiracy with the "intent to help it succeed." ECF No. 306 at 28; *Khalupsky*, 5 F.4th at 297. And as in *Khalupsky*, the Court defined "willfully" as something "done voluntarily and intentionally and with the specific intent to do something which the law forbids." ECF No. 306 at 13; *Khalupsky*, 5 F.4th at 297.[26]

Finally, and again similar to the circumstances of *Khalupsky*, if the Court does determine that its "conscious avoidance" instruction was erroneous, which it was not, any such error was harmless. The jury heard overwhelming evidence—including direct testimony from the bribe recipient and significant other evidence described above—of Glenn Oztemel's knowing and willful participation in the conspiracy to violate the FCPA and the conspiracy to commit money laundering. In fact, the government did not even rely on a conscious avoidance theory in its closing argument, rendering the "dispute over conscious avoidance beside the point." *See Khalupsky*, 5 F.4th at 279 (citing *United States v. Ferrarini*, 219 F.3d 145, 154 (2d Cir. 2000)).

---

[26] The Court should reject Glenn Oztemel's effort to distinguish *Khalupsky* based on the placement of "conscious avoidance" instruction in that case. *See* Mot. at 28–29. Viewed as a whole, the instructions in this case did not fail to inform or mislead the jury as to the law. Moreover, and contrary to Glenn Oztemel's claim, the "conscious avoidance" portion of the Court's knowledge instructions was not the "focus" of the instruction on membership in the conspiracy, but rather simply a constituent part that must be read in conjunction with the Court's other instructions.

**5.** **The Court Properly Instructed the Jury on the Statute of Limitations**

Glenn Oztemel claims the instructions did not adequately inform the jury of the statute of limitations requirements for the conspiracy offenses charged in Counts One and Five. Mot. at 29–32. In an effort to sow confusion where there was none, the Motion directs the Court to the "Date of Commission" instruction in the Court's general instructions. ECF No. 306 at 8–9. Here again, the Motion seeks relief that defense counsel could have sought, but did not, prior to the jury charge. Defense counsel did not object to the "Date of Commission" instruction, *see* Sept. 19 Charge Tr. at 4; nor did defense counsel object to the statute of limitations instruction in Count One, *see* Sept. 23 Charge Tr. at 10,[27] or to the absence of such an instruction in Count Five, *see id.* at 20–21. Thus, these instructions are subject to review only for plain error, *see Vilar*, 729 F.3d at 88, of which there was none.

As a starting point, the final paragraph outlining the third element of Count I ("Overt Acts") could not have been clearer, providing: "Finally, there is a limit on how much time the government has to bring an indictment. For you to find the defendant guilty of conspiracy, the government must prove beyond a reasonable doubt that at least one act in furtherance of the conspiracy was committed after August 14, 2017." ECF No. 306 at 31–32. And although this paragraph was not repeated in the instructions for Count Five, since Count Five did not have an overt act requirement, the instructions as a whole adequately informed the jury that the money laundering conspiracy also needed to continue until the limitations period—particularly since the duration of the FCPA and money laundering conspiracies was essentially the same.

---

[27] *See* Mot. at 31 n.2 ("[T]he defense did not object to this specific portion of the jury instructions.").

Glenn Oztemel first argues that the "Date of Commission" instruction "wrongly told the jury that the conspiracy need exist only during 'some time' between 2010 and 2018 . . . as opposed to during some time between August 14, 2017, and 2018." Mot. at 30. But this instruction was proper and necessary, as the government was required to prove that the conspiracy existed within the time period charged in the Superseding Indictment. *See United States v. Teague*, 93 F.3d 81, 84 (2d Cir. 1996) (date alleged in indictment must be "substantially similar to the date established at trial") (cleaned up); *United States v. Morgenstern*, 933 F.2d 1108, 1115 (2d Cir. 1991) ("the district court correctly instructed the jury that there had to be a substantial similarity between the indictment and the proof in order to find the defendant guilty") (citations and quotation marks omitted). Moreover, the inclusion of the statute of limitations instruction later in the charge does not require a modification to the "Date of Commission" instruction, and Glenn Oztemel cites no authority for such proposition. Indeed, to include similar language in the "Date of Commission" instruction would serve only to make that instruction confusing, as such language could arguably suggest that the time period of the scheme proven at trial did not need to be substantially similar to the time period alleged in the indictment.

Likewise, Glenn Oztemel cites no authority to support his argument that it was error for the instructions to identify any alleged overt acts that fell outside the statute of limitations period. *See* Mot. at 30–31 (claiming "whether an overt act occurred before the limitations period even began was irrelevant" and suggesting that instructions must identify only those alleged overt acts falling within the limitations period). That is not the law. Courts that have addressed this specific issue have found no error in submitting alleged overt acts outside the limitations period to the jury so long as the charge includes a statute of limitations instruction. *See United States v. Wharton*, No. CRIM. ELH-13-0043, 2014 WL 1430387, at *11 (D. Md. Apr. 10, 2014), *aff'd*, 840 F.3d 163

(4th Cir. 2016) (denying defendant's request to strike from indictment any conduct outside the limitations period, since "[s]uch conduct is pertinent to the continuing offenses at issue, and the instructions to the jury will certainly resolve any potential for confusion"); *United States v. Damra*, No. 1:06 CR 367, 2008 WL 11404220, at *6–7 (N.D. Ohio Sept. 12, 2008) (no error in instruction referring to eighteen overt acts alleged in indictment, only two of which fell within limitations period, and that required jury to find at least one overt act was committed within limitations period). While untimely overt acts are not sufficient proof to satisfy the statute of limitations, they are relevant to show the existence and continuing nature of the conspiracy. *See United States v. Salmonese*, 352 F.3d 608, 619 (2d Cir. 2003) ("[A] principal reason for the overt act requirement in a conspiracy prosecution is simply to manifest that the conspiracy is at work.") (internal quotations omitted); *Luparella v. United States*, 335 F. App'x 212, 215 (3d Cir. 2009) (untimely acts may be included in an indictment "as overt acts to show the existence and continuance of the conspiracy") (quotation marks omitted). It was not error to allow the jury to consider the alleged overt acts that fell outside the limitations period, especially given the inclusion of the statute of limitations instruction.

And to be sure, the jury also convicted Glenn Oztemel on three substantive FCPA counts, which alleged two wire transfers and an email that occurred within the limitations period, and which were specifically alleged as overt acts in furtherance of Count One. *See* ECF No. 306 at 29–30. Thus, there is no risk that the jury convicted on Count One based only on a pre-limitations overt act. *Cf. United States v. Malpeso*, 115 F.3d 155, 166 (2d Cir. 1997) (error in jury instruction was harmless because verdicts on other counts demonstrated basis for verdict).

Additionally, Glenn Oztemel's claim that the instructions "suggested that the requisite act within the limitations period need not be 'overt,'" Mot. at 30, is merely nitpicking in a way that is

not supported by the law.  In the section titled "Third Element: *Overt Act*" (emphasis added), the instructions repeatedly emphasized the requirement of proof of an "overt act," using the term 17 times in that section alone.  *See* ECF No. 306 at 28–32.  That one sentence in the section omitted the word "overt" prior to the phrase "act in furtherance of the conspiracy," *see id.* at 32, could not have confused or misled the jury.  *See United States v. Gengo*, 808 F.2d 1, 4 (2d Cir. 1986) (no reversible error where trial court did not repeat in supplemental charge that overt act must have been in furtherance of conspiracy, where on at least four occasions in main charge, court defined overt act as an act committed in furtherance of conspiracy).  Indeed, it is a "well established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973).  In the context of the overall charge, the instructions were clear that the jury was required to find beyond a reasonable doubt proof of an overt act after August 14, 2017.

While the Court properly instructed the jury on the statute of limitations for Count One, the Court was equally correct to omit a statute of limitations instruction as to Count Five.  Unlike the general conspiracy statute, the money laundering conspiracy statute does not require proof of an overt act.  *See Whitfield v. United States*, 543 U.S. 209, 219 (2005).  For a conspiracy without an overt act requirement, "once the government proves the conspiracy's existence, the scheme's continued operation into the limitations period is presumed . . . ." *Salmonese*, 352 F.3d at 620 (internal citations omitted); *see also United States v. Ravenell*, 66 F.4th 472, 482 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 1344 (2024) ("A non-overt act conspiracy is presumed to continue 'as long as its purposes have neither been abandoned nor accomplished, and no affirmative showing has been made that it has terminated.'") (citation omitted).  Indeed, a "conspiracy is a continuing

offense," and the burden is on the defendant to raise the statute of limitations affirmative defense. *Smith v. United States*, 568 U.S. 106, 111–12 (2013).

Glenn Oztemel now argues, but did not argue or otherwise suggest to the jury, that the money laundering conspiracy ended in August 2016 when Berkowitz was last paid by Innecco. But to warrant a statute of limitations instruction, a defendant must have a basis in the record for that affirmative defense. *See United States v. Morales*, No. 21-885-cr (L), 22-334 (Con), 2024 WL 220402, at *6 (2d Cir. Jan. 22, 2024) ("A conviction will not be overturned for refusal to give a requested charge unless that requested instruction is legally correct, represents a theory of the defense with a basis in the record that would lead to acquittal, and the theory is not effectively presented elsewhere in the charge.") (cleaned up).  It is "not plain error for the district court to decline to provide, sua sponte, a jury instruction regarding an unpresented defense theory." *Morales*, 2024 WL 220402, at *7; *United States v. Brettholz*, 485 F.2d 483, 490 (2d Cir. 1973) ("it was not error, and certainly not 'plain error'" for court not to give unrequested instruction concerning an affirmative defense theory).  Because there was no factual basis for a withdrawal defense, a statute of limitations instruction was unnecessary for Count Five.

Finally, as with the FCPA charges, the jury also convicted Glenn Oztemel on Counts Six and Seven, which alleged two wire transfers that occurred within the limitations period of Count Five.  Given the convictions on Counts Six and Seven, there is no risk that the jury convicted on Count Five based only on pre-limitations money laundering conduct.  *Cf. Malpeso*, 115 F.3d at 166 (finding error in instruction harmless based on verdicts on other counts).

### C.    Glenn Oztemel Was Not Prejudiced by the Court's "Guardrails" for Opening Statements

Glenn Oztemel contends that he was materially prejudiced by the "guardrails" imposed by the Court for opening statements.  Mot. at 32.  Specifically, he asserts that the Court gave the

government an "unfair and unusual advantage" by permitting the government to reference the allegations in the Superseding Indictment in its opening statement. *Id.* at 36. Even if his contentions were correct (and they are not), any error would be harmless and is not a basis for granting a new trial. Moreover, any alleged prejudice was avoidable insofar as the Court specifically conditioned its authorization of opening statements on the parties agreeing to the Court's limitations—which were primarily intended to prevent the government from presaging the evidence to the jury—and defense counsel elected to proceed anyway. ECF No. 245 at 35 ("So, if counsel tell me that they are willing to abide by those guardrails, I will grant your motion and give you 20 minutes."); *id.* at 48 ("What I'm trying to avoid is the Government - - the jury being told 'This is what the evidence is going to be . . . .'").

"An opening statement is a matter for the discretion of the court, [the local rules],[28] and is not a constitutional right." *United States v. Evans*, 629 F. Supp. 1544, 1546 (D. Conn. 1986). "There are no federal statutes or rules regarding opening statements, and existing case law regarding opening statements does not discuss the issue in constitutional terms." *United States v. Donald*, No. 3:21-CR-8 (VAB), 2023 WL 6958797, at *29 (D. Conn. Oct. 20, 2023). As such, "the making and timing of opening statements can be left constitutionally to the informed discretion of the trial judge." *United States v. Salovitz*, 701 F.2d 17, 21 (2d Cir. 1983) (denial of defendant's motion for opening statement was not abuse of discretion).

Here, the Court gave each party 20 minutes for opening statements and allowed defense counsel to choose between opening at the beginning of trial or the beginning of the defense case-in-chief; Glenn Oztemel chose the former. ECF No. 245 at 33–34. In addition, the Court spent

---

[28] Local Crim. Rule 57.2 provides that "[t]he presiding judge shall determine in his or her discretion whether or not to allow opening statements."

significant time outlining its guardrails, specifically that neither the government nor defense could presage the evidence, including what any witness was expected to say or what any document would show. *Id.* at 34. Rather, the Court directed the parties to provide a roadmap to orient the jury about the nature of the allegations and the types of evidence it would see and hear. *Id.* at 34–35; 52. The Court explained that the government's opening statements could reference the allegations in the Superseding Indictment as well as the particular charges as long as they were mentioned in the context of being allegations. *Id.* at 52. The defense, in turn, was permitted to tell the jury that it would see additional evidence that tells a different narrative than the government provided in the Superseding Indictment. *Id.* at 56.

After a lengthy discussion, Glenn Oztemel had the opportunity to withdraw his motion for an opening statement, made jointly with the government; he chose not to. Despite a request from the Court for authority supporting his position that the limitations on opening statements impacted his due process rights, Glenn Oztemel provided none. *See* ECF No. 245 at 46.

Against this background, and in light of the opening statements the parties gave, Glenn Oztemel's assertion that he was prejudiced because the defense was unable to make an opening statement "remotely comparable to the government's" is simply wrong. Mot. at 35. *See United States v. Chu*, No. 02CR673–RMB, 2004 WL 1176647, at *2 (S.D.N.Y. May 26, 2004) (test for whether new trial is warranted due to improper opening statements "is whether the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial").

As initial matter, Glenn Oztemel mischaracterizes the substance of the government's opening statement and thus misconstrues any purported prejudicial effect. Glenn Oztemel describes the Superseding Indictment as "prolix" and states that the Court's decision to permit the government to refence allegations in the Superseding Indictment "gave the government a

48

substantial and unfair advantage." Mot. at 34. While the Superseding Indictment quotes from specific communications among alleged co-conspirators, ECF No. 76 ¶ 29, the government's opening statement did not. The government did not quote from or otherwise read any portions of the Superseding Indictment, including any of the emails or wires listed as overt acts. *See* Sept. 4 Tr. (AM) at 27–34. Rather, the government outlined the charges against Glenn Oztemel and the types of evidence the jury would see, including personal and work emails, encrypted messages, code words and aliases, invoices and financial records, as well as testimony from witnesses. *Id.* The government described categories of evidence, not specific communications, records, or anticipated testimony. Glenn Oztemel did not object during the government's opening.

Contrary to Glenn Oztemel's assertion that the Court's opening statement guidelines "overwhelmingly and unilaterally favored the government" because the defense "had no similar document to draw from," Mot. at 34, defense counsel repeatedly used the Superseding Indictment to orient the jury to its view of the case and to underscore a litany of questions that the defense believed the jury should ask about the government's evidence. For example, defense counsel told the jury that the Superseding Indictment "alleges that certain behavior was designed to conceal the conspiracy" such as the allegations that "Glenn used his personal Yahoo email account to hide his activities." Sept. 4 Tr. (AM) at 38. Defense counsel then told the jury to "[t]est that allegation. See whether Glenn Oztemel communicated with Mr. Innecco both on his personal account and on his work account. Look to see if Glenn ever initiated an email to Mr. Innecco on his Yahoo account or if he just responded to emails sent there." *Id.* Throughout the opening statement, defense counsel used the allegations in the Superseding Indictment to ask the jury to test the government's theory of the case and to question the meaning of the evidence presented. *See id.* at 40 ("as alleged in the Indictment, assess Mr. Innecco's instructions to Glenn to not share the information Innecco

49

received from Berkowitz with Ms. Cannella.  Think about why would Innecco have to say that to Glenn if Glenn was in a conspiracy with Innecco and Berkowitz").[29]

Furthermore, Glenn Oztemel has not identified any legal authority requiring that the jury hear an opening statement with "the defense's framing of the case." Mot. at 35.  Glenn Oztemel directs the Court to *United States v. Yakobowicz*, 427 F.3d 144 (2d Cir. 2005); *see* Mot. at 31–34, but that decision is inapposite.  There, the Second Circuit found that allowing the government to make summation comments after each witness's testimony violated the defendant's right to a fair trial and was unduly prejudicial.  427 F.3d at 153.  Through interim summations, the "government was allowed to repeat and reinforce *with advocacy* the testimony of its witnesses . . . .  The problem is that the repetitive and cumulative summations altered and undermined the defense's use of the presumption of innocence as a defense and had indeterminable effects on defense strategy and tactics." *Id.* at 153–54 (emphasis added).  The *Yakobowicz* court stated that "the gravamen of our concerns has to do with argumentative summations" and noted that proper procedures to aid the jury would include "opening statements which, as noted, are generally limited to statements of expectations as to the evidence rather than arguments." *Id.* at 154.

Here, no such arguments occurred in the government's opening statement.  Rather, the government outlined the allegations in the Superseding Indictment and identified the types of evidence—such emails, invoices, and bank records—that the jury would see, and as well as the types of witnesses from whom the jury would hear testimony.  Sept. 4 Tr. (AM) at 27–34.

---

[29] Glenn Oztemel has not identified any support for his position that references to an indictment in an opening statement are unduly prejudicial to a defendant, and the government is aware of none.  In fact, the Second Circuit has long held that "[i]t is not improper for the court to read the indictment in its entirety or portions thereof to the jury." *United States v. Press*, 336 F.2d 1003, 1016 (2d Cir. 1964) (trial court read indictment before the jury was impaneled, after jury was sworn, and in the course of the charge); *see also Salovitz*, 701 F.2d at 19 (trial court prohibited opening statements but read indictment to jury); *Evans*, 629 F. Supp. at 1547 ("Any advantage claimed to accrue to the government by the reading or paraphrasing of the indictment is countered by a recitation of defendant's denial, buttressed by instructions as to the government's burden of proof, defendant's entitlement to a presumption of innocence and the want of any obligation on defendant's part to offer evidence or prove her innocence.").

Finally, even assuming that the Court's parameters for opening statements were unfair to Glenn Oztemel, any such purported prejudice was harmless. Before opening statements, the Court instructed the jury that "an opening statement is not evidence" and, instead, is intended to assist the jury by "providing a structural or procedural framework within which you will be receiving the evidence." Sept. 4 Tr. (AM) at 27. The Court also instructed the jury that Glenn Oztemel was presumed innocent against all charges and presumed innocent throughout trial, that the government bears the burden of proof, and that Glenn Oztemel need not put on any case or evidence at all. *Id.* at 18–19. The Court repeated these instructions at the close of trial, including instructing the jury that the Superseding Indictment is not evidence but merely an accusation, and that what the lawyers said during trial is not evidence. Sept. 24 Tr. (PM) at 15, 65–66. Given these clear instructions to the jury both before and after trial, any supposed error caused by the limits on opening statements or the government's reference to the Superseding Indictment was harmless.

### D.    The Court Should Deny Glenn Oztemel's Request that the Court Reconsider its Previous *Giglio* Ruling

As his final ground for seeking a new trial, Glenn Oztemel reiterates his claim that the government violated its disclosure obligations in connection with an FBI interview report prepared by Agent Lundby that did not reflect, as Berkowitz testified at trial, that Berkowitz, Innecco, and Glenn Oztemel discussed bribes during a meeting in Rio in or about 2016. As discussed above, the Court has already considered and rejected this argument. *See* ECF No. 278. Glenn Oztemel's rehashed Motion relies exclusively on *Giglio*, whereas his Motion for Mistrial also relied on the Jencks Act, and the Motion comes after Glenn Oztemel declined the opportunity to call Agent Lundby, who was in the courtroom, available to testify. If anything, the grounds for denying the Motion are even stronger today than they were during trial.

51

In denying the Motion for Mistrial, the Court squarely addressed the *Giglio* argument:

> I also reject the defendant's assertion that this information, whether reduced to writing or not, is *Giglio* material. The defense argues that had it known the details of this disclosure, it would have been material to Mr. Berkowitz's cross-examination. I think it first bears repeating that the information was inculpatory as to the defendant. There is nothing about this additional information that is exculpatory of the defendant or that implicates the witness's truthfulness, bias, or motive to lie. While the timing of the disclosure may give rise to a basis for cross-examination, the defendant did, in fact, have the opportunity to conduct that cross-examination.

Sept. 13 Tr. (AM) at 7–8. The Motion essentially ignores the Court's findings, instead claiming that Berkowitz's testimony regarding the Rio meeting was somehow "favorable" to Glenn Oztemel because it purportedly showed that Berkowitz embellished his account of meetings with Oztemel. *See* Mot. at 38 (analyzing government's *Giglio* obligations under *Brady* standard). It does not.

As the government said previously, *see* ECF No. 258 at 2, although *Giglio* requires the government to turn over evidence that could be used to impeach its witnesses' credibility, the alleged omission (that commissions or bribes were discussed at the Rio meeting) is not a statement that could be used to impeach Berkowitz. Even if the interview report were Berkowitz's statement (and it is not), it is not inconsistent with Berkowitz's trial testimony. Regardless, counsel for Glenn Oztemel did in fact attempt to cross-examine Berkowitz with Agent Lundby's interview report, and it amounted to nothing. Berkowitz reaffirmed his direct examination testimony, stating that he *did* "mention[] commissions being discussed" in his meetings with the FBI. Sept. 10 Tr. (AM) at 77. Thus, Glenn Oztemel's theory about Berkowitz's evolving story did not bear fruit. Berkowitz's testimony was inculpatory.[30]

---

[30] The situation here is similar to the facts in *United States v. Napout*, 332 F. Supp. 3d 533 (E.D.N.Y. 2018). In that case, the defendant argued that he learned of new evidence at trial, allegedly suppressed by the government, when a cooperator stated that he attended a meeting with the defendant in Paraguay at which bribes were discussed.

In any event, the Motion does not provide any new grounds for the Court to change its conclusion that the government did not suppress any of Berkowitz's statements. As the Court observed, "the law is clear that the Government is under no obligation to memorialize everything a witness says and produce it to the Defense. . . . That this aspect of Mr. Berkowitz's testimony did not end up in a 302 is not a basis for the finding or even further inquiry into a *Jencks* Act violation." Sept. 13 Tr. (AM) at 6. *See also United States v. Rodriguez*, 496 F.3d 221, 224–25 (2d Cir. 2007) (government does not violate *Brady* or *Giglio* obligations merely by not taking notes of witness interviews); *United States v. Walsh*, 774 Fed. App'x 706, 707 (2d Cir. 2019) (same). In addition, even if there were such an obligation, a new trial would only be required "if there is a significant chance that this added item, developed by skilled counsel, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *United States v. Hilton*, 521 F.2d 164, 166 (2d Cir. 1975); *see also United States v. Hunter*, 32 F.4th 22, 34 (2d Cir. 2022) (with respect to *Giglio* evidence, information is not material "when the testimony of the [government's] witness is corroborated by other testimony, or when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable"). Here, defense counsel's cross-examination of Berkowitz established only that his testimony regarding the Rio meeting was more detailed than what was recorded in Agent Lundby's report. *Cf. United States v. Full Play Group, S.A.*, 2023 WL 1994196, at *8 (E.D.N.Y. Feb. 13, 2023) ("The Court again notes that Lopez has had, and taken full advantage of, the opportunity to cross-examine Burzaco about the absence of details regarding the

---

*See* 332 F. Supp. 3d at 561–62. The defendant argued after conviction that he was later able to develop evidence casting doubt that the cooperator was in Paraguay at that time and, had he been able to present that evidence to the jury, he would have been able to show the cooperator was a liar. *See id.* The court found no *Brady* violation because, among other reasons, the cooperator's "statements on this point were highly inculpatory and, therefore, did not trigger the government's *Brady* obligations." *Id.* at 562.

NewsCorp meeting in Burzaco's 302s.  Lopez's counsel will also be able to call the FBI summary witness or any of the three FBI agents to corroborate [the] omission and impeach Burzaco's claim that he told the Government about that meeting.").[31]  Under these circumstances, Glenn Oztemel simply cannot show that, had this been "disclosed to the defense, the result of the proceeding would have been different."  *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005).[32]

Finally, Glenn Oztemel was not prejudiced by any supposed *Giglio* violation, as he was able to make effective use of Berkowitz's on cross-examination and during his closing.  *See United States v. Coppa*, 267 F.3d. 132, 142 ("[W]e have never interpreted due process of law as requiring more than that *Brady* material must be disclosed in time for its effective use at trial.").  The defense cross-examined Berkowitz extensively about the Rio meeting, including asking Berkowitz whether the discussion was "basically embellished and made up," and suggesting that his testimony about discussing bribes with Glenn Oztemel was "a lie."  Sept. 10 Tr. (AM) at 42. Defense counsel also argued to the jury that "all of Berkowitz's testimony" was "embellishments" and that "Berkowitz is a proven, very skilled liar."  Sept. 25 Tr. (AM) at 59–60; *see also id.* at 53 ("The Government's case was built on the testimony of Rodrigo Berkowitz.  There's no escaping it.  He was -- he is a very experienced liar, a very skilled liar . . . .").  In sum, there no credible argument that a different verdict would have resulted if the details about Berkowitz's memory of

---

[31]  Regarding his decision not to call Agent Lundby, Glenn Oztemel opines that a "a last-minute decision to call Lundby would have been especially risky."  Mot. at 39.  Putting aside whether that decision would have been last minute (it was not), it was a choice that defense counsel routinely face.  *See Full Play Group, S.A.*, 2023 WL 1994196, at *14 ("In the absence of a *Brady/Giglio* violation, any fairness issues are adequately remedied through cross-examination and the introduction of . . . testimony of FBI agents who were present at the witness proffer sessions.").

[32]  The information was also cumulative.  Impeachment evidence is not material "when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.'"  *Hunter*, 32 F.4th at 34 (citing *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998)).  The impeachment value of the supposed inconsistency between Agent Lundby's interview report and Berkowitz's testimony was at best cumulative, considering that Berkowitz admitted to receiving bribes from multiple trading companies, lying to Brazilian law enforcement, and using prostitutes in Brazil.  *See* Sept. 25 Tr. at 53–54.

the Rio meeting had been disclosed prior to trial.  *See United States v. Cook*, No. 3:17-CR-65 (SRU), 2019 WL 4247938, at *16 (D. Conn. Sept. 6, 2019) (denying Rule 29 motion where "there is nothing to suggest that if the defendants received a contemporaneous, and perhaps a more detailed, report of [a] meeting, that there was a reasonable probability of a not guilty verdict").

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendant Glenn Oztemel's Motion.

Respectfully submitted,

MARC H. SILVERMAN
ACTING UNITED STATES ATTORNEY

*/s/ Clayton P. Solomon*
Michael S. McGarry
Assistant United States Attorney
Federal Bar No. CT 25713
157 Church Street
New Haven, CT 06510
(203) 821-3700
Email: Michael.McGarry@usdoj.gov

GLENN S. LEON
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

Allison L. McGuire
Clayton P. Solomon
Trial Attorneys
Jonathan P. Robell
Assistant Deputy Chief
1400 New York Avenue NW
Washington, DC 20005
(202) 616-5960
Email: Clayton.Solomon@usdoj.gov

*Counsel for the United States*

55

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 24, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


/s/ *Clayton P. Solomon*
Clayton P. Solomon
Trial Attorney