UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 3:23-cr-26 (KAD) |
| | : | |
| v. | : | |
| | : | |
| GLENN OZTEMEL | : | |
| | : | |
| | : | |

## **GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States respectfully submits this memorandum in advance of the sentencing of Defendant Glenn Oztemel, scheduled for December 9, 2025, and in response to the Defendant's sentencing memorandum (ECF No. 419). As discussed below, the Defendant committed serious crimes and personally authorized millions of dollars in bribes for the better part of a decade. To avoid getting caught, he lied to his closest colleagues and friends—many of the same individuals who wrote letters of support to the Court—and directed a sophisticated international money laundering scheme involving a foreign intermediary, code names, shell companies, and sham invoices. The Defendant knew that his conduct was illegal but pressed forward nonetheless to make tens of millions of dollars in profit for his companies and for himself. He was already wealthy and successful, and his only apparent motivations were ego and greed.

Having been found guilty on all seven counts, the Defendant seeks to avoid meaningful punishment by casting himself as a victim of a corrupt industry and of the "happenstance of timing." *See* ECF No. 419 at 24. Neither of these claims is correct. Moreover, the Defendant suggests that his crimes should be excused because of his privileged upbringing and role as a mentor to more junior traders. In fact, the opposite is true: the Defendant must be held accountable,

and his sentence must send a message of deterrence to other professionals in the trading industry who seek to gain an advantage over their competitors through cheating and bribery.

Under the Government's calculation, the Defendant faces a United States Sentencing Guidelines (the "Guidelines" or "USSG") term of life.   Although the Government agrees that a sentence at or near this range is unwarranted in this case, the Government maintains that the Court should sentence the Defendant to a significant sentence of imprisonment of seven to ten years, commensurate with the serious nature of his extensive, deceptive, and deliberate criminal conduct and his role as one of the leaders and organizers of the international bribery scheme.

## I.      FACTUAL BACKGROUND AND OFFENSE CONDUCT [1]

Defendant Glenn Oztemel was a senior oil and gas trader at Arcadia Fuels, Inc. ("Arcadia") and later at Freepoint Commodities LLC ("Freepoint"), both of which were commodities trading companies with offices in Connecticut.  *See* Presentence Investigation Report ("PSR"), ECF No. 417 ¶ 12.  Gary Oztemel, the Defendant's brother, was the owner and president of Oil Trade & Transport S.A. ("OTT") and the owner of Petro Trade Services, Inc. ("Petro Trade").  *Id.*  Eduardo Innecco ("Innecco") worked as an agent for Arcadia, Freepoint, and OTT, as well as other companies.  *Id.*

From at least 2010 to December 2018, the Defendant, Gary Oztemel, and Innecco participated in a scheme to offer, promise, and pay bribes to officials at Brazil's state-owned and state-controlled oil and gas company, Petróleo Brasileiro S.A. – Petrobras (together with its U.S. subsidiary Petrobras America, Inc., "Petrobras"), including Rodrigo Berkowitz ("Berkowitz"),

---

[1] Because the Court presided over the Defendant's trial and re-reviewed much of the trial evidence in considering the Defendant's post-trial motions, the Government will not describe all aspects of the criminal conduct or cite all evidence relevant to the matters addressed herein.  Many of these facts are also set forth in the PSR at ¶¶ 12–39, and the Government also references certain trial testimony and government exhibits ("GX") admitted during Glenn Oztemel's trial.  *See also* ECF No. 394 (Government's Opposition to Glenn Oztemel's Motion for Judgment of Acquittal).

Marcos Alcoforado, and Jorge Rodrigues. *Id.* ¶ 13. In exchange for the bribes, Berkowitz and other foreign officials at Petrobras provided the Defendant, Gary Oztemel, and Innecco with confidential information related to Petrobras's business and directed cargoes to Arcadia, Freepoint, and OTT. *Id.* The confidential information and other improper assistance Berkowitz provided to the Defendant, Gary Oztemel, and Innecco gave Arcadia, Freepoint, and OTT improper business advantages in trades with Petrobras. *Id.* ¶¶ 13–14.

### A.    The Origins of the Conspiracy

In 2010, prior to the Defendant's employment at Freepoint, the Defendant, Gary Oztemel, and Innecco agreed to pay bribes to Berkowitz, Alcoforado, and Rodrigues to obtain and retain business for Arcadia and OTT. *Id.* ¶ 15; *see also* GX 5393 ("USD 60/bbl commission would cover the whole group, including Gary"); GX 5009 ("Met key people last evening . . . 60cts/bbl for the whole group."). More specifically, the Defendant, together with Gary Oztemel, agreed to have OTT facilitate "back-to-back" trades in order to pay higher bribe amounts of up to $1 per barrel to Petrobras officials. *Id.* ¶ 15. Around that same time, the Defendant advocated hiring Innecco as an Arcadia agent, telling Arcadia executives that "[t]he man talking to me now is a person I have used as my agent in [P]etrobras for the past 6 years . . . I would like to take him on." GX 5013.[2]

According to Berkowitz, the mechanics of the scheme were formally confirmed during an in-person October 2011 meeting in Miami. *See* Sept. 9 Tr. (AM) at 43 (explaining that he had an agreement with the Defendant "after the meeting in Miami"). During the meeting, Berkowitz testified, Alcoforado demanded that the Defendant increase "commissions" from 25 cents per barrel to one dollar per barrel. *Id.* at 33. Berkowitz testified that he was surprised that Alcoforado

---

[2] Evidence admitted at trial indicates that the bribery scheme began well before the Defendant joined Arcadia in 2010. *See, e.g.*, GX 5062 (In a May 9, 2011 email, Innecco wrote to the Defendant, "GOOD OLD TIMES ARE BACK. DO YOU LIKE THAT? IF SO PLEASE LET ME KNOW.").

was so direct in public and that the Defendant, while appearing uncomfortable, responded that he could not increase the commissions, but that Petrobras could continue selling to Arcadia through OTT in "back-to-back" transactions because "he was only interested in touching Petrobras oil." *Id*. at 35.

In emails to the Defendant and Gary Ozemel during this time, Innecco used coded language such as "breakfast" and "freight deviation" to refer to the bribes. PSR ¶ 16. For example, in an October 6, 2011 email to the Defendant and Gary Oztemel, Innecco stated that "in principle max [number] of people Archie [*i.e.*, Arcadia] can invite for breakfast is 25, and that [would] leave some key people (although not top people) with no breakfast." *Id.*; GX 5218. Again in November 2011, Innecco emailed the Defendant using the fictitious name "Spencer Kazisnaf" and an associated email address. In the email, which had the subject line "[m]aintaining the goodwill," Innecco stated, "May I remind you of requested increase for 5 additional breakfast servings after first table set up, which already occurred." PSR ¶ 17; GX 5276.

### B.    Continuation of the Bribery Scheme at Freepoint

In June 2012, the Defendant left Arcadia to work for Freepoint. PSR ¶ 19. Almost immediately upon joining his new company, the Defendant caused Freepoint to enter sham service provider agreements with Innecco's shell companies, including Albatross Shipping Consultants Ltd., Morgenstern Energy Trading, and Wertech S.A. (together, the "Innecco Companies"). *Id.* ¶ 12; GX 1022; GX 1132. Pursuant to those agreements, the Defendant caused Freepoint to pay Innecco a purported "consultancy fee" in addition to commissions of between 5 and 30 cents per barrel for trades between Freepoint and Petrobras. PSR ¶ 20; GX 9009; 9010; 9013. The Defendant determined the commission amount for each trade. Sept. 19 Tr. (PM) at 33 (Robert Peck testifying that the Defendant "had the discretion" to set Innecco's commission).

4

To conceal their bribery and money laundering scheme, the Defendant, Innecco, and others took various steps, including but not limited to: sharing confidential information using personal and alias email accounts and encrypted messaging applications; using coded language to refer to bribes and individuals involved in the scheme; and engaging in sham negotiations to give the appearance of legitimacy to trades between Freepoint and Petrobras.  PSR ¶ 21; *see also* GX 5482 (the Defendant responding to an email from "Spencer Kazisnaf" attaching a spreadsheet tracking the bribe payments, stating, "Spencer, u. R. A bad boy!"); GX 5743 (email from Nikita Maksimov responding to an email from the Defendant, who wrote, "Did you speak with r"); GX 6020 (email with the subject line, "Breakfast"—"Being discreetly told its abt time to improve it.  Think abt it."); GX 5229 ("Pls see your private mail"); GX 7092 ("At working hours we communicating via text message via disposable phone."); GX 5793 (responding to an email with the subject line "Your last message (breakfast)," stating "We can talk in the morning. U write too much."); GX 5965 ("You may not know, but depending on what you say RB cud be completely exposed"); GX 6097 ("Just a reminder:  He will be calling you this morning from his office where all in and out phone calls are recorded and monitored (as well as his mobile and messenger.)"); GX 6325 ("pls have in mind that all their telephones are bugged . . . . And remember: I do not exist."); GX 6525 (Innecco encouraging the Defendant to use WhatsApp, explaining, "ALL MESSAGES ARE INCRIPTED !!!").

### C.    The Mechanics of the Scheme

The Defendant caused Arcadia and Freepoint to pay bribes in two ways.  Most commonly, the bribes were paid to Berkowitz and other Petrobras officials through purported consultancy fees and commissions paid to Innecco.  PSR ¶ 28.  In addition, the Defendant and Gary Oztemel caused bribes to be paid from OTT's profits on the back-to-back trades between Freepoint, OTT, and

Petrobras. *Id.* As Berkowitz testified, he "started giving Freepoint inside information from Petrobras, privileged information, in order to favor Freepoint on trading activities, in order to make them the most competitive buyers, in order to make Freepoint win long-term contracts," and this scheme continued "until 2018." Sept. 6 Tr. (PM) at 25. Berkowitz described being in "daily contact with Eduardo Innecco trying to find business opportunities for Freepoint." *Id.* at 24–25. For 2018 trades, Berkowitz expected, based on his agreement with the Defendant and Innecco, to get half of the commission Innecco received from Freepoint and that he would not get paid if Freepoint did not win the cargo. *See* Sept. 9 Tr. (PM) at 14 ("The commission [w]as an average was around 25 cents per barrel. I would get half of it."); *see also id.* at 48.

In total, between 2010 and 2018, the Defendant caused Arcadia, Freepoint, and OTT to pay Innecco approximately $7.8 million in corrupt consulting fees and commissions, knowing that a portion of such money would be used to pay bribes to Brazilian government officials. *See* GX 501, 503.

### D.    Relevant Procedural History

On February 14, 2023, a grand jury sitting in New Haven, Connecticut, returned a seven-count indictment charging the Defendant and Innecco with conspiracy, multiple counts of violating the Foreign Corrupt Practices Act (the "FCPA"), money laundering conspiracy, and money laundering. *See* ECF No. 1. On February 15, 2023, the Defendant was arrested and was released on bond the following day. On August 29, 2023, a grand jury sitting in New Haven, Connecticut, returned a nine-count superseding indictment adding charges against Gary Oztemel. *See* ECF No. 76.

On December 14, 2023, Freepoint entered into a Deferred Prosecution Agreement ("DPA") with the Government. *See United States v. Freepoint Commodities, LLC*, 23-CR-00224-KAD,

ECF No. 10.  As part of the DPA, Freepoint agreed to pay a $98 million criminal penalty.  *Id.* Freepoint's criminal penalty was based, in part, on the company's admission that it "earned approximately $30.5 million in profits from its corruptly obtained business with Petrobras."  *Id.* at ECF No. 10-1.

On June 24, 2024, Gary Oztemel entered a guilty plea to Count Nine of the Superseding Indictment and was sentenced on October 28, 2024.  ECF Nos. 186, 329.  Innecco was arrested in Lille, France, and was pending extradition to the United States, but he fled to Brazil prior to his extradition and died in October 2025.  PSR ¶ 3.

On September 26, 2024, following a three-week jury trial, the Defendant was found guilty on all seven counts in the Superseding Indictment.  ECF No. 303.  On January 23, 2025, Glenn Oztemel filed a motion for a judgment of acquittal or a new trial.  ECF No. 379.  The Court denied the motion on August 11, 2025.  ECF No. 403.

## II.    SENTENCING GUIDELINES CALCULATION

### A.    The Applicable Guidelines Term of Imprisonment Is Life

The Government respectfully submits that the appropriate Guidelines calculation is set forth below.  The United States Probation Office agrees with the Government's calculation except that the Government believes that a four-level adjustment is applicable to Glenn Oztemel's Guidelines calculation, pursuant to USSG 3B1.1(a), based on his role as an organizer and leader of a criminal activity that involved five or more participants.  Because the Government believes that a leader/organizer adjustment is appropriate, the Government also believes that the Defendant is ineligible for the two-level downward adjustment under USSG 4C1.1(a)(10).

**COUNTS ONE THROUGH FOUR**:

CONSPIRACY TO VIOLATE THE FCPA AND VIOLATIONS OF THE FCPA

| | | |
|---|---|---|
| Base Offense Level | 12 | USSG § 2C1.1(a)(2) |
| More than One Bribe | +2 | USSG § 2C1.1(b)(2) |
| Value of Benefit Received – $25,000,000 to $65,000,000[3] | +22 | USSG §§ 2C1.1(b)(2), 2B1.1(b)(1)(L) |
| Aggravating Role – Organizer/Leader | +4 | USSG § 3B1.1(a) |
| **Total Offense Level:** | **40** | |

**COUNTS FIVE THROUGH SEVEN:**

CONSPIRACY TO COMMIT MONEY LAUNDERING AND MONEY LAUNDERING

| | | |
|---|---|---|
| Base Offense Level | 36 | USSG § 2S1.1(a)(1)[4] |
| Conviction Under 1956 | +2 | USSG § 2S1.1(b)(2)(B) |
| Sophisticated Laundering | +2 | USSG § 2S1.1(b)(3) |
| Aggravating Role – Organizer/Leader | +4 | USSG § 3B1.1(a) |
| **Total Offense Level:** | **44** | |

The counts all involve substantially the same harm, so they constitute a single group under USSG § 3D1.2, and there is no increase in offense level under USSG § 3D1.4. As a result, the combined offense level is 44. However, the Guidelines state that where the offense level is more than 43, the offense level will be treated as a level 43. USSG § 5A cmt 2.

---

[3] As set forth in Freepoint's DPA, the company's profits from the scheme were approximately $30.5 million. *See Freepoint Commodities LLC*, No. Case 3:23-cr-00224-KAD, ECF No. 10-1.

[4] The specified unlawful offense ("SUA") is FCPA conspiracy calculated pursuant to U.S.S.G. § 2C1.1, as set forth above.

The Defendant has a criminal history score of zero and, thus, a criminal history category of I. PSR ¶ 66. Based on the total offense level of 43 and a criminal history category of I, the Defendant's Guidelines range of imprisonment is life. USSG § 5A. However, since the statutorily authorized maximum sentences are less than the minimum of the applicable Guidelines range (specifically, the maximum term of imprisonment for Counts One through Four is five years; the maximum term of imprisonment on Counts Five through Seven is 20 years), the restricted Guidelines term of imprisonment is equivalent to the combined maximum statutory sentences.

Moreover, because the Guidelines range is above a level 14 and, thus, in Zone D of the Sentencing Table, the Guidelines "do not authorize" a sentence of probation. USSG § 5B1.1 cmt. 2; *see also* USSG § 5C1.1(f) ("If the applicable guideline range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment.").

**B.    The Defendant's Objections to the Guidelines Calculations Are Unavailing**

The Defendant objects to two of the enhancements that Probation and the Government have determined are applicable under USSG §§ 2C1.1(b)(2) (benefits received from a bribery scheme) and 2S1.1(b)(3) (sophisticated money laundering). He also objects to the Government's determination that an aggravating role adjustment is warranted under USSG § 3B1.1(a) (leader/organizer). His objections should be rejected in their entirety.

*1.    The Sentencing Enhancement for a Benefit Received of Approximately $30.5 Million Is Warranted*

The Defendant objects to the 22-level enhancement pursuant to USSG §§ 2C1.1(b)(2) and 2B1.1(b)(1)(L) based on the Government's calculation that the "benefit received" in return for the bribes was greater than $25,000,000, arguing that the Government did not prove this figure at trial and that the Government cannot do so in any event because it is "impossible to trace profits to Freepoint back to individual oil transactions." ECF No. 419 at 15 (citing letter from Robert Peck).

9

The Government, however, was not required to establish the benefit received at trial and is only required at sentencing to establish an approximation of profits by a preponderance of the evidence. In fact, the Defendant objected to the introduction of any evidence regarding his annual incentive compensation (which would have been based, in part, on the profitability of the corrupt transactions), ECF No. 206 at 12–14, and both parties agreed not to introduce evidence related to the DPA. ECF No. 227 at 16–18. The Government is prepared, if necessary, to establish the reasonable estimate of benefits received by Freepoint and the Defendant by calling a witness at sentencing.

USSG § 2C1.1(b)(2) states that "[i]f the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount." The commentary to the Guidelines states that the value of the benefit received "means the net value of such benefit." USSG §2C1.1 cmt. 3. To calculate the "net value" of the benefit, courts start with gross revenue from the ill-gotten benefit and then subtract "direct costs;" courts do not deduct either the value of the bribe payment or any "indirect costs." *See*, *e.g.*, *United States v. Glick*, 142 F.3d 520, 525 (2d Cir. 1998) ("In calculating the amount of 'improper benefit,' only direct costs, not indirect costs, should be subtracted from the gross value received.").[5]

---

[5] Direct costs are "all variable costs that can be specifically identified as costs of performing a contract. This might include, for example, transportation costs for the goods in question." *United States v. Landers*, 68 F.3d 882, 884 n.2 (5th Cir. 1995). On the other hand, "[i]ndirect costs (fixed costs) are the costs incurred independently of output. For example, rent and debt obligations are costs a business incurs no matter how many contracts it receives. For the most part, overhead costs are fixed costs. The marginal increase in variable overhead costs from a wrongfully obtained contract is normally so *de minimis* that accounting for them during sentencing would be impractical." *Id.* at 885 n.3; *see also United States v. DeVegter*, 439 F.3d 1299, 1304 (11th Cir. 2006) ("Unlike the accounting term 'direct costs,' for sentencing

"The government bears the burden of establishing the estimated net value with reliable and specific evidence." *United States v. DeVegter*, 439 F.3d 1299, 1304 (11th Cir. 2006); *see also Lianidis*, 599 F.3d 273, 278 (3d Cir. 2010) ("We have held that the Government bears the burden of showing 'benefit received.'"). However, the Second Circuit has indicated that the Defendant has the burden of showing what direct costs should be deducted. *See Glick*, 142 F.3d at 525 (refusing to deduct costs from the value of the improper benefit received because the defendant "failed to establish direct costs sufficient to warrant a reduction of his sentence"); *see also DeVegter*, 439 F.3d at 1305 ("[T]he defendants have the burden of proving what direct costs should be subtracted in determining the net improper benefit. . . .").

In calculating the value of the benefit received, "[t]he district court need not determine the value of the benefit with precision." *United States v. Griffin*, 324 F.3d 330, 366 (5th Cir. 2003) (addressing § 2C1.1 in the context of an extortion case); *see also United States v. Figueroa*, No. 24-1008, 2025 WL 289426, at *2 (2d Cir. Jan. 24, 2025) ("Where, as here, Del Valle's record-keeping was such that the exact amount he paid Figueroa was unknown, the district court was entitled to estimate the gain amount 'by extrapolating the average amount of [gain] from known data and applying that average to transactions where the exact amount of [gain] is unknown.'") (quoting *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir. 1997) (per curiam)); *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009) (in the context of determining loss, holding, "even if not based on precise data, [the trial court's estimate] was reasonably based on 'known' data such as the average dollar amount of food stamp redemptions"); *United States v. Gray*, 521 F.3d 514, 543 (6th Cir. 2008) (stating that the amount of benefit "need not be determined with precision").

---

purposes, variable overhead costs not easily identifiable to a specific contract are not direct costs. The court can ignore these variable costs in sentencing because the sentencing courts are not required to make precise calculations.") (internal citations omitted).

Where, as here, the Defendant paid bribes to Berkowitz and others to benefit his employers, the commentary to the Sentencing Guidelines and several courts have made clear that the value of the "benefit received or to be received" refers to the benefit received by the company on whose behalf the individual paid the bribe, as well as any co-conspirator. *See* USSG § 2B4.1 (Background) ("As with non-commercial bribery, this guideline considers not only the amount of the bribe but also the value of the action received in return. Thus, for example, . . . [i]f a gambler paid a player $5,000 to shave points in a nationally televised basketball game, the value of the action to the gambler would be the amount that he *and his confederates* won or stood to gain.") (emphasis added); *United States v. Cohen*, 171 F.3d 796, 803 (3d Cir. 1999) ("'[I]mproper benefit' refers to the net value accruing to the entity on whose behalf the individual paid the bribe."); *United States v. Kinter*, 235 F.3d 192, 197 (4th Cir. 2000) ("[W]e join all of the other circuit courts that have considered the issue, which have uniformly held that when a middleman defendant acts on behalf of a third-party payer of the bribe, the district court may consider the payer's bribe-generated benefits when calculating the 'benefit received' under USSG § 2C1.1, as long as those profits were reasonably foreseeable or the result of acts aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."); *United States v. Montani*, 204 F.3d 761, 770 (7th Cir. 2000) (noting that "the value should be considered as a *whole*, not as individual shares to each co-conspirator") (emphasis in original); *United States v. Landers*, 68 F.3d 882, 884 (5th Cir. 1995) (improper benefit was the net value defendant's employer derived from contracts that resulted from the bribes); *United States v. Ziglin*, 964 F.2d 756, 758 n.3 (8th Cir. 1992) ("It is irrelevant that the taxes that were to be avoided as a result of the bribery scheme were the taxes of third parties and not Ziglin's taxes, as the Guidelines speak only of the value of the benefit to accrue as a result of the bribe.").

Here, the total value of the "benefit" to Freepoint in return for the bribes to Berkowitz and others is approximately $30.5 million. *See Freepoint Commodities LLC*, 23-CR-00224-KAD, ECF No. 10. This amount, which does not include the benefit received to Arcadia or OTT,[6] is greater than the combined amount that Arcadia, Freepoint, and OTT paid to Innecco[7] and is greater than the amount of the bribes that Berkowitz estimated he received from the Defendant. Sept. 6 Tr. (PM) at 17. The table in §2B1.1 provides for a 22-point enhancement where the benefits to be received are greater than $25,000,000, but less than $65,000,000.

As discussed in further detail in the declaration of Michael Petron, attached hereto as Exhibit 1, the Government's calculation of the benefits received is based on a months-long analysis of over 130 trades between Petrobras and Freepoint (with a combined contract value of over $200,000,000), with input from company representatives, in connection with the Freepoint DPA.[8] The Defendant argues—based on a letter from the best man at his wedding—that the Government's profits calculation is "entirely unreliable" as a means to determine Freepoint's profits from the scheme, since Freepoint often "blended" the oil it bought from Petrobras with other cargoes, and, therefore, "it is impossible to trace profits back to individual oil transactions." *See* ECF 419 at 15. The Defendant's argument misses the mark. First, as explained above, whether or not every dollar in profit can be "traced" back to a specific Petrobras cargo is irrelevant. For purposes of sentencing, the Government need only make a reasonable estimation of the benefit

---

[6] The Government does not have sufficient financial records to determine the total direct costs deductible from the contracts that Arcadia and OTT won from Petrobras. Therefore, the Government has not included any benefit to these companies in its analysis.

[7] As discussed below, because Innecco was paid from the profits of the Petrobras transactions and, per the Guidelines, his compensation is not deductible as a direct cost of the transactions, the combined amount paid to Innecco by Arcadia, Freepoint, and OTT represents the absolute floor for measuring profits from the Petrobras transactions.

[8] Mr. Petron will be available as a witness at sentencing should the Defendant object to the calculations herein.

received and the Second Circuit has held that one way to make such an estimation is to extrapolate average profits across a large number of transactions. *See Figueroa*, 2025 WL 289426, at *2 ("[E]xtrapolating the average amount of [gain] from known data and applying that average to transactions where the exact amount of [gain] is unknown" is an acceptable approach under the Guidelines); *see also Uddin*, 551 at 180.  Second, not only was the Government's approach reasonable, but, in considering two possible approaches to measuring profits, the Government chose the approach that was more favorable to the company (and therefore also the Defendant). As noted in Mr. Petron's declaration, for the "blended" transactions, the Government determined the company's average per-barrel profits and then calculated, on a transaction-by-transaction basis, the amount of profits that might reasonably be attributed to the *Petrobras-only barrels.* The Government could also have measured the benefit received by Freepoint by calculating the *total profit* from all cargoes containing any corruptly obtained oil, but it elected not to do so.  *See* Exhibit 1.

Finally, as to hedging, the Government was correct to exclude such costs (and gains) from its analysis, since Freepoint did not hedge individual trades or trading books, but, instead, hedged entire trading "portfolios."  In other words, Freepoint's hedging costs (and gains) are more akin to non-direct and non-deductible costs in this case, and therefore, the Defendant is simply wrong to argue that these costs affect the reliability of the Government's profits calculation.[9]

---

[9] As noted above, the Government maintains that its methodology for determining Freepoint's profits is reliable and that $30.5 million is the appropriate value for determining the Defendant's Guidelines range.  To the extent that the Court believes that this approach results in a sentence that is disproportionate to the conduct at issue, the Government submits that this consideration should be accounted for in weighing the § 3553(a) factors.

If the Court is inclined to use a different number as a substitute for the "benefit received" from the offense, the Government requests that the Court use the total amount paid to the Innecco Companies—$7,829,671—as the basis for determining the minimum benefit.  This approach would result in an 18-point enhancement under U.S.S.G. § 2B1.1(b)(1)(J), rather than a 22-point enhancement.

2.     *An Aggravating Role Adjustment Is Warranted*

Next, the Defendant objects to the Government's determination that a four-level adjustment is applicable to Glenn Oztemel's Guidelines calculation, pursuant to 3B1.1(a), based on his role as an organizer and leader of a criminal activity that involved five or more participants. The Court should reject the Defendant's attempt to blame his co-conspirators and minimize his own role in the scheme, a scheme he clearly organized, nurtured, exercised decision-making authority over, and from which he claimed a significantly large share of the ill-gotten proceeds.

*First*, the evidence at trial established that the bribery and money laundering scheme involved five or more participants, including but not limited to Alcoforado, Berkowitz, Innecco, Gary Oztemel, and Rodrigues. *See* PSR at ¶ 15; Sept. 9 Tr. (AM) at 25–26. The fact that Alcoforado and Rodrigues (who also attended the October 2011 fuel oil conference in Miami where the co-conspirators discussed the scheme) could not be charged under the FCPA is of no moment. Both individuals, like Berkowitz, were participants in the scheme and were criminally responsible and could have been charged as members of the money laundering conspiracy, having entered into an agreement and understanding with the Defendant and others to launder the bribe payments through Innecco. Notably, as discussed below, both were also charged in Brazil.

*Second*, as to Glenn Oztemel's role in the offense, the sentencing Guidelines at Application Note 4 of the Commentary accompanying USSG § 3B1.1 set forth factors to be considered by the Court in determining the applicability of this role adjustment, including: (1) the exercise of decision making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in the planning or organizing of the offense; (6) the nature and scope of the

illegal activity; and (7) the degree of control and authority exercised over others.  USSG § 3B1.1 (Application Notes).

More specifically, as the Second Circuit instructs, sentencing courts should consider, *inter alia*, "the degree of discretion exercised by him, the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy." *United States v. Si Lu Tian*, 339 F.3d 143, 156 (2d Cir. 2003) (quoting *United States v. Beaulieau,* 959 F.2d 375, 379–80 (2d Cir. 1992)).  Although the criminal activity must involve five or more participants, the Guidelines "only require that the defendant be an organizer or leader of one or more of those participants for the section 3B1.1(a) enhancement to be appropriate." *Si Lu Tian*, 339 F.3d at 156 (citing *United States v. Zichettelo*, 208 F.3d 72, 107 (2d Cir. 2000)).  Moreover, it is well settled in the Second Circuit that more than one person can occupy the position as an organizer or leader and that "one conspirator's leadership role is not dispositive on the question of whether another was also a leader."  *Si Lu Tian*, 339 F.3d at 156 (quoting *United States v. Duncan*, 42 F.3d 97, 106 n. 6 (2d Cir. 1994) and citing *United States v. Garcia,* 936 F.2d 648, 656 (2d Cir. 1991)).

Here, the evidence at trial established that the Defendant, a seasoned and senior trader at both Arcadia and Freepoint, was undoubtedly an organizer and leader of the conspiracy.  Not only did he control Innecco—*his* contractual agent for over a decade (*see* GX 5013)—but the scheme could not have worked without him: the Defendant controlled the flow of bribery funds and dictated when and in what amounts those funds would be distributed to Innecco for further distribution to foreign government officials.

16

For example, the trial record established that the Defendant:

- Was at the key in-person meetings in which he and his co-conspirators devised the Arcadia (and later Freepoint)/OTT/Petrobras bribery scheme. *See* ECF No. 403 at 7 (Order Denying Motion for Judgment of Acquittal).

- Caused Arcadia and Freepoint to enter into sham Service Provision Agreements. *See* GX 1021; GX 1022.

- Approved and signed the sham invoices submitted by Innecco on behalf of Arcadia and Freepoint. *See, e.g.*, GX 9013 at 14; GX 102-A; 103-A; 106-A; 107-A.

- Controlled how much money would be set aside to pay bribes. *See* Sept. 9 Tr. (AM) at 33–36 (Rodrigo Berkowitz testified: "He [the Defendant] said that unfortunately he will not be able to increase commissions from .25 cents per barrel. . . But if Petrobras would like to keep using OTT, that was fine for him."). Likewise, in response to email from Innecco asking the Defendant to "just tell [Innecco] what commission rate [he] shud use," the Defendant responded, "Do 20 cts. And i am tired of this bullshit. I dont like ure or br behavior. It is greedy and unfortunate." GX 6395.

- Instructed Innecco to speak with him before speaking with Berkowitz. *See* GX 5938 ("I want to talk with u. Before u speak with rb.").

- Directed Innecco to make payments to Gary Oztemel. For example, the Defendant told Innecco via WhatsApp: "By the way, don't forget about big bro." GX 4001 at 44.

Meanwhile, other emails introduced at trial evidence the leader/subordinate relationship between the Defendant and Innecco. For example:

- In correspondence between Innecco and Gary Oztemel, Innecco stated that certain actions were "SUBJECT TO GLENN'S FINAL APROVAL" and that "When I say that GLENN'S FINAL APROVAL shud be obtained prior to you calling PB on behalf of Arcadia AS AN AGENT, I sincerely believe this would just be a formality, as he and I already discussed this point when we recently met in CT, and he obviously never manifested any objection to it." GX 5009.

- In an email between the Defendant and Innecco, wherein they discussed Berkowitz showing fuel oil to another trader, the Defendant stated, "I will liase with him. We can work together. Keep the room dark." GX 6718.

- In an email in which Innecco asked the Defendant to authorize payment of Wertech invoices so that Innecco could "cover" certain "obligations," the Defendant responded, "Eduardo, you would have been paid two months ago if you had

accepted the agreement.  Please do not send any message like this anymore."  GX 6431.

The Defendant's argument that Berkowitz, Alcoforado, and Rodrigues "led" the scheme (ECF No. 419 at 17–18) is simply wrong.  The trial record is devoid of any communications, much less instructions, from Alcoforado or Rodrigues.  In any event, as noted above, the Guidelines do not require that the Defendant control *all* the members of the conspiracy for the leader/organizer enhancement to apply.  *See* USSG § 3B1.1 Appl. n.2 (2025); *see also United States v. Gaskin*, 364 F.3d 438, 466–67 (2d Cir. 2004).  And while the evidence at trial did not show that there was a formal hierarchy within the scheme as in some gang-related conspiracies, it did establish that the Defendant understood that, because he was the one paying the bribes and the one who controlled the flow of funds, he exercised control over Innecco, Berkowitz, and others.  *See, e.g.*, GX 6567 ("[Y]ou have to encourage him to be a good boy."); GX 5938 ("I want to talk with u. Before u speak with rb.").

Moreover, based on the evidence before the Court, it was the Defendant who made the final decision that the conspirators would use Gary Oztemel's company, OTT, in the back-to-back transactions to generate additional funds for bribery payments.  As Berkowitz testified, the Defendant "said that unfortunately he will not be able to increase commissions from .25 cents per barrel. . . . But if Petrobras would like to keep using OTT, that was fine for him."  *See* Sept. 9 Tr. (AM) 33–36.  As Berkowitz testified, from his point of view, OTT was only used as an intermediary between Petrobras and the Defendant's companies, Arcadia and Freepoint. Berkowitz never saw "OTT engaged in any other trading transactions in the market."  *Id.* at 37. Plainly, Gary Oztemel was not in charge and was not a leader or decision-maker, even as to when and how his own company was used in the scheme or whether it would continue to be used at all. It was the Defendant who was the leader and organizer with respect to OTT's involvement.  *Id.* at

18

39 (the Defendant "told us that we can only stick with that .25 cents, we could use OTT").  This fact alone is sufficient for the Court to find this adjustment to be applicable because the Defendant was the organizer, leader, manager, and supervisor over Gary Oztemel, in addition to Innecco.  *See United States v. Blount*, 291 F.3d 201, 217 (2d Cir. 2002) ("A defendant may properly be considered a manager or supervisor if he 'exercise[d] some degree of control over others involved in the commission of the offense . . . or play[ed] a significant role in the decision to recruit or to supervise lower-level participants.'" (quoting *Ellerby v. United States*, 187 F.3d 257, 259 (2d Cir. 1998) (per curiam)).

Nor does the fact that other companies paid bribes to Petrobras officials or that Petrobras paid a criminal penalty to the United States government show that "Petrobras [was] asserting its dominance over Freepoint and its competitors."  ECF No. 419 at 19.  As established at trial, after the "car wash" investigations began in or about March 2014, Freepoint was the only company that was still willing to risk criminal exposure by paying bribes to Berkowitz for inside information. Sept. 6 Tr. (PM) at 28–29 ("When I was back in Rio, the only trading company that was paying me was Freepoint."); *id.* at 40.

In short, contrary to the Defendant's arguments, for nearly nine years—significantly longer than any of Freepoint's competitors—the Defendant exercised "control and authority . . . over" Innecco, Gary Oztemel (GX 4001 at 44), and Berkowitz (GX 6567).  *See Si Lu Tian*, 339 F.3d at 156.  For all these reasons, the Government believes that the four-point leadership adjustment should be applied to Glenn Oztemel's Guidelines calculation.[10]

---

[10] If the Court agrees with the Government that the scheme involved five or more participants or was otherwise extensive but does not believe there is sufficient record evidence to conclude he was a leader or organizer, the Government believes that the record supports, at a minimum, that he was a "manager or supervisor" of the criminal activity for purposes of 3B1.1(b) based on his direction of and control over Innecco, his agent, and Gary Oztemel, his compliant brother.

3.    *A Sophisticated Money Laundering Enhancement Is Warranted*

Finally, the Defendant's argument that the two-level "sophisticated laundering" enhancement is unwarranted is belied by the very same Guidelines comment he relies upon, as well as by the trial record. Comment Five to USSG § 2S1.1 provides:

> For purposes of subsection (b)(3), "sophisticated laundering" means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense.
>
> Sophisticated laundering typically involves the use of—
>
> (i)    fictitious entities;
> (ii)    shell corporations;
> (iii)    two or more levels (*i.e.*, layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or
> (iv)    offshore financial accounts.

All four of these examples are present in this case. *First*, as noted above, the scheme involved the use of fictitious entities and shell corporations—namely, Innecco's purported consulting companies in Brazil, Liberia, the British Virgin Islands, and Uruguay. Sept. 10 Tr. (PM) at 45–53; GX 1021. No witness at trial could recall ever dealing with any Innecco employee, or having ever visited an office associated with any Innecco company. *See, e.g.*, Sept. 4 Tr. (AM) at 105 (Adams testifying that he was not aware of any employees working for Innecco); Sept. 23 Tr. (AM) at 60–62 (Peck testifying that he had never been to Innecco's offices). Moreover, even though Innecco was supposedly the Defendant's agent in Brazil, Innecco repeatedly asked the Defendant not to disclose his identity to Petrobras. *See, e.g.*, GX 6325 ("pls [have] in mind that

20

all their telephones are bugged . . . . And remember: I do not exist."); GX 6361 ("[T]he girl has never heard of me. For all purposes I do not exist.").[11]

The fact that Freepoint's compliance department may have approved the Innecco Companies as counterparties is irrelevant since, among other things, the Defendant lied to the company's compliance department about their (and Innecco's) true purpose. *See* Sept 18 Tr. (PM) at 33 ("Q. And when he told you it was helpful to have someone who spoke the language, did you believe him? A. [Ramirez] Yes."). As established at trial, the Defendant knew that Innecco's only job was to pay bribes and to be a conduit for illegally obtained inside information. *See* GX 6567 ("eduardo, i do not need to tell you how much i am addicted to information"); GX 5965 ("Thank god for rb who helps us with vital info and thank god for eduarrrrrrdo who feeds it to me.").

*Second*, the transactions at issue involved two or more layers of criminally derived funds. In the first layer, the Defendant and Innecco falsely disguised payments to Innecco as consulting payments or commissions. *See, e.g.*, GX 107-A ("NATURE OF SERVICE: PROVISION OF CONSULTING SERVICES"). In the second layer, Innecco paid Berkowitz's bribes into a shell company in Uruguay held in Berkowitz's father's name.[12] GX 502; Sept. 6 Tr. (PM) at 22, 67–68 (Pimelir "only received bribes, and the money that was getting out of the bank was basically to launder it to my company account there in Brazil or to distribute money to other Petrobras officials."). Innecco also paid kickbacks to Gary Oztemel from the scheme using bogus invoices.

---

[11] In addition, as noted above, this case also involved the use of fictitious individuals (*e.g.*, Spencer Kazisnaf, Nikita Maksimov) and code names (*e.g.*, "Mr. X," "Mr. A").

[12] In several instances, especially at the beginning of the scheme, there was an additional step for back-to-back transactions through Gary Oztemel and OTT. For those transactions, Gary Oztemel marked up the cost of the oil cargoes by approximately $1 per barrel (on top of any regular profit) to create a delta for the payment of bribes and kickbacks. Arcadia and Freepoint paid OTT and Gary Oztemel, Gary Oztemel paid Innecco, and Innecco paid the bribes. GX 9011; GX 501; GX 503; GX 5483; GX 5483-A; Sept. 9 Tr. (AM) at 36–37.

*See* GX 6829 (April 2018 email from Innecco to Gary Oztemel stating, "To save you time and work I've prepared 18 Petro Trade invoices . . . . All invoices correspond to the transfers Wertech made to Petro Trade from Feb 1st 2017 thru Jan 31st 2018.").

*Third*, the payments were made to and through offshore accounts. As established at trial, Innecco's shell companies banked in Switzerland and Uruguay, and Berkowitz's Pimelir account was located in Uruguay. GX 500; GX 3002-B; GX 3008-B; GX 9013; Sept. 6 Tr. (PM) at 22; GX 3027-T.

Stated simply, rather than paying bribes to Berkowitz and others himself, the Defendant used an intermediary, a web of overseas shell companies and bank accounts, and dozens of sham invoices to avoid detection from his companies' compliance departments and from law enforcement. The sophisticated money laundering enhancement applies in this case.

## III.    THE SENTENCING FACTORS WEIGH IN FAVOR OF A SIGNFICIANT NUMBER OF YEARS OF IMPRISONMENT

Calculation of the Guidelines range is the starting point for the Court's determination of a sentence. *See Gall v. United States*, 552 U.S. 38, 49 (2007); *Peugh v. United States*, 569 U.S. 530 (2013) (noting that "the post-Booker federal sentencing system adopted procedural measures that make the guidelines the 'lodestone' of sentencing'"). Next, the Court should consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.

Section 3553(a) provides that, in imposing a sentence, the Court shall consider:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;
(2)    the need for the sentence imposed—
    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B)    to afford adequate deterrence to criminal conduct; [and]
    (C)    to protect the public from further crimes of the defendant.

As discussed below, consideration of the Guidelines and each of the factors in 18 U.S.C. § 3553(a) demonstrates that the Defendant committed a serious crime warranting punishment and supervision, even in light of his public-facing personal characteristics and lack of criminal history. The Government respectfully submits that a sentence of imprisonment of seven to ten years is sufficient, but not greater than necessary, to satisfy the goals of sentencing.

### A.    Nature and Circumstances of the Offense

The nature and circumstances of the offense counsel strongly in favor of a substantial sentence of incarceration. *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  As detailed above and proven at trial, the Defendant did not have a one-off lapse in judgment.  Rather, for the better part of a decade, he orchestrated a sophisticated bribery and money laundering scheme involving fuel oil cargoes worth hundreds of millions of dollars.  He had multiple opportunities to end his criminal conduct and disavow corruption—when he moved from Arcadia to Freepoint in 2012; when Berkowitz went to Brazil and was no longer the Petrobras trader in Houston in 2014; when Julia Canella, who never asked him for a bribe, became his direct trading counterpart at Petrobras; when the "car wash" investigations became public; every time he was presented with a bogus invoice from Innecco; when Innecco told him that he needed additional "breakfast" servings; and after each of the 100+ corrupt trades he oversaw during the life of the scheme.  Not only did he choose to continue with the scheme in all those instances, but he took affirmative measures to avoid getting caught.  For example, he communicated with Innecco on his personal email account and by WhatsApp, including to fictitious aliases; he used his brother to facilitate trades that required higher "commission" amounts that might catch the attention of Arcadia's compliance department; he misled Freepoint's compliance department; he lied to Julia Canella while receiving

backchanneled, confidential Petrobras information from Berkowitz through Innecco; and, as discussed further below, he compartmentalized information that he wanted to hide from his peers.

At the time he committed the offense, the Defendant was already making millions of dollars a year in salary and bonus. PSR ¶ 101. Yet, he deliberately broke the law because he was "addicted to information" (GX 6567) and because he knew that, with confidential information about his competitors' bids and negotiating strategies (*see, e.g.*, GX 6433; GX 7034; GX 4001), he stood to win whatever trades he wanted. He also knew that the inside information he received from Berkowitz meant that he would not have to pay any more for a trade than Petrobras was willing to accept. *See* GX 5976 ("Understand Julia started discussions with Rob today. Pls remind him not to propose her any numbers, so as not to run the risk of leaving money on the table."). His conduct prevented Petrobras from maximizing its profits on trades worth hundreds of millions of dollars and deprived his competitors—many United States companies—from competing for business on a level playing field.[13]

In short, international corruption of the nature and extent engaged in by the Defendant and his co-conspirators undermines the public's confidence in international markets and institutions and is deeply unfair to companies which play by the rules. When, as here, foreign corruption is undertaken by American citizens working for U.S.-based companies, it impacts confidence and trust in American businesses worldwide. The damage caused by this type of corruption is real and lasting.

---

[13] The Defendant's suggestion that his conduct harmed only foreign companies (ECF No. 419 at 24) is undermined by extensive evidence in the trial record. To cite just a few examples, the Defendant received inside information about Petrobras trades with various U.S.-based companies, including Novum Energy, Rio Energy, Conoco Phillips, PBF Energy, Chevron, Koch Industries, JP Morgan, Nustar, and Morgan Stanley. *See, e.g.*, GX 4001, GX 5055, GX 6613. He also received inside information about Petrobras trades with foreign companies with U.S. subsidiaries, such as BP, Shell, Novum, Total, and Valero. *Id.* All these companies were put at a competitive disadvantage on the over 100 trades the Defendant won by paying bribes.

The Defendant's sentencing memorandum seeks to trivialize this harm and minimize his conduct by suggesting that he was merely a victim of a corrupt industry and that he was unfairly targeted by the Government.  But these arguments are contrary to the evidence and show that, even today, the Defendant refuses to accept responsibility for his conduct.  For example, the Defendant's claim that an incarceratory sentence would mean that he was made to "bear the weight of the government's case against the entire fuel oil industry" is grossly inaccurate.  ECF No. 419 at 21. In this case, nearly everyone involved was charged in either the United States or Brazil: the Defendant, Gary Oztemel, and Eduardo Innecco were charged in this District; Rodrigo Berkowitz was charged in the Eastern District of New York ("EDNY") (No. 19-CR-00064); Marcos Alcoforado ("Mr. A.") was charged in Brazil, along with Marcio Magalhães ("Mr. X") and two Trafigura oil traders, Mariano Ferraz and Carlos Herz;[14] Jorge Rodrigues ("Mr. J") was charged in Brazil along with his predecessor, Carlos Barbosa, and Petrobras trader Daniel da Silva Gomes Filho.[15]  Indeed, were the Defendant to avoid jail time in this case, he would fare the same as, if

---

[14] *See* https://www.theguardian.com/world/2018/dec/14/brazil-charges-former-trafigura-executives-with-corruption, last visited on November 29, 2025.

[15] *See* https://www.reuters.com/article/world/uk/exclusive-petrobras-ignored-warnings-about-fuel-broker-implicated-in-graft-prob-idUSKCN1TE19Q/, last visited on November 29, 2025.

In other Petrobras-related cases, Luiz Eduardo Andrade (17-CR-00497), Roberto Finocchi (17-CR-600), Daniel Sargeant (19-CR-319), Bruno Luz (20-CR-558), Jorge Luz (20-CR-559), Jeffrey Chow (17-CR-466), Zwi Skornicki (19-CR-00277), and Jose Carlos Grubisich (19-CR-102) were charged in EDNY, and Anthony Mace (17-CR-00618) and Robert Zubiate (17-CR-00591) were charged in the Southern District of Texas ("S.D. Tex.").  Likewise, various oil traders, intermediaries, and public officials have been charged with FCPA and money laundering violations related to bribery schemes at other state-owned oil companies:  Vitol oil trader Javier Aguilar was charged in EDNY (20-CR-00390) and S.D. Tex. (23-CR-00335) in connection with bribing officials at Ecuador's and Mexico's state owned oil companies; Glencore oil trader Anthony Stimler was charged with bribing officials at Nigeria's state-owned oil company in the Southern District of New York (21-CR-0041); and Antonio Pere Ycaza (20-CR-00376), Enrique Pere Ycaza (20-CR-00377), Lionel Hanst (22-CR-00075), Christian Cazarin Meza (23-CR-00419), Gonzalo Guzman Manzanilla 21-CR-00260), Carlos Espinosa Barba (21-CR-259), and  Nilsen Arias Sandoval (21-CR-00628) were charged in EDNY in connection with foreign bribery schemes involving Vitol, Gunvor, and various other commodities trading companies.  *See generally* https://www.justice.gov/archives/opa/pr/justice-departments-investigation-international-commodities-trading-companies-foreign, last visited on November 29, 2025.

not better than, the many individuals who accepted responsibility for their crimes and cooperated with the government, in some instances, for several years. Such a result would not only deter cooperation in future cases, but it would also send the message that putative defendants might avoid meaningful punishment by asserting a variation of the "everybody was doing it" defense.[16]

The Defendant's argument that his prosecution is due to a "happenstance of timing" and that "similar cases are no longer being pursued" because of the President's February 10, 2025 Executive Order (the "Executive Order") and the Blanche Memorandum is similarly misguided. *See* ECF No. 419 at 22–24. The Executive Order temporarily paused FCPA enforcement and directed the Department of Justice to undertake a review of all pending FCPA cases and to issue updated guidelines on FCPA enforcement. Pursuant to the Executive Order, and as the Defendant is aware, this case underwent the required review, and the undersigned offices were authorized to proceed with this case. That authorization was entirely consistent with the guidance in the Blanche Memorandum, which instructs the Department to consider several non-exhaustive priority factors when determining whether to pursue an FCPA case. Moreover, the Executive Order explicitly states that it "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against" the government.

Finally, the Defendant is simply wrong in his claim that similar cases are not being pursued. Earlier today, a chief executive and part-time owner of a United-States based company, who used an intermediary to pay bribes abroad, was sentenced to eight years for FCPA and money laundering

---

[16] The Defendant's argument also overlooks the fact that, as Berkowitz explained at trial, the only company that was willing to pay him bribes after the "car wash" allegations became public was Freepoint. Sept. 6 Tr. (PM) at 28–29. In other words, even though a dozen individuals were charged in the United States with FCPA or money laundering violations related to Petrobras bribery schemes, this number may well have been much higher but for the statute of limitations and other evidentiary hurdles inherent in older criminal conduct. The Defendant should not be rewarded merely because he was brazen enough to continue paying bribes to Petrobras officials when, according to Berkowitz, other oil trading companies ended this practice years earlier.

violations stemming from a five-year foreign bribery scheme in Honduras in exchange for government contracts. *See United States v. Carl Zaglin*, No. 23-CR-20454 (S.D. Fla.). Other individuals and companies have likewise been charged with violations of the FCPA and related laws consistent with and post-dating the Executive Order and the Blanche Memorandum, and several other individuals have been sentenced. All are being prosecuted in due course and as expeditiously as their and the courts' schedules allow, just like the Defendant.[17]

In short, the Court should reject the Defendant's attempt to evade responsibility for his involvement in a multi-year foreign bribery scheme that caused real and sustained harm in the United States and abroad. A significant sentence commensurate with the seriousness of his crimes is appropriate.

### B.    The Defendant's History and Characteristics

Much of the Defendant's sentencing memorandum is dedicated to describing his personal history, his relationships with family and friends, and his reputation in the commodities trading industry. ECF No. 419. He notes, for example, that many of his colleagues considered him a "mentor" and a generous friend. *Id.* at 9. The Government agrees that the Court should consider these circumstances in arriving at a sentence under 18 U.S.C. § 3553(a), and the Government's recommendation of a below-Guidelines sentence accounts for them.

---

[17] The Defendant's speculation that "charges might never have been brought" in this case and his reliance on the government's dismissal of charges in *United States v. Coburn* is likewise of no moment. ECF No. 419 at 24. By the Defendant's logic, every person awaiting sentencing on FCPA charges (and perhaps, every person currently incarcerated), would be entitled to a non-incarceratory sentence (or to release) merely because, in one case before a jury was even selected, the government elected to dismiss the charges. In this case, a jury was selected, the parties put on a three-week trial, the jury carefully deliberated, and ultimately, the Defendant was convicted on all counts. Following that, the Department reviewed this case pursuant to the Executive Order and authorized it to proceed. The Defendant was convicted and must now receive a sentence consistent with the Guidelines and the § 3553(a) factors.

The reality, however, is that the Defendant's personal history and characteristics do not set him apart from many similarly situated defendants—especially white-collar defendants—who have had the opportunity to engage in good deeds and charitable acts, who face similar challenges as a result of incarceration, and whose families often suffer disproportionately despite having no role in the criminal conduct. Indeed, unlike many defendants, the Defendant had every opportunity to succeed. He had a strong community, a loving family, a stable home, and substantial success in his business. PSR ¶¶ 71–89; 136. Despite these advantages, the Defendant "let greed get the best of him." *Id.* ¶ 135. "Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime." *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) (quoting *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("Business criminals are not to be treated more leniently than members of the 'criminal class' just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity.")).

In addition, while many of the Defendant's trading counterparties may describe him as having the utmost honesty and integrity and as "a man who prized his integrity and trustworthiness over short-term profits," *see* ECF No. 419 at 7, the evidence at trial—and in particular, his treatment of Petrobras trader Julia Canella—show otherwise. As the Court heard, Canella was not part of the scheme and never asked the Defendant for a bribe. Yet, the Defendant went behind her back and paid bribes to Berkowitz for information that he used to undermine her in what otherwise would have been (and what she believed were) arms-length negotiations. The Defendant knew that the information he used against Canella came from internal Petrobras deliberations, including from Canella herself, and yet he misled her into believing he was negotiating with the same quality of information as his competitors. To make matters worse, in emails to colleagues, including those

28

who have described him as a "mentor" (ECF No. 419-1 at 170), the Defendant disparaged Canella for trying to get the best possible deals for Petrobras and, ultimately, the Brazilian government. *See* GX 5965 (describing Canella as a "lowly employee"); *see also* GX 7092 ("This woman is really a piece of work" and "I am trying not to say something rude to this idiot").

That the Defendant's friends and colleagues have a different picture of him than what came across at trial is not surprising, however, since the Court and the jury had visibility into what they did not: what the Defendant said and did when he believed no one was looking. In many of the most incriminating emails and text messages, the only people involved were the Defendant and Innecco. *See, e.g.*, GX 6718 (the Defendant instructs Innecco to "[k]eep the room dark"). Indeed, Innecco even reported separately to the Defendant about the Defendant's own brother. GX 5009. Likewise, when forwarding emails from Innecco to his colleagues, including Peck, the Defendant often deleted the most incriminating portions of the emails. *Compare* GX 5965 ("I do not want u discussing too much with rob. Be discreet.") *with* GX 7063 (forwarding GX 5965 to Rob Peck, but deleting the bottom half of the email where Innecco states, "you cannot expose my friends the way you doing by showing Julia knowledge of what is going on at PB or not being careful abt the origin of the info I give you when you pass it on to Rob. This is like suicide for all of us."); *see also* GX 7055 ("There will be no breakfast discussions, repeat, no breakfast discussions. You can bring Rob."). In fact, Peck was visibly surprised when he learned during trial that Berkowitz used a disposable phone to communicate with Innecco—a fact long-known by the Defendant. Sept. 23 Tr. (AM) at 90–91 ("Q. Did Mr. Innecco ever tell you to call Mr. Berkowitz on a disposable phone? A. Not that I'm aware of … Q. Why did you make the face? A. It's -- I would remember it."); GX 5773; GX 7092.

29

In short, the Defendant may well have publicly been the person described in his sentencing memorandum and in his letters of support. But in private, and with his co-conspirators, including Innecco and Gary Oztemel, the Defendant showed that he was willing to break the law over and over again for the slightest of advantages over his competitors.

C.    **The Need for Protection of the Public, Just Punishment, and Respect for the Law**

Given the seriousness and the scope of the criminal conduct, a substantial sentence of imprisonment is warranted to provide just punishment and to promote respect for the law.

The corrosive effects of foreign corruption and bribery cannot be denied. Among other harms, bribery schemes undercut fair business practices, undermine the rule of law, and destabilize countries and even entire regions. When only the corrupt prosper, societies, governments, and legitimate businesses lose. The United States has long recognized the harmful effects of bribery of foreign officials, and the Defendant's personal involvement in bribing Brazilian government officials goes to the heart of the proscriptions put in place by the FCPA.

Accordingly, a substantial sentence of incarceration in this case would be a just punishment that would promote respect for the law and would fairly punish the defendant for his conduct—conduct that showed repeatedly, over the course of nearly a decade, the Defendant's lack of respect for the law.

D.    **The Need for Deterrence**

Finally, the need for general deterrence strongly weighs in favor of a sentence of incarceration. *See* 18 U.S.C. § 3553(a)(2)(B). Given the powerful economic incentives associated with paying bribes overseas to get lucrative contracts, it is critical that there be equally strong counterincentives. *See United States v. Blech*, 550 F. App'x 70, 71 (2d Cir. 2014) (summary order) ("Blech was sentenced based on the 18 U.S.C. § 3553(a) factors, including the need . . . for general

deterrence for those who might otherwise feel that some white-collar crimes are 'game[s] worth playing.'") (quoting *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013)); S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense.  This is particularly important in the area of white collar crime.  Major white collar criminals often are sentenced to small fines and little or no imprisonment.  Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.")).[18]

The sentence in this case should reflect the seriousness of the offense and, to create the appropriate level of deterrence, should be commensurate with the seriousness of the illegal conduct.  The Government respectfully asks the Court to impose a period of incarceration to demonstrate that those who engage in foreign corruption, bribery, and money laundering receive meaningful punishment.  Furthermore, given that sophisticated schemes—like the instant scheme with multiple international actors and companies, foreign bank accounts, and other evidence abroad—are difficult to detect and prosecute, there is greater need for general deterrence.  *See, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 989 (1991) ("since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").  Because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*,

---

[18]  The Second Circuit has addressed the issue of providing deterrence through periods of incarceration in white-collar cases.  *See, e.g.*, *United States Cutler*, 520 F.3d 136, 163 (2d Cir. 2008); *United States v. Zukerman*, 897 F.3d 423 (2d Cir. 2018); *United States v. Park*, 758 F.3d 193 (2d Cir. 2014).  In *Zukerman*, for example, the Second Circuit reasoned that general deterrence has a particularly important role in the prosecution of tax crimes, given the significant resources required to prosecute these types of offenses.  The court further noted that general deterrence is especially effective in the prevention of tax crimes because tax criminals are more likely to make reasoned decisions based on potential outcomes.  *Id.* at 429.  The same is true for bribery and money laundering crimes like the Defendant's.

455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation marks omitted)); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress"); *United States v. Thurston*, 456 F.3d 211, 218 (1st Cir. 2006) vacated on other grounds sub nom *Thurston v. United States*, 552 U.S. 1092 (2008) ("One of the goals of the entire guidelines regime" is "to minimize discrepancies in the treatment of 'white collar' and 'blue collar' offenses.") (quotation omitted).

The Defendant contends that the repercussions to Freepoint and the "significant public attention this case has received" provide sufficient deterrence and that a term of incarceration is unnecessary. ECF No. 419 at 27–28. However, the Defendant ignores the fact that much of his and his co-conspirators' conduct was done in the dark—communicating using personal and alias email accounts, establishing companies in foreign jurisdictions, and opening foreign bank accounts (among other actions), all of which underscore the deliberate and calculated nature of his crimes and the need for robust specific and general deterrence. The loss of his career—a career sustained by paying bribes—is hardly the "severe" consequence the Defendant claims, *id.* at 29, particularly at this stage of the Defendant's career and after he has obtained significant wealth. In fact, given the media coverage, allowing the Defendant to avoid incarceration would serve the opposite purpose of deterrence. It would signal to the market and traders like the Defendant that there are minimal consequences for bribery and corruption and that the rewards from criminal conduct may be worth the risk of exposure.

Finally, as to the Defendant's efforts to compare this case to others, ECF No. 419 at 24–26, the Government contends simply that the Court should be guided by its application of the Guidelines together with the § 3553(a) factors. What the Court should and must consider is who the Defendant showed himself to be when he believed no one was looking, the nature of his deliberate actions throughout a nearly decade-long conspiracy, and the fact that the Defendant's crimes, which gave him an unfair advantage over other companies and undermined Petrobras's ability to maximize its profits, resulted in millions of dollars in profits to his company. He had numerous opportunities to say no to paying bribes and the means and stature in his industry to earn comfortable living while conducting business fairly and by the rules.[19]

For his conduct, the Defendant should receive a substantial period of incarceration and a significant financial penalty to promote respect for the law and deter further, similar conduct. And while the Government agrees with the Defendant that a sentence at or even near the Guidelines range is not appropriate in this case given many of the factors discussed in the PSR and in the Defendant's sentencing memorandum, the Government believes that a non-incarceratory or otherwise minimal sentence would fail to promote the objectives of the Guidelines and of sentencing more generally.

---

[19] The Government recognizes and acknowledges that such comparisons may not be helpful to the Court and submits that the Defendant's sentence in this case should be driven by the Guidelines and the § 3553(a) factors, not by false comparisons (for example, the Defendant cites the sentencing of Mauricio Gomez Baez, who pleaded guilty to a single count information prior to trial pursuant to a cooperation plea agreement). The unhelpful nature of such comparisons is demonstrated by the fact that the Government can cite to other, more recent sentencings involving defendants who went to trial and were convicted on FCPA charges, or money laundering cases with FCPA SUAs, that resulted in substantial terms of incarceration. For example, in just the last two years: Roger Ng and Carlos Polit were sentenced to 10 years in EDNY (No. 18-CR-538) and the Southern District of Florida (No. 22-CR-202114), respectively; Claudia Diaz Guillen and her husband were sentenced to 15 years (which was later reduced to 12 years) in the Southern District of Florida (18-CR-80160); and, as noted above, the most recent comparison, as of today, is the sentencing of Carl Zaglin, who was sentenced to 96 months in the Southern District of Florida.

## IV.    FORFEITURE AND FINES

### A.    Forfeiture Is Required by Statute

Criminal forfeiture "serves no remedial purpose, is designed to punish the offender . . . [and] focuses on the disgorgement by a defendant of his 'ill-gotten gains.'" *United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012) (citations omitted). Furthermore, criminal forfeiture is mandatory and required by statute. *See United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory" in cases where the relevant forfeiture statute provides that the court 'shall order' forfeiture). As outlined in the Government's motion for order of forfeiture, the Government seeks a money judgment in the amount of $7,829,671, which represents the total amount of funds laundered by the Defendant and his co-conspirators through Innecco and his shell companies during the life of the conspiracy. ECF No. 416. The Government respectfully requests that the Court impose such forfeiture as part of its sentence in this case.

### B.    The Court Should Impose a Fine

A fine is also appropriate in this case. In addition to the factors in Section 3553(a), 18 U.S.C. § 3572(a) sets forth factors to be considered by the Court before imposing a fine. Those factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant and any of his dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment. 18 U.S.C. § 3572(a). The Guidelines provide that the Court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." USSG § 5E1.2(a). The Guidelines further

34

provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." USSG § 5E1.2(d). The defendant bears the burden of demonstrating an inability to pay a fine. *See United States v. Camargo*, 393 F. App'x 796, 798 (2d Cir. 2010) (upholding imposition of a fine despite Probation and the defendant arguing that the defendant was currently unable to pay a fine because the court concluded the defendant was likely to be able to pay in the future); *see also United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001) (concluding that the district court acted within its discretion in basing fines on defendants' future earnings potential "in the absence of any evidence from defendants to counter the inference that future income from media contracts was a substantial possibility").

The statutory maximum fine applicable to the Defendant's offenses is $500,000 or twice the value of the property involved in the transaction, whichever is greater, and the Guidelines fine range is $50,000 to $500,000. *See* 18 U.S.C. § 3571(b); USSG § 5E1.2(c)(3); PSR ¶¶ 123–125. Based on the Defendant's financial profile, which includes a net worth of several million dollars and the prospect of future earning based on private equity investments, the Defendant is more than capable of paying a fine within the Guidelines range. *Id.* ¶ 111. As such, the Government submits that the Court should impose a fine within the Guidelines fine range.

## V.    CONCLUSION

For these reasons, the Government respectfully submits that a below-Guidelines but substantial sentence of imprisonment of seven to ten years, a term of supervised release of 3 years, an order of forfeiture in the amount of $7,829,671, and a fine within the Guidelines range would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAVID X. SULLIVAN
UNITED STATES ATTORNEY

*/s/ Clayton Solomon*

Michael S. McGarry
Assistant United States Attorney
Federal Bar No. CT 25713
157 Church Street
New Haven, CT 06510
(203) 821-3700
Email: Michael.McGarry@usdoj.gov

LORINDA I. LARYEA
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

Allison L. McGuire
Clayton P. Solomon
Trial Attorneys
1400 New York Avenue NW
Washington, DC 20005
(202) 616-5960
Email: clayton.solomon@usdoj.gov

*Counsel for the United States*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 2, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Clayton P. Solomon*
Clayton P. Solomon
Trial Attorney